# EXHIBIT 2

CONFIDENTIAL

TALC SUPPLY AGREEMENT

BETWEEN

WINDSOR MINERALS INC.

AND

JOHNSON & JOHNSON BABY PRODUCTS COMPANY,
A DIVISION OF
JOHNSON & JOHNSON CONSUMER PRODUCTS, INC.

DATED

JANUARY 6, 1989

CONFIDENTIAL

Protected Document--Subject to Protective Order

JNJ 000066674

## TABLE OF CONTENTS

| Section | | | | Page |
|---|---|---|---|---|
| 1. | Seller's Covenants.......................................... | | | 3 |
| 2. | Term of Agreement.......................................... | | | 4 |
| | (a) | Initial Term........................................ | | 4 |
| | (b) | Additional Terms.................................... | | 4 |
| 3. | Exclusivity: Minimum Purchases............................. | | | 5 |
| | (a) | Buyer's Requirements................................ | | 5 |
| | (b) | Shear Disc.......................................... | | 6 |
| | (c) | Minimum Purchases................................... | | 10 |
| | | (i) | Initial Term-First Five Years.......... | 10 |
| | | (ii) | Initial Term-Second Five Years......... | 11 |
| 4. | Price ..................................................... | | | 11 |
| | (a) | Base Price.......................................... | | 11 |
| | (b) | Annual Price Adjustment............................. | | 12 |
| | | (i) | Definitions............................ | 13 |
| | | | (A) Adjusted Price..................... | 13 |
| | | | (B) Base Deflator..................... | 13 |
| | | | (C) New Deflator...................... | 14 |
| | | | (D) Base Market Basket Price.......... | 14 |
| | | | (E) New Market Basket Price........... | 14 |
| | | | (F) Market Basket Price Determination......................... | 14 |
| | | (ii) | Price Adjustment Factors............... | 15 |
| | | | (A) GNP Factor........................ | 15 |
| | | | (B) Market Basket Factor.............. | 15 |
| | | (iii) | Adjustment Formula..................... | 15 |
| | | (iv) | Substitute Deflators................... | 16 |
| | | (v) | Resetting Deflators, Prices............ | 16 |
| | (c) | Additional Price Adjustment......................... | | 17 |
| | (d) | Price Reopeners..................................... | | 17 |
| | (e) | Hardship............................................ | | 18 |
| | | (i) | Buyer's Hardship....................... | 20 |
| | | (ii) | Seller's Hardship...................... | 23 |
| 5. | Orders; Payment............................................ | | | 23 |
| | (a) | Purchase Estimates.................................. | | 23 |
| | (b) | Orders.............................................. | | 24 |
| | (c) | Cooperation; Priority............................... | | 24 |
| | (d) | Title; Risk; Mode of Delivery....................... | | 25 |
| | (e) | Payment............................................. | | 25 |

(i)

Protected Document--subject to Protective Order   JNJ 000066675

| Section | | | | Page |
|---|---|---|---|---|
| 6. | Specifications; Quality | | | 25 |
| | (a) | Source | | 25 |
| | (b) | Quality Standards | | 27 |
| | (c) | Good Manufacturing Procedures and Standard Operating Procedures | | 28 |
| | (d) | Price Adjustments | | 28 |
| | | (i) | Final Product Specifications | 28 |
| | | (ii) | Mining Regulations | 29 |
| | | (iii) | Cost Savings | 30 |
| | | (iv) | Column Flotation | 32 |
| | (e) | Ship-to-Stock Certification Requirements | | 32 |
| | (f) | Inspection, Acceptance | | 33 |
| | | (i) | Non-Microbiological Specifications | 33 |
| | | (ii) | Microbiological Specifications | 34 |
| | | (iii) | Event of Non-Conformance | 35 |
| | (g) | Buyer's Remedies for Non-Conformance | | 36 |
| | (h) | Future Collaboration | | 37 |
| 7. | Secrecy | | | 37 |
| 8. | Termination | | | 38 |
| | (a) | Bankruptcy | | 38 |
| | (b) | Breach | | 39 |
| | (c) | Sale of Assets or Business | | 39 |
| 9. | Force Majeure | | | 41 |
| | (a) | Events of Force Majeure | | 41 |
| | (b) | Buyer's Force Majeure | | 42 |
| | (c) | Seller's Force Majeure | | 43 |
| | (d) | Limitation | | 44 |
| 10. | Seller's Indemnity | | | 44 |
| 11. | Buyer's Indemnity | | | 45 |
| 12. | Promotion | | | 46 |
| 13. | Warranty; Apportionment | | | 47 |
| | (a) | Warranty | | 47 |
| | (b) | Apportionment | | 47 |
| 14. | Product Development | | | 49 |
| 15. | Miscellaneous | | | 51 |
| | (a) | Parties in Interest; Assignment | | 51 |
| | (b) | Notices | | 51 |
| | (c) | Entire Agreement | | 52 |
| | (d) | Modification | | 53 |
| | (e) | Waiver | | 53 |
| | (f) | Governing Law | | 53 |

(ii)

Protected Document--subject to Protective Order

JNJ 000066676

(g)   Severability................................................  53
(h)   Headings...................................................  54
(i)   Mutual Negotiation.........................................  54
(j)   Obligations of Buyer.......................................  54

**EXHIBITS**

**Exhibit A**   Good Manufacturing Procedures; Standard Operating
              Procedures
**Exhibit B**   Arbitration
**Exhibit C**   Sample Hardship Calculation
**Exhibit D**   Argonaut and Hammondsville Ore Bodies
**Exhibit E**   Quality Standards
**Exhibit F**   Ship-to-Stock Certification Requirements

Protected Document--Subject to Protective Order

JNJ 000066677

## TALC SUPPLY AGREEMENT

THIS TALC SUPPLY AGREEMENT, is made and entered into this sixth day of January, 1989 (the "Agreement"), between WINDSOR MINERALS INC., a Vermont corporation ("Seller"), and JOHNSON & JOHNSON BABY PRODUCTS COMPANY, a division of JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., a New Jersey corporation ("Buyer").

## W I T N E S S E T H

WHEREAS, Johnson & Johnson, a New Jersey corporation (the parent of Buyer), has agreed to sell, and Cyprus Mines Corporation, a Delaware corporation, (the parent of Seller, referred to herein as "Cyprus") has agreed to purchase, all the capital stock of Seller, pursuant to an Agreement dated January 6, 1989 (the "Windsor Agreement");

WHEREAS, Seller, to date, has sold to Buyer and its corporate affiliates, all of Buyer's United States cosmetic talc requirements;

WHEREAS, Buyer sells cosmetic grade talc products in the consumer market which are manufactured from the talc Buyer purchases from Seller;



-2-

TX+29178

Protected Document--Subject to Protective Order

JNJ 000066678

WHEREAS, Buyer desires to maintain the quality of the cosmetic talc products it produces, and therefore desires to continue to receive high quality talc from ore sources which it has qualified, or from new sources which are owned or controlled by Seller or its affiliates and approved by Buyer, which high quality talc is used by Buyer for cosmetic applications, as the term "cosmetic" is defined in the Food, Drug and Cosmetic Act, 21 U.S.C.A. § 321 (1972) (the "Talc").

WHEREAS, Seller desires to continue to sell and deliver, and Buyer desires to continue to purchase, pay for and receive Buyer's domestic requirements for Talc on the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Seller's Covenants.  Seller covenants to Buyer that, during the term of this Agreement, Seller shall:  (a) keep proper books of record and account relating to Buyer's purchases of Talc from Seller in which true entries shall be made of its transactions in accordance with generally accepted accounting principles and the provisions of this Agreement; and (b) maintain its mining properties and processing facilities in good repair, working

— 3 —

73A06806

Protected Document--subject to Protective Order

JNJ 000066679

order and condition to the extent necessary to perform Seller's obligations hereunder.

2. Term of Agreement.

(a) Initial Term. The initial term of this Agreement (the "Initial Term") shall commence on the later of the date first above written or the Closing Date specified in the Windsor Agreement (the "Commencement Date"), and, unless sooner terminated pursuant to the terms of Agreement, shall expire at the close of business on December 31, 1998. For the purposes of this Agreement, the term "Calendar Year" shall mean the twelve (12) month period commencing on any January 1 and ending on the subsequent December 31.

(b) Additional Terms. Prior to March 31, 1998, or such later date as the parties may agree, Buyer and Seller shall conclude good faith negotiations concerning amendments or modifications to this Agreement, if any, which shall apply to an additional term of five (5) years from and after January 1, 1999 (the "Additional Term"). In the event that the parties shall agree to enter into an Additional Term, the term of this Agreement may be extended for such Additional Term on the terms and conditions set forth in this Agreement, as modified by any valid amendment hereto. In the event that Buyer and Seller fail to execute a valid amendment extending this Agreement for the Additional Term on or before March 31, 1998, Buyer shall have the

- 4 -

TSAG8R08

Protected Document--subject to Protective Order

JNJ 000066680

right to solicit bids from, and to negotiate (before July 31, 1998) a talc supply agreement to be effective from and after January 1, 1999, with any third party; provided, however, that prior to entering into a talc supply agreement with such third party, Seller shall have the right, on or before October 1, 1998, to meet the terms and conditions which Buyer has reached with such third party. In the event that Seller's offer is substantially equivalent to or is more favorable than such third party's terms and conditions, Buyer shall enter into a talc supply agreement with Seller commencing January 1. 1999.

## 3. Exclusivity; Minimum Purchases.

(a) _ Buyer's Requirements. Subject to the provisions of Section 3(c) hereof, Buyer shall purchase from Seller, and Buyer shall cause all of its United States Affiliates (as such term is defined in Section 8(c) hereof) to purchase from Seller/ one hundred percent (100%) of the Talc requirements of Buyer and Buyer's Affiliates for products manufactured by Buyer and Buyer's Affiliates in the United States during the first five (5) years of the Initial Term, and not less than ninety-eight percent (98%) of the Talc requirements of Buyer and Buyer's Affiliates for products manufactured by Buyer and Buyer's Affiliates in the United States during the second five (5) years of the Initial Term. (For the purposes of this Agreement, the term "Buyer" shall include Buyer's Affiliates; and the phrase "manufactured by Buyer" shall include, without limitation, the production or

- 5 -

TSACSRO6

manufacture by, for, or on behalf of, or by license or other authority of, Buyer or Buyer's Affiliates.) The assignment of this Agreement to a third party purchaser shall be a precondition to any sale of Buyer's business or assets, or the business or assets of any of Buyer's Affiliates utilizing Talc in the manufacture of consumer products, or the sale of any line of consumer products belonging to Buyer or Buyer's Affiliates. Seller shall not unreasonably withhold its consent to the assignment of this Agreement by Buyer to a third party purchaser.  Provided that Buyer is not in default under the provisions of Section 5(b) hereof, Seller agrees to use its best reasonable commercial efforts to ensure Seller's ability to fill purchase orders submitted by Buyer pursuant to Section 5(b) hereof prior to committing to fill orders for third party purchasers of floated talc products from Seller's West Windsor Mill.  Buyer agrees to make available to Price Waterhouse, on a confidential basis, such documentation as may be necessary in order to permit such third party to verify Buyer's compliance with Buyer's purchase requirements pursuant to this Section 3(a).

(b)   Shear Disc.  The Talc heretofore sold by Seller to Buyer has been manufactured using a process referred to herein as the "Shear Disc Process". That certain piece of equipment used to manufacture the Talc heretofore sold by Seller to Buyer is referred to herein as the "Shear Disc Device".  Title to the Shear Disc Process and the Shear Disc Device remained in Buyer pursuant to the Windsor Agreement, and Buyer hereby agrees to

- 6 -

15AG5508

Protected Document--subject to Protective Order   JNJ 000066682

calendar day preceding the cessation or reduction of deliveries therefrom. On or before the expiration of such one hundred and twenty (120) day period, Seller shall notify Buyer of: (i) its intent to continue supplying Buyer with alternate Talc at the delivered price for Talc delivered from the West Windsor Mill, or (ii) its intent to declare an Event of Force Majeure and indicate Seller's permanent inability to supply Talc. In the event that Seller shall declare an Event of Force Majeure in accordance with this Section 9(c): (A) Seller shall continue to supply alternate Talc to Buyer at the price in effect during the preceding one hundred and twenty (120) day period for an additional sixty (60) days; (B) this Agreement shall then terminate at the close of business on such sixtieth (60th) day; and (C) Seller shall have no further obligation or liability whatsoever pursuant to this Agreement.

(d)    Limitation.   The provisions of this Section 9 shall not be invoked merely to delay or suspend deliveries of Talc to Buyer, or to delay or suspend acceptance of, or payment for, Talc delivered to Buyer, absent, in the good faith estimation of the party invoking such provisions, an Event of Force Majeure.

10. Seller's Indemnity.  Seller shall indemnify, defend and hold harmless Buyer, and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any violation by Seller of any law, ordinance, regulation or rule or the order of any court or

− 14 −

TSAC8808

Protected Document--subject to Protective Order

administrative agency, and from and against all liabilities arising out of any claim by an employee, agent, or contractor of Seller arising in connection with this Agreement; provided, however, that Seller shall not indemnify Buyer for any such liabilities to the extent that such liabilities arise from: (i) the acts or omissions of Buyer; or (ii) the acts or omissions of Seller which were directed by Buyer. The provisions of this Section 10 shall survive the termination or expiration of this Agreement.

11. Buyer's Indemnity. Buyer shall indemnify, defend and hold harmless Seller, and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any violation by Buyer of any law, ordinance, regulation or rule or the order of any court or administrative agency, and from and against all liabilities arising out of any claim by an employee, agent, or contractor of Buyer arising in connection with this Agreement; provided, however, that Buyer shall not indemnify Seller for any such liabilities to the extent that such liabilities arise from: (a) the acts or omissions of Seller; or (b) the acts or omissions of Buyer which were directed by Seller. In addition, Buyer shall indemnify, defend and hold harmless Seller, and its affiliates, and each of their respective directors, officers, employees and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against Seller or any of Seller's affiliates: (i)

TSAG5808

Protected Document--subject to Protective Order

JMJ 000066721

arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by Seller prior to the date first above written; or (ii) for which Buyer is directly or indirectly responsible as a result of Buyer's possession, use or processing of Talc delivered to Buyer pursuant to this Agreement, or as a result of Buyer's manufacture, shipment and sale of Talc-containing product (including without limitation, baby powder and adult powder) derived from Talc delivered to Buyer pursuant to this Agreement; provided, however, that Buyer shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to Buyer hereunder did not conform to the specifications for such Talc then in effect, and such variance from such specifications was a material contributing factor in the claim, suit, demand or cause of action being asserted. For the purposes of this Section 11, the term "Buyer" shall include Buyer and Buyer's Parent and Affiliates as such terms are defined in Section 8(c). The provisions of this Section 11 shall survive the termination or expiration of this Agreement.

12. **Promotion.** Each party hereby warrants that it will not use any trademark, trade name or representation of the products or services of the other party or its affiliates, or refer directly or indirectly to the other party, its affiliates, or the products or services of the other party or its affiliates, without in any case obtaining the prior written permission of the other party.

- 46 -

TSAG8808

JNJ 000066722

contemporaneous agreements and understandings, representations and warranties, whether oral or written, relating to the subject matter hereof.

(d) Modification. This Agreement cannot be changed and no performance, term or condition may be waived in whole or in part except by a writing executed by a duly authorized officer of Buyer and Seller.

(e) Waiver. Except as specifically set forth herein, failure or delay by either party hereto to require performance of any provision of this Agreement shall not affect its right to require full performance thereof at any time thereafter, and the waiver of a breach of any provision shall not constitute a waiver of any breach of any other provision or of the same provision at any time thereafter.

(f) Governing Law. The terms and conditions of this Agreement shall be interpreted in accordance with and construed pursuant to the Uniform Commercial Code as from time to time in effect in the State of Vermont.

(g) Severability. The unenforceability or invalidity of any Section or provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

TSA08808

Protected Document--subject to Protective Order

JMJ 000006729

(h)   **Headings.**   All headings of this Agreement have been inserted for convenience of reference only, and are not to be considered a part of this Agreement, and shall in no way affect the interpretation of any of the provisions of this Agreement.

(i)   **Mutual Negotiation.**   This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties.   Accordingly, no provision hereof shall be construed against one party or in favor of another party merely, by reason of draftsmanship.

(j)   **Obligations of Buyer.**   With respect to any covenant, obligation or agreement to be performed hereunder by Buyer, Buyer shall perform, or cause an affiliate of Buyer to perform, the same.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

WINDSOR MINERALS INC.,
a Vermont corporation

By: _____

Title: Executive Vice President

JOHNSON & JOHNSON BABY PRODUCTS COMPANY, a division of JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., a New Jersey corporation

By: _____

Title: President

75468808

- 54 -

Protected Document--subject to Protective Order

JMJ 000066730