# EXHIBIT 3

CONFIDENTIAL
08/09/01

## SUPPLY AGREEMENT

This Agreement (the "Agreement") is made as of the 15th day of April 2001, by and between Johnson & Johnson Consumer Companies, Inc. ("Buyer"), and Luzenac America, Inc. ("Seller").

**WHEREAS**, Seller is in the business of making the product described in Annex A to the Agreement (the "Products") and Buyer would like to purchase Products from Seller pursuant to the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1. **Purchase and Sale of Products.**

    (a) During the term of this Agreement, Seller shall supply Buyer with those quantities of Products as ordered by Buyer pursuant to this Agreement and Buyer shall purchase from Seller 100% of Buyer's requirements for Products containing cosmetic grade talc to be manufactured in Royston, Georgia. Nothing set forth in this Agreement shall obligate Buyer to purchase any specific minimum quantity of Products from Seller.

    (b) The Products shall conform to, and shall be manufactured in accordance with, the specifications as set forth in Annex A attached to this Agreement, and as the same may subsequently be mutually agreed to in writing by the parties hereto or prescribed by any local, state or federal regulatory agency (collectively, the "Product Specifications"). From time to time during the term of this Agreement, either party may submit written proposals for the adoption or development of improvements relating to the Products. If the parties mutually determine to pursue such improvements they shall mutually agree upon modifications to the Product Specifications to reflect such improvements as well as revisions to the price to be charged for the Products.

    (c) The initial price for Products ordered by Buyer during the first twelve months of this Agreement shall be as set forth in Annex B attached to this Agreement. On April 15, 2002 and April 15, 2003, the price for Products prevailing during the Contract Year (as such term is defined in Section 22 (b) below) just ended shall be increased or decreased for the Contract Year commencing on such dates in accordance with the proportionate increase or decrease in the Producer Price Index for Nonmetallic Mineral Products, Minerals and earths ground or treated, Series ID PCU3295#1 (the "Index"), published by the United States Department of Labor, Bureau of Labor Statistics (the "BLS"). In the event that this series

CONFIDENTIAL
08/09/01

is no longer published or is otherwise unavailable, then Series ID PCU3295# shall be used. The proportionate increase or decrease in the Index shall be determined by comparing the average of the final or preliminary Index data for the most recent January, February and March obtained from the BLS website during the second week of April to the average of the final Index data for January, February and March of the year prior to the Contract Year just ended. Index data used for the purposes of this Section 1(c) shall not be seasonally adjusted. For greater certainty, but by way of illustration only, a sample calculation for adjustment of the purchase price is set forth in Annex B attached to this agreement.

(d) The prices charged by Seller to Buyer as set forth in Annex B, or as may subsequently be determined, shall include all costs for F.O.B. Ludlow, Vermont (the "Shipping Point"). The risk of loss with respect to Products shall pass to Buyer upon notification to Seller by Buyer of acceptable microbiological testing results from Product samples obtained during railcar loading, and Seller's release of said railcar to the rail carrier.

(e) In addition to any price increases or decreases determined pursuant to this Agreement, Seller shall actively investigate and present to Buyer, cost savings opportunities having the potential to reduce either prices charged by Seller to Buyer or Buyer's processing costs by 4% per year. Nothing set forth herein shall obligate either party to implement any cost savings opportunity presented to Buyer.

2.  **Forecasts; Orders.**

(a) Buyer shall provide Seller electronic access to a non-binding forecast of Buyer's expected requirements for Products during the following quarter. Buyer shall place binding orders for Products by written or electronic purchase order (or by any means agreed to by the parties) to Seller, which shall be placed at least 18 calendar days prior to the desired date of shipment.

(b) To the extent of any conflict or inconsistency between this Agreement and any purchase order, purchase order release, confirmation, acceptance of any similar document, the terms of this Agreement shall govern.

3.  **Shipment; Inventory; Invoices; Payment.**

(a) All charges for packing, hauling, storage, bar coding, transportation to and loading at the Shipping Point are included in the purchase price unless otherwise agreed to by the parties. All shipments must

CONFIDENTIAL
08/09/01

      be accompanied by a packing slip which describes the Products, states the item number, purchase order number and shows the shipment's destination.

(b)   Seller shall invoice Buyer within 48 hours following shipment of Products to Buyer. Buyer shall pay Seller the purchase price set forth on such invoices not later than thirty (30) calendar days following the date of Seller's invoice.

(c)   Seller will maintain inventory of Products on a first-in, first-out basis. At all times during the term of this Agreement, Seller shall maintain an adequate number of dedicated silos to ensure timely shipment of all Products ordered by Buyer hereunder. Seller and Buyer agree to cooperate to improve the process for ordering Products with the mutual objectives of expediting the supply process to a Lean Supply process and reducing inventory costs.

(d)   In the event that Seller shall be unable or unwilling or shall fail to supply such Products in such quantities as Buyer shall request and in compliance with the shipping periods set forth herein or as otherwise requested by Buyer (other than as a result of a force majeure event as described in Section 9), then Buyer shall be permitted (with no obligation or liability to Seller) to obtain Products from another source and such inability, unwillingness or failure to supply Products shall be deemed a material breach of this Agreement, *provided, however,* that Seller shall have no liability to Buyer in the event that Buyer shall fail to make sufficient railcars available to Seller for loading of any order or any portion thereof.

### 4. Product Acceptance; Corrective Actions; Assistance.

(a)   Shipment of Products by Seller to Buyer shall constitute a certification by Seller that Products have been tested, and been found to conform fully to the Product Specifications and are free from defects. In the event that Buyer conducts testing on the Products for non-microbiological parameters, Buyer shall forward the results of such tests to Seller as soon as possible. In the event of dispute between the parties concerning conformance to any of Buyer's non-microbiological specifications as described in Annex A, Buyer shall give written notice of such dispute to Seller as soon as possible. Immediately after such notice, each party shall submit a sample of the Product to a mutually satisfactory third party laboratory. Seller shall also submit to the laboratory a third untested, sealed portion of Product sample. Such laboratory shall determine, in its judgment, whether the shipment conforms with the Product Specifications as evidenced by the Product sample. The decision of the third party laboratory shall be final, and all costs and

CONFIDENTIAL
08/09/01

        expenses pertaining to such testing by the third party laboratory shall be shared equally.

(b) Buyer shall be responsible for conducting any microbiological testing with respect to the Product. Such testing shall be conducted in such manner as Buyer shall determine. Buyer acknowledges that Seller shall not be conducting any microbiological testing. Within 90 calendar days of execution of this Agreement and biannually during the term of this Agreement, a review of Product Specifications shall be completed jointly by Buyer and Seller to ensure conformity.

(c) In the event of any non-conformance, Seller within a reasonable period of time shall: (i) arrange for return to Seller or an Affiliate of Seller, at Seller's sole cost and expense, such Products as are finally determined to be out of conformance with the Product Specifications; (ii) replace such Products as are finally determined to be out of conformance with the Product Specifications; and (iii) compensate Buyer for the freight costs, including cleaning and sanitization as required of any carload rejected for nonconformance in accordance with this Section 4.

(d) Any shipment of Products for which Buyer shall not submit a Claim within sixty (60) calendar days of receipt shall be deemed accepted. Upon acceptance, Buyer shall release Seller from all Claims for non-conformity or defects except Claims for latent defects which are not reasonably detectable at the time of acceptance.

(e) In the event any governmental agency having jurisdiction shall request or order, or if Buyer shall determine to undertake, any corrective action with respect to Products supplied hereunder, including any Product recall, customer notice, restriction, change, corrective action or market action or any Product change, and the cause or basis of such corrective action is attributable to a breach by Seller of any of its warranties, guarantees, representations, obligations or covenants contained herein, then Seller shall be liable, and shall reimburse Buyer for the reasonable costs of such action including the cost of any Product affected thereby whether or not such particular Product shall be established to be in breach of any warranty by Seller hereunder *provided, however,* that Seller's obligation to indemnify Buyer hereunder shall not exceed Twenty Million Dollars ($20,000,000) in the absence of Seller's gross negligence or willful misconduct, and Forty Million Dollars ($40,000,000) in the event of Seller's gross negligence or willful misconduct.

CONFIDENTIAL
08/09/01

(f) Seller will provide Buyer with all such technical assistance and training as may be required by Buyer to maintain satisfactory Product performance.

5. **Inspection.**

Buyer shall have the right, upon reasonable notice to Seller and during regular business hours, to inspect and audit the facilities being used by Seller for production of the Products to assure compliance by Seller with applicable rules and regulations and with other provisions of this Agreement and to determine Seller's raw materials and manufacturing costs in connection with the Products to the extent these costs are passed on to Buyer. Seller shall within seven calendar days remedy any deficiencies which may be noted in any such audit, and the failure by Seller to remedy any such deficiencies within such seven day period shall be deemed to be a material breach of this Agreement; provided, however, that if such deficiency is not capable of being remedied within such seven (7) day period, then so long as Seller is pursuing in diligent fashion a commercially acceptable remedy to such deficiency it shall not be deemed to be a material breach. Seller acknowledges that the provisions of this Article granting Buyer certain audit rights shall in no way relieve Seller of its obligations under this Agreement, nor shall such provisions require Buyer to conduct any such audits.

6. **Warranty.**

(a) Seller represents and warrants to Buyer that all Products sold by Seller shall (i) conform to the quality standards set forth in Annex A and (ii) be in compliance with all applicable federal, state or municipal statutes, laws, rules or regulations, including those relating to the environment, food or drugs and occupational health and safety. Without limiting the foregoing, Seller represents and warrants that it shall comply with all present and future statutes, laws, ordinances and regulations relating to the manufacture, assembly and supply of the Products being provided hereunder, including without limitation, those enforced by the United States Food and Drug Administration (including compliance with good manufacturing practices) and International Standards Organization Rules 9,00 et. seq. Seller further represents and warrants to Buyer that the performance of its obligations under this Agreement will not result in a violation or breach of, and will not conflict with or constitute a default under its Certificate of Incorporation or corporate bylaws or any agreement, contract, commitment or obligation to which Seller or any of its Affiliates is a party or by which it is bound. **EXCEPT FOR THE WARRANTIES CONTAINED IN THIS AGREEMENT, SELLER MAKES NO OTHER**

JNJ 000066280

CONFIDENTIAL
08/09/01

**WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, WHETHER OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR OTHERWISE.**

(b) Seller has read and understands the Johnson & Johnson Policy on the Employment of Young Persons (the "Policy"). In the manufacture of the Products, Seller shall employ young persons only as permitted by the Policy. Seller shall permit representatives of Buyer to enter Seller's premises at any reasonable time to inspect relevant employment, health and safety records and to observe the manufacturing process. Seller shall maintain the records necessary to demonstrate compliance with the Policy and shall provide to Seller a written certification of such compliance annually during the term of this agreement. If Seller shall fail to comply with this provision, then Buyer shall have the right to terminate this agreement forthwith and without penalty.

7. **Indemnification.**

(a) Buyer and Seller agree that liability for damages alleged to have been suffered by Buyer and Seller arising out of an alleged breach of Section 6(a) or otherwise under this Agreement shall be handled as follows:

   (i) Seller shall indemnify Buyer for any cost, loss, damage or expense suffered by Buyer which arises from: (A) the Product not meeting the specifications therefor as described in Annex A at the time title for such Product passed to Buyer, except for the microbiological specifications set forth therein; or (B) Seller failing to sample and test Products in accordance with the sampling and testing methods described in Annex A in the manner practiced by Seller on the date of this Agreement or as modified by the mutual agreement of the parties pursuant to Section 1 (b) above; *provided, however,* that Seller's obligation to indemnify Buyer shall not exceed Twenty Million Dollars ($20,000,000) in the absence of Seller's gross negligence or willful misconduct, and Forty Million Dollars ($40,000,000) in the event of Seller's gross negligence or willful misconduct.

   (ii) Seller shall be solely liable in the event that the Product failed to conform to the microbiological quality standards as set forth in Annex A before title to such Products passed from Seller to Buyer; *provided, however,* that Seller's liability pursuant to this Section 7 (a) (ii) shall be limited to replacement of Products and reimbursement of certain of

JNJ 000066281

CONFIDENTIAL
08/09/01

        Buyer's freight costs, including railcar cleaning and sanitization, in accordance with Sections 4 (c) above.

(iii) Buyer shall be solely liable for, and shall indemnify Seller for any cost, loss, damage or expense suffered by Seller arising out of the failure of the Products to conform to the microbiological quality standards established therefor, as the same may be amended from time to time.

(iv) Excluding those matters set out in the preceding clauses (i), (ii) and (iii), Seller shall indemnify, defend and hold harmless Buyer and its Affiliates, and each of their respective officers, directors, agents and employees from and against all liabilities arising out of any violation by Seller of any law, ordinance, regulation or rule or the order of any court or administrative agency, and from and against all liabilities arising out of any claim by an employee, agent, or contractor of Seller arising in connection with this Agreement, *provided however,* that Seller shall not indemnify Buyer for any such liabilities to the extent that such liabilities arise from: (i) the acts or omissions of Buyer; or (ii) the acts or omissions of Seller which were directed by Buyer.

(b) The provisions of this Section 7 shall survive any termination or expiration of this Agreement.

8. **Term; Termination.**

(a) The term of this Agreement shall be for a period of 3 years beginning on April 15, 2001, unless sooner terminated pursuant to this Agreement.

(b) Either party may terminate this Agreement for any reason by giving notice to the other party of its intent to terminate at least 365 calendar days prior to the date on which it seeks to terminate this Agreement.

(c) This Agreement may be terminated, prior to the expiration of its term, upon fifteen (15) calendar days written notice by either party: (i) in the event that the other party hereto shall (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (B) make a general assignment for the benefit of its creditors, (C) commence a voluntary case under the United States Bankruptcy Code, as now or hereafter in effect (the "Bankruptcy Code"), (D) file a petition seeking to take advantage of any law (the "Bankruptcy Laws") relating to

CONFIDENTIAL
08/09/01

bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts, (E) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code, or (F) take any corporate action for the purpose of effecting any of the foregoing; or (ii) if a proceeding or case shall be commenced against the other party hereto in any court of competent jurisdiction, seeking (A) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts, (B) the appointment of a trustee, receiver, custodian, liquidator or the like of the party or of all or any substantial part of its assets, or (C) similar relief under any Bankruptcy Laws, or an order, judgment or decree approving any of the foregoing shall be entered and continue unstayed for a period of 60 calendar days; or an order for relief against the other party hereto shall be entered in an involuntary case under the Bankruptcy Code.

(d) This Agreement may be terminated, prior to the expiration of its term, by either party by giving written notice of its intent to terminate and stating the grounds therefor if the other party shall materially breach or materially fail in the observance or performance of any representations, warranty, guarantee, covenant or obligation under this Agreement, and such breach or failure is not the result of an Event of Force Majeure (as such term is defined in Section 9 below). The party receiving the notice shall have thirty (30) calendar days from the date of receipt thereof to cure the breach or failure; or, in the event that such breach or failure is not reasonably susceptible to cure within such time, to commence and diligently pursue good faith efforts to cure such breach within such time as may be reasonable in the circumstance. In the event such breach or failure is cured, the notice shall be of no effect.

(e) Notwithstanding the termination of this Agreement for any reason, each party hereto shall be entitled to recover any and all damages which such party shall have sustained by reason of the breach by the other party hereto of any of the terms of this Agreement. Termination of this Agreement for any reason shall not release either party hereto from any liability which at such time has already accrued or which thereafter accrues from a breach or default prior to such expiration or termination, nor affect in any way the survival of any other right, duty or obligation of either party hereto which is expressly stated elsewhere in this Agreement to survive such termination. In the case of a termination under Section 8 (d) above, the non-defaulting party may pursue any remedy available in law or in equity with respect to such breach, subject to Section 15 hereof.

9. **Force Majeure.**

(a) If either party is prevented from performing any of its obligations hereunder due to any cause which is beyond the non-performing party's reasonable control, including fire, explosion, flood, or other acts of God; acts, regulations, or laws of any government; war or civil commotion; strike, lock-out or labor disturbances; or failure of public utilities or common carriers (a "Force Majeure Event"), such non-performing party shall not be liable for breach of this Agreement with respect to such non-performance to the extent any such non-performance is due to a Force Majeure Event. Such non-performance will be excused for three months or as long as such event shall be continuing (whichever occurs sooner), provided that the non-performing party give immediate written notice to the other party of the Force Majeure Event. Such non-performing party shall exercise all reasonable efforts to eliminate the Force Majeure Event and to resume performance of its affected obligations as soon as practicable.

(b) Notwithstanding the provisions of Section 9 (a) above, in the event that due to the occurrence of an Event of Force Majeure, Seller shall be unable to supply Products in such quantities as Buyer shall request and in compliance with the delivery periods set forth in this Agreement, Buyer shall be permitted (with no obligation to Seller) to obtain Products from another source, and Buyer shall thereafter have no obligation to purchase Products from Seller until any contractual obligations that Buyer has assumed in connection with obtaining a substitute supply of Products shall have terminated. Buyer shall have no obligation to affirmatively terminate any such contractual arrangements.

(c) In the event that such an alternative supplier is established, Seller shall use its best efforts to give Buyer access to any proprietary technical materials, information and techniques necessary or helpful for Buyer to arrange an alternative supplier of Product, and to provide advice and consultation in connection therewith. The provision of any proprietary information by Seller shall be subject to the recipient entering into reasonable confidentiality obligations with Seller as well as a commitment by the recipient that such proprietary information shall only be used for purposes of providing substitute Product to Buyer.

**10. Confidentiality.**

As used herein, "Confidential Information" shall include all information given to, or otherwise acquired by a party hereto, relating to the other party's business or affairs, including without limitation: (i) information regarding any of the products of a party or the design or manufacture of

CONFIDENTIAL
08/09/01

such products or the packaging thereof; (ii) information regarding advertising, distribution, marketing or strategic plans; (iii) information regarding costs, productivity or technological advances; (iv) any designs, specifications, blueprints or patterns ;or (v) the terms and conditions of this Agreement; or (vi) any other information received by a party in connection with its performance of the obligations contemplated under this Agreement. Neither party shall use or disclose, but shall insure that its employees, officers and agents shall not use or disclose (except, in either case, to comply with a party's obligations under this Agreement or the rules of any stock exchange), any Confidential Information to third parties. Upon the termination or expiration of this Agreement each party shall return to the other party all Confidential Information in written form. This Section 10 shall survive the termination or expiration of this Agreement for a period of five (5) years. Confidential Information shall not include information that (vii) was already known to the other party at the time of its receipt thereof, as evidenced by competent evidence, (viii) is disclosed after its receipt thereof by a third party who has a right to make such disclosure without violating any obligation of confidentiality, (ix) is independently developed by a party or (x) is or becomes part of the public domain through no fault of any party hereto. For purposes of this Section 10, a reference to a "party" or to Buyer or Seller shall include Affiliates of the referenced party.

11. **Compliance with Certain Laws.**

Seller agrees to comply with the applicable provisions of any federal (United States or otherwise) or state law and all executive orders, rules and regulations issued thereunder, whether now or hereafter in force, including Executive Order 11246, as amended; Chapter 60 of Title 41 of the Code of Federal Regulations, as amended, prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex or national origin; Section 60-741.1 of Chapter 60 of Title 41 of the Code of Federal Regulations, as amended, prohibiting discrimination against any employee or applicant for employment because of physical or mental handicap; Section 60.250.4 of Chapter 60 of Title 41 of the Code of Federal Regulations, as amended, providing for the employment of disabled veterans and veterans of the Vietnam era; Chapter 1 of Title 48 of the Code of Federal Regulations, as amended, pertaining to the Federal Acquisition Regulations; Sections 6, 7 and 12 of the Fair Labor Standards Act, as amended, and the regulations and orders of the United States Department of Labor promulgated in connection therewith; and any provisions, representations or agreements required thereby to be included in this Agreement are hereby incorporated by reference. If any Products are ordered by Buyer under U.S. government contracts, Seller agrees that all applicable federal statutes and regulations

CONFIDENTIAL
08/09/01

applying to Buyer as contractors are accepted and binding upon Seller insofar as Seller may be deemed a subcontractor.

12. **Insurance.**

Seller agrees to procure and maintain in full force and effect during the term of this Agreement valid and collectible insurance policies in connection with its activities as contemplated hereby which policies shall provide for the type of insurance and amount of coverage described in Annex C. Upon Buyer's request, Seller shall provide to Buyer a certificate of coverage or other written evidence reasonably satisfactory to Buyer of such insurance coverage.

13. **Relationship of the Parties.**

The relationship of Buyer and Seller established by this Agreement is that of independent contractors, and nothing contained herein shall be construed to: (i) give either party any right or authority to create or assume any obligation of any kind on behalf of the other or; (ii) constitute the parties as partners, joint ventures, co-owners or otherwise as participants in a joint or common undertaking.

14. **Publicity.**

Neither party shall originate any publicity, news release, or other announcement, written or oral, whether to the public, the press, the trade, Buyer's or Seller's customers or otherwise, relating to this Agreement, or to performance hereunder, or to the existence of an arrangement between the parties, without the prior written approval of the other party. Neither party shall use the name of the other party for advertising or promotional purposes without the prior written consent of such party.

15. **Construction.**

This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of New Jersey. Any controversy or claim arising out of or relating to this Agreement, or the parties' decision to enter into this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitration shall be held in New Jersey and arbitrators shall apply the substantive law of New Jersey except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act. The arbitrators shall not award any of the parties punitive damages and the parties shall be deemed to have waived any right to

CONFIDENTIAL
08/09/01

such damages. This Section 15 shall survive any termination of this Agreement.

## 16. Entire Agreement.

It is the mutual desire and intent of the parties to provide certainty as to their respective future rights and remedies against each other by defining the extent of their mutual undertakings as provided herein. The parties have, in this Agreement, incorporated all representations, warranties, covenants, commitments and understandings on which they have relied in entering into this Agreement, and, except as provided for herein, neither party makes any covenant or other commitment to the other concerning its future action. Accordingly, this Agreement and the Annexes attached hereto, which are by this reference incorporated herein: (i) constitute the entire agreement and understanding between the parties with respect to the subject matter hereof and there are no promises, representations, conditions, provision or terms related thereto other than those set forth in this Agreement, and (ii) supersede all previous understandings, agreements and representations between the parties, whether written or oral. No modification, change or amendment to this Agreement shall be effective unless in writing signed by each of the parties hereto. Notwithstanding the foregoing and for clarification purposes, to the extent that any of the provisions of the previous supply agreement between Buyer and Seller for the Product survive the expiration and/or termination of such earlier supply agreement, then those surviving terms or provisions shall continue in effect as provided for in such earlier supply agreement.

## 17. Headings.

The headings used herein have been inserted for convenience only and shall not affect the interpretation of this Agreement.

## 18. Notices.

All notices and other communications hereunder shall be in writing, and shall be: (i) delivered personally; (ii) mailed by certified or registered U.S. mail, return receipt requested, postage prepaid; or (iii) sent by Federal Express or another nationally recognized courier service (billed to sender), to the parties at the following addresses:

If to Seller:   President
                Luzenac America, Inc.
                9000 East Nichols Avenue
                Englewood, Colorado 80112

CONFIDENTIAL
08/09/01

If to Buyer:  Purchasing Manager
Johnson & Johnson
Consumer Products Companies
Shared Services Purchasing
P. O. Box 587
545 Old Elbert Road
Royston, Georgia  30662

or to such other place as either party may designate by written notice to the other. Such notices shall be deemed given (i) upon personal delivery; (ii) three business days after such deposit in the U.S. mail; or (iii) upon delivery by such courier service.

### 19. Failure to Exercise.

The failure of either party to enforce at any time for any period any provision hereof shall not be construed to be a waiver of such provision or of the right of such party thereafter to enforce each such provision, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy. Remedies provided herein are cumulative and not exclusive of any remedies provided at law.

### 20. Assignment.

This Agreement may not be assigned by either party without the prior written consent of the other, except that Buyer and Seller may assign their rights and/or obligations hereunder to any of their respective Affiliates, and except that Buyer may assign its rights and/or obligations hereunder to any successor to all or substantially all of Buyer's assets which relate to the Product. Subject to the foregoing sentence, this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

### 21. Severability.

Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, to the extent the economic benefits conferred by this Agreement to both parties remain substantially unimpaired, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

### 22. Definitions.

CONFIDENTIAL
08/09/01

(a) For purposes of this agreement, an "Affiliate" of a party to this Agreement shall mean any corporation or partnership or other entity which directly or indirectly controls, is controlled by or is under common control with such party. "Control" shall mean the legal power to direct or cause the direction of the general management or partners of such entity whether through the ownership of voting securities, by contract or otherwise. "Affiliate" shall also include any party manufacturing talc-containing body powders for, on behalf of, or under license or other authority of Buyer or Buyer's Affiliates.

(b) "Contract Year" shall mean the twelve-month period commencing on April 15th of any year during the term of this Agreement and concluding on April 14th of the next succeeding year.

23. **Equipment.**

(a) Buyer has made and may make available certain equipment, such as railcars (the "Equipment") for Seller to use in manufacturing the Products or otherwise preparing the Products for delivery. Seller shall have no ownership or leasehold interest of any nature in the Equipment and all right, title and interest in the Equipment shall remain with the Buyer. From time to time at the request of the Buyer and in connection with the Equipment, Seller will execute one or more financing statements, information statements and/or continuation statements pursuant to the Uniform Commercial Code in such form or forms as Buyer may request for filing in such public offices as Buyer shall determine.

(b) Buyer shall have the right to enter Seller's facilities in order to (i) inspect the Equipment, (ii) inspect and copy all records relating to the repair, maintenance and servicing by Seller of the Equipment and (iii) affix tags, stickers or other items to the Equipment indicating Buyer's status as owner thereof. Buyer shall be given access to such facilities, on reasonable notice, during normal business hours and at any other time when work is performed pursuant to this Agreement.

(c) During the term of this Agreement, Seller shall (i) be responsible for any damage to the Equipment, (ii) keep the attachments, security interests or other claims that could affect title to the Equipment of Buyer's interest therein, (iii) not modify or alter the Equipment in any way, (iv) not remove, conceal or deface any tags, sticker or other items affixed to the Equipment that indicate Buyer's status as owner thereof, (v) operate the Equipment in accordance with good business practice and in compliance with all written and verbal instructions provided to Seller and (vi) not use the Equipment for

**CONFIDENTIAL**
08/09/01

      any purpose except to provide Products to Buyer pursuant to this Agreement.

(d)    During the term of this agreement Buyer shall service, repair and maintain (collectively, "Service") the Equipment as may be necessary to keep the Equipment in good working order.

(e)    Seller shall be responsible for training its employees to operate properly the Equipment and shall supervise all operations thereof. Seller shall be responsible for all personal damages or injuries and for any damage to property or Equipment resulting from (i) Seller's operation of the Equipment, (ii) Seller's failure to arrange with Buyer for required Service of the Equipment or (iii) Seller's use of the Equipment for any purpose other than as specifically contemplated in this Agreement.

(f)    In the event that this Agreement is terminated for any reason, Buyer shall have the right to enter, upon reasonable notice and during regular business hours, and shall be given access to, Seller's facilities so that Buyer may retrieve the Equipment and all records maintained in connection with the Equipment. Seller agrees to cooperate with Buyer to ensure the timely and safe return of the Equipment to Buyer after termination of this Agreement. Seller's obligations under this Section shall survive the termination of this Agreement until the Equipment is returned to Buyer.

(g)    Seller shall maintain insurance coverage in connection with its operation of the Equipment as described in Annex C.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized respective representatives as of the day and year first above written.

**LUZENAC AMERICA, INC.**

By: _/s/ illegible_
Name: DANIEL D HARRIS
Title: PRESIDENT

**JOHNSON & JOHNSON CONSUMER COMPANIES, INC.**

By: _/s/ illegible_
Name: Robert E. Kirby
Title: Vice President

**CONFIDENTIAL**
**08/09/01**

## ANNEX C

## INSURANCE COVERAGE

Seller will obtain and maintain the following insurance coverage:

- Commercial general liability coverage in the amount of US$5 million

- Product liability insurance in the amount of US$5 million per occurrence, US$10 million aggregate

Such policies shall name Buyer as an additional insured and shall provide for 30 calendar days written notice of cancellation. Seller shall annually provide Buyer with a certificate of insurance evidencing required coverage.