# EXHIBIT 7

AGREEMENT

BETWEEN

CYPRUS MINES CORPORATION

AND

JOHNSON & JOHNSON

DATED

JANUARY 6, 1989

AG8805B07

TABLE OF CONTENTS

| Section | | | Page |
|---|---|---|---|
| 1. | Sale of Stock | | 2 |
| 2. | Purchase Price and Payment | | 2 |
| | 2.1 | Base Purchase Price | 2 |
| | 2.2 | Adjustment of Base Purchase Price | 3 |
| 3. | Representations and Warranties of J & J, Windsor and Western | | 5 |
| | 3.1 | Organization and Existence | 5 |
| | 3.2 | Articles and Bylaws | 6 |
| | 3.3 | Minute Books and Stock Certificate Books and Records | 6 |
| | 3.4 | Capitalization | 7 |
| | 3.5 | Authority and No Violations | 8 |
| | 3.6 | Interest in Other Entities | 9 |
| | 3.7 | Financial Statements of Windsor and Western | 10 |
| | 3.8 | Undisclosed Liabilities | 11 |
| | 3.9 | Tangible Personal Property | 11 |
| | 3.10 | Real Property | 13 |
| | 3.11 | Transfers of Real and Personal Property | 14 |
| | 3.12 | Environmental Matters | 14 |
| | 3.13 | Permits and Compliance with Other Laws | 15 |
| | 3.14 | Litigation and Proceedings | 16 |
| | 3.15 | Contracts | 17 |
| | 3.16 | Customers | 17 |
| | 3.17 | Taxes | 18 |
| | 3.18 | Insurance and Bonds | 18 |
| | 3.19 | Banking and Personnel Matters | 19 |
| | 3.20 | Events Since Balance Sheet Date | 20 |
| | 3.21 | Brokers | 21 |
| | 3.22 | Disclosures | 22 |
| | 3.23 | Underground Storage Tanks; PCB's | 23 |
| | 3.24 | Pension and Benefit Matters | 23 |
| | 3.25 | Intellectual Property | 29 |
| 4. | Representations and Warranties of Cyprus | | 30 |
| | 4.1 | Organization and Existence | 30 |
| | 4.2 | Authority and No Violations | 30 |
| | 4.3 | Brokers | 31 |
| | 4.4 | Purchase for Investment | 31 |
| | 4.5 | Salaried Pension Plan | 31 |
| 5. | Covenants | | 32 |
| | 5.1 | Assumption of Obligations | 32 |
| | 5.2 | Windsor and Western Obligations | 32 |
| | 5.3 | Due and Uncollected Receivables; Petty Cash | 33 |
| | 5.4 | Change of Ownership | 33 |
| | 5.5 | Corporate Records | 33 |
| | 5.6 | Employee Matters | 33 |

AG8805B07

## TABLE OF CONTENTS (Continued)

| Section | | | Page |
|---|---|---|---|
| 5.7 | Tax Matters Agreement | | 41 |
| 5.8 | Tax Liabilities and Refunds | | 41 |
| 5.9 | Insurance | | 42 |
| 5.10 | Articles and Bylaws | | 43 |
| 5.11 | Financial Statements of Windsor and Western | | 43 |
| 5.12 | Sale of Real Property and Personal Property | | 44 |
| 5.13 | Permits | | 44 |
| 5.14 | Banking and Personnel Matters | | 44 |
| 5.15 | Additional Permits | | 45 |
| 5.16 | Railroad Right-of-Way | | 48 |
| 6. | Access to Records | | 50 |
| 6.1 | Cyprus' Access | | 50 |
| 6.2 | J & J's Access | | 51 |
| 7. | Closing | | 52 |
| 8. | Mutual Conditions Precedent to Closing | | 52 |
| 8.1 | No Injunctions | | 53 |
| 8.2 | Approvals; Consents | | 53 |
| 8.3 | Board Approval | | 53 |
| 8.4 | Due Diligence | | 54 |
| 8.5 | Talc Supply Agreement | | 54 |
| 8.6 | Tax Matters Agreement | | 55 |
| 8.7 | Roger Miller Agreement | | 55 |
| 9. | Conditions to Obligations of Cyprus | | 55 |
| 9.1 | Representations and Warranties True | | 55 |
| 9.2 | No Adverse Change | | 56 |
| 9.3 | No Loss | | 56 |
| 9.4 | Certificates | | 56 |
| 9.5 | Opinion of Counsel | | 56 |
| 9.6 | Resignations | | 57 |
| 9.7 | Stock Certificates | | 57 |
| 9.8 | J & J Certificate of Good Standing | | 58 |
| 9.9 | Windsor Certificate of Good Standing | | 58 |
| 9.10 | Western Certificate of Good Standing | | 58 |
| 9.11 | Release of Escrowed Funds | | 58 |
| 10. | Conditions to Obligations of J & J | | 58 |
| 10.1 | Payment | | 59 |
| 10.2 | Representations and Warranties True | | 59 |
| 10.3 | Certificate | | 59 |
| 10.4 | Opinion of Counsel | | 59 |
| 11. | Survival and Indemnification | | 60 |
| 11.1 | Survival | | 60 |
| 11.2 | Indemnification by J & J | | 61 |

AG8805B07

<u>TABLE OF CONTENTS</u> (Continued)

| <u>Section</u> | | | <u>Page</u> |
|---|---|---|---|
| | 11.3 | Indemnification by Cyprus.......................... | 62 |
| | 11.4 | Indemnification Procedure; Defense................ | 63 |
| | 11.5 | Exclusive Remedy.................................. | 64 |
| 12. | Operation of Business.................................... | | 64 |
| 13. | Miscellaneous........................................... | | 65 |
| | 13.1 | Parties in Interest; Assignment.................. | 65 |
| | 13.2 | Expenses.......................................... | 66 |
| | 13.3 | Confidentiality.................................. | 66 |
| | 13.4 | Notices........................................... | 67 |
| | 13.5 | Further Assurances............................... | 68 |
| | 13.6 | Entire Agreement................................. | 68 |
| | 13.7 | Modification...................................... | 68 |
| | 13.8 | Delay............................................. | 69 |
| | 13.9 | Governing Law..................................... | 69 |
| | 13.10 | Severability..................................... | 69 |
| | 13.11 | No Merger......................................... | 69 |
| | 13.12 | Obligations of Windsor and Western............... | 70 |
| | 13.13 | Headings.......................................... | 70 |
| | 13.14 | Mutual Negotiation............................... | 71 |

**<u>EXHIBITS</u>**

| | |
|---|---|
| Exhibit A | 1987 Balance Sheet |
| Exhibit B | Debt Instruments |
| Exhibit C | Undisclosed Liabilities |
| Exhibit D | Personal Property |
| Exhibit E | Real Property |
| Exhibit F | Transfers of Real Property and Personal Property |
| Exhibit G | Environmental Matters |
| Exhibit H | Permits |
| Exhibit I | Litigation |
| Exhibit J | Contracts |
| Exhibit K | Customers |
| Exhibit L | Insurance and Bonds |
| Exhibit M | Banking and Personnel Matters |
| Exhibit N | Encumbrances |
| Exhibit O | Transfers |
| Exhibit P | Underground Storage Tanks; PCB's |
| Exhibit Q | Employee Matters |
| Exhibit R | Patents, Trademarks, Trade Names and Licenses |
| Exhibit S | License Agreements |
| Exhibit T | Tax Matters Agreement |
| Exhibit U | Letter of Intent |
| Exhibit V | Talc Supply Agreement |
| Exhibit W | Release of Escrow Instructions |
| Exhibit X | Escrow Agreement |
| Exhibit Y | Confidentiality Agreement |

AG8805B07

## AGREEMENT

THIS AGREEMENT is made this sixth day of January, 1989 (the "Agreement") by and between Cyprus Mines Corporation, a Delaware corporation ("Cyprus"), and Johnson & Johnson, a New Jersey corporation ("J & J").

## W I T N E S S E T H:

WHEREAS, J & J is the owner of all of the issued and outstanding shares of the capital stock of Windsor Minerals Inc., a Vermont corporation ("Windsor")(which capital stock shall hereinafter be referred to as the "Windsor Stock");

WHEREAS, Windsor is the owner of all of the issued and outstanding shares of the capital stock of Western Source Inc., a California corporation ("Western")(which capital stock shall hereinafter be referred to as the "Western Stock");

WHEREAS, J & J desires to sell and deliver all of the Windsor Stock to Cyprus, and Cyprus desires to purchase and receive all of said Windsor Stock from J & J, upon the terms and conditions provided herein; and

WHEREAS, J & J and Cyprus desire to enter into a Talc Supply Agreement (as such term is defined in Section 8.5 hereof), wherein Windsor agrees to sell and deliver, and J & J agrees to purchase and receive, talc pursuant to the terms and conditions set forth in the Talc Supply Agreement.

-1-

a manner that would not adversely affect its qualified status. Cyprus has no reason to believe that the Master Trust (the "Cyprus Master Trust") maintained under the Agreement of Master Trust between Cyprus Minerals Company and Boston Safe Deposit and Trust Company dated August 1, 1988 is not exempt from tax pursuant to Section 501(a) of the Code. The Cyprus Master Trust has been determined by the IRS to be exempt from tax.

5.   **Covenants.**

5.1   **Assumption of Obligations.**   On the Settlement Date, Cyprus and J&J shall agree upon the Closing Balance Sheet. All liabilities determined to remain with J & J hereunder shall be the sole responsibility and liability of J & J, and J&J shall promptly pay and discharge all such liabilities as they become due. Except as otherwise set forth in this Agreement, all other liabilities of Windsor and Western shall remain with Windsor and Western from and after the Closing.

5.2   **Windsor and Western Obligations.**   Prior to the Closing Date, J & J shall cause Windsor and Western to perform the obligations of Windsor and Western hereunder, and shall be solely responsible and liable for each representation made, and each warranty granted, by Windsor and Western, as if J & J had made such representation or granted such warranty itself.

-32-

AG8805B07

5.3   **Due and Uncollected Receivables; Petty Cash**. Accounts and notes receivable of Windsor and Western which are more than one hundred and eighty (180) days old as of the Closing Date shall become the responsibility of J&J and shall be removed from the Closing Balance Sheet.   Accounts and notes receivable that are current on the Closing Date, but which become due and uncollected after one hundred and eighty (180) days following the Closing Date, shall be sold to J&J for cash at face value, provided that such amounts exceed Five Thousand Dollars ($5,000) in the aggregate.   Accounts receivable owed from affiliates of J&J to Windsor shall be included in the Closing Balance Sheet. Petty cash accounts existing at the operations of Windsor and Western shall be included in the Closing Balance Sheet.

5.4   **Change of Ownership**.  Within thirty (30) days following the Closing Date, Cyprus shall take all steps reasonably necessary to notify the customers of Windsor and Western of the change in ownership of Windsor and Western.

5.5   **Corporate Records**.   At Closing, J&J shall provide Cyprus with all of the original corporate records of Windsor and Western.

5.6   **Employee Matters**.   (a) Cyprus agrees that Windsor and Western will accept on the Closing all salaried employees employed by Windsor or Western respectively upon the Closing, in the positions held immediately prior to the Closing, on terms and conditions of employment, including benefit plans,

-33-

which will be consistent with the terms and conditions of employment of Cyprus salaried employees, which the parties understand to be such terms and conditions as Cyprus deems appropriate. Cyprus agrees that Windsor will accept on the Closing all hourly employees employed by Windsor on the Closing in the positions held immediately prior to Closing, on the then current terms and conditions of employment and the obligations attendant thereto. Cyprus agrees that Windsor will assume or retain the existing Collective Bargaining Agreement of Windsor with the Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, AFL-CIO Local and Lodge D449, which expires May 11, 1990 (the "Collective Bargaining Agreement");

(b) Cyprus agrees that Windsor and Western will retain or assume all liabilities and obligations relating to all hourly and salaried employees of Windsor and Western respectively (whether active, inactive, former or retired), their dependents and beneficiaries, including those relating to the Collective Bargaining Agreement, Employee Plans and Benefit Arrangements; provided, however, that, not withstanding the foregoing, after the Closing, J&J, and not Cyprus, Windsor or Western shall be solely liable for and shall pay or provide: (i) pension benefits under the Retirement Plan of Johnson & Johnson and Affiliated Companies (the "J&J Salaried Plan") for all salaried employees of Windsor and Western (whether active, inactive, former or retired) their dependents and beneficiaries; (ii) benefits under the J&J Savings Plan for all active, inactive, former or retired salaried

-34-

employees of Windsor and Western, their dependents and beneficiaries; (iii) pension benefits, life insurance, medical benefits, supplemental pension benefits, short- and long-term disability benefits and all other benefits for those individuals listed on Exhibit Q hereto; (iv) any and all health care continuation coverage to which any current or former Windsor or Western salaried employee (or a dependent of such) is or becomes entitled in connection with a "qualifying event" (as defined in Code Section 162(k)(3)) occurring on or before the Closing Date; and (v) any and all stock options, stock appreciation, incentive compensation or other such benefits for Windsor and Western employees for periods prior to the Closing. Nothing stated in this Section 5.6(b) shall modify or alter the obligations of Cyprus and J&J to each other contained elsewhere in this Agreement.

In respect of all life insurance, medical, supplemental pension and other benefits (except benefits under the J&J Salaried Plan) for all salaried employees of Windsor and Western who have retired on or before the Closing Date, J&J shall pay or provide such benefits and Cyprus shall fully and promptly reimburse J&J the actual out of pocket identified cost of such benefits on a quarterly basis, in each case following receipt of a statement from J&J specifying such actual cost in reasonable detail. In respect of life insurance, Cyprus shall reimburse J&J for only the amount of any premiums paid by J&J in respect of such salaried retiree. In respect of medical benefits, Cyprus shall reimburse J&J for ASO fees and medical expenses covered under the

AG8805807

Johnson & Johnson Salaried Health Care Plan.   In respect of supplemental pension benefits, Cyprus shall reimburse J&J for benefits paid pursuant to the J & J Supplemental Pension Plan. In respect of all of the above, Cyprus also shall reimburse J&J for the actual cost to J&J of performing the services described above.   Cyprus shall have the right to review, during normal office hours and upon reasonable notice, such records of J&J as may be necessary to verify any charges imposed upon Cyprus under this Section.   Upon 30 days notice to J&J, Cyprus shall have the right to assume the obligations of any or all of such benefits directly, and to provide or cause an affiliate to provide any or all of such benefits, at which time J&J shall be relieved of its obligations hereunder in respect of such benefit.

J&J shall assist Cyprus by continuing to be responsible for pension payments under and administration of the Windsor Hourly Plan until such time as the related assets and liabilities are transferred to the Cyprus Master Trust.

J&J will keep confidential, and will not disclose to any other person, all confidential information given to J&J by Cyprus, Windsor or Western, or their employees, in order to allow J&J to provide the services contemplated under this Agreement.   J&J shall use or disclose such confidential information only as may be necessary in order to provide services hereunder, as otherwise provided by law or required by any government agency, or with the written consent of Cyprus.

-36-

AG8805807

All liabilities of Windsor and Western for medical, dental and life insurance benefiits incurred prior to the Closing Date and presented to J&J or the appropriate agent of J&J for payment on or before the Settlement Date shall be paid by J&J.  Such liabilities not presented to J&J for payment on or before the Settlement Date shall remain the obligations of Windsor and Western;

(c) Effective as of the Closing, Cyprus will amend or cause to be amended the Cyprus Salaried Plan to include as eligible employees all salaried employees of Windsor and Western who continue as employees of Windsor and Western after the Closing. For each such salaried employee, the accrued benefits attributable to the period of service of such employee with J&J or a subsidiary of J&J on and prior to the Closing Date shall be determined under the terms of the J&J Salaried Plan as in effect on the Closing Date, on the basis of the compensation of such employee on and before the Closing Date and service of such employee through the last day of the calendar month in which the Closing Date occurs, and without regard to any compensation of such employee after the Closing Date and service of such employee after the last day of the calendar month in which the Closing Date occurs.  For each such salaried employee, the accrued benefits attributable to the period of service of such employee with Cyprus or a subsidiary of Cyprus following the Closing shall be determined under the terms of the Cyprus Salaried Plan or a

-37-

successor plan, if any, on the basis of the compensation of such employee after the Closing Date and service after the last day of the calendar month in which the Closing Date occurs and without regard to any compensation and service of such employee on or before the Closing Date; provided, however that each such employee shall receive credit under the Cyprus Salaried Plan or a successor plan, if any, for purposes of vesting and determination of eligibility to participate and to receive benefits, but not for purposes of benefit accrual, for all service of such employee on or before the Closing in the employment of J&J or any affiliated company of J&J that was credited for such purposes under the J&J Salaried Plan;

(d) effective as of the Closing Date, Cyprus agrees to amend the Cyprus Minerals Company Savings Plan and Trust (the "Cyprus Savings Plan") to include as eligible employees all active salaried employees of Windsor and Western on the Closing Date and to credit, only for purposes of vesting and determination of eligibility to participate in the Cyprus Savings Plan, all service of such employees before the Closing Date in the employment of J&J and any affiliated company of J&J that was credited for such purposes under the J&J Savings Plan.

J&J shall cause the account balances in the J&J Savings Plan of all active salaried employees of Windsor and Western on the Closing Date to be distributed in accordance with the terms of that Plan, the provisions of applicable law and the election of

AG8805B07

the participant or beneficiary. J&J shall provide such individuals with the required 402(f) notice;

(e) Cyprus agrees that Windsor will assume or retain the assets, liabilities and sponsorship of the Windsor Hourly Plan as of the Closing Date. J&J agrees that within 60 days of the Closing Date, J&J will transfer in cash from the J & J Master Trust to the Cyprus Master Trust all assets of the Windsor Hourly Plan, determined in accordance with the usual procedures used under the Johnson & Johnson Master Trust for the determination of the separate shares of a single plan thereunder. Until the date of any segregation of the assets of the Windsor Hourly Plan pursuant to the transfer, such assets shall share pro rata in the investment experience, including expenses, of the J&J Master Trust. Upon segregation, such assets shall be liquidated to cash, and from the date of such liquidation to the date of transfer of possession of the assets will be invested in the Bankers Trust Commingled Short-Term Investment Fund, a qualified fund for qualified plans for which Bankers Trust Company acts as Trustee.

J&J shall cause Windsor and Western to make on or before the Closing Date all required contributions under the Windsor Hourly Plan for all completed fiscal years, including contributions that may not by law have otherwise been required to be made until the due date for filing the tax return for any completed fiscal year. All contributions and payments accrued under the Windsor

AG8805B07

Hourly Plan, determined in accordance with prior funding and accrual practices, as adjusted to the extent required to include proportional accruals for service for periods prior to the Closing Date, will be discharged and paid by Windsor to the Plan on or prior to the Closing Date.

In addition, J&J, and not Windsor or Western, shall pay to the Windsor Hourly Plan, on or before the date of the actual transfer of the assets, any amount necessary so that, as of the date of the actual transfer of the assets, the fair market value of the assets of the Windsor Hourly Plan (including for these purposes any accrued but unpaid contributions) equalled or exceeded the present value of all "benefit liabilities" (as defined in ERISA Section 4001(a)(16)) under the Windsor Hourly Plan determined on a termination basis using the assumptions used for reporting purposes in Note 13 to the 1987 corporate financial statements of Windsor and J&J, including without limitation an assumed interest rate of 8.75 percent.

(f)   J&J shall be solely liable and responsible for all claims made by employees of Windsor and Western pursuant to applicable workmen's compensation laws, if such claims arise out of any act, event or occurrence occurring prior to the Closing Date and such claims are filed prior to the Settlement Date. J&J's liability pursuant to the foregoing sentence shall include, without limitation, all costs, damages, expenses and settlements payable after the Closing.   Windsor and Western shall retain all

liability and responsibility for all claims made by their respective employees pursuant to applicable workman's compensation laws if such claims: (i) arise out of any act, event or occurrence occurring on or after the Closing Date; or (ii) arise out of any act, event or occurrence occurring prior to the Closing Date, but were not properly filed on or prior to the Settlement Date.

5.7 **Tax Matters Agreement.** On or before the Closing Date, Cyprus and J&J shall enter into a Tax Matters Agreement substantially in the form of Exhibit "T", attached hereto and by this reference incorporated herein (the "Tax Matters Agreement"). Cyprus and J&J each acknowledge and confirm the content of the Tax Matters Agreement, and agree to perform all obligations required thereunder.

5.8 **Tax Liabilities and Refunds.** Any tax liability determined to be due and owing on behalf of Windsor and/or Western, or any tax refund determined to be due and owing Windsor and/or Western, for periods prior to the Closing Date as a result of an audit performed by any taxing authority after the Closing Date, shall be the sole responsibility and liability of, or shall be paid over to, J & J, as the case may be. All Land Gains Tax determined to be due to the Vermont Tax Department as a result of the transaction contemplated herein shall be the sole liability and responsibility of J & J. Prior to the Closing Date, Cyprus and J & J shall negotiate in good faith to determine J & J's

-41-

basis in such Real Property, and the amount of the Base Purchase Price allocable to each parcel of Real Property. Cyprus shall be responsible for performing an appraisal of the Real Property prior to any negotiations between Cyprus and J & J concerning the foregoing.

5.9   **Insurance**.   Windsor and Western have been included, since the acquisition or incorporation thereof by J&J, as additional insureds on all general liability, employee liability, workers' compensation, and other insurance policies held by J&J.  On and after the Closing Date, J&J agrees to use its best efforts to make such coverages and policies (including excess coverage policies) available to Cyprus, Windsor and Western, and their affiliates, up to the limits specified in such policies, and to cooperate with Cyprus and its affiliates in making claims against such policies.  In the event of a claim, Windsor and Western shall be responsible for the balance of any applicable deductibles and retentions, and for the amount of any claim or claims made against Windsor or Western in excess of applicable coverage limits, and for the costs of defending any claim or claims made against Windsor or Western to the extent to which such insurance coverages do not cover such costs or do not apply.  For the purposes of this Section 5.9, the term "deductibles" shall include the amount of any captive insurance underwritten or reinsured in whole or in part by J&J or its affiliates.  To the extent that the amount of any proposed insurance settlement given serious consideration by Cyprus or its

-42-

affiliates, or to the extent that a potential trial judgment, would exhaust the coverage available to J&J, Cyprus and its affiliates agree to permit J&J to participate in such settlement negotiations, or in the defense of such litigation, as the case may be.  Cyprus shall have the final authority in the event of any dispute between J&J and Cyprus concerning the foregoing matters; provided, however, that Cyprus and J&J shall cooperate in the event of litigation against J&J's insurance carriers to establish coverage.  J&J shall be solely liable for its cost in any such litigation to establish coverage.

5.10  **Articles and Bylaws.**  From the date hereof through the Closing Date, Windsor shall not amend its Articles of Association or Bylaws, and Western shall not amend its Articles of Incorporation or Bylaws without the prior written consent of Cyprus.

5.11  **Financial Statements of Windsor and Western.**  On the Settlement Date, the Closing Balance Sheet shall fairly present the combined financial position of Windsor and Western as of the Closing Date, and shall be prepared in conformity with generally accepted accounting principles consistently applied, subject to the adjustments described in Section 2.2 hereof. Between the date hereof and the Closing Date, neither J & J, nor Windsor nor Western shall do or perform any act, or shall omit to act, which act or omission will result in a material adverse change in the financial condition, assets, or liabilities of

-43-

the Tax Records for more than three (3) years, Cyprus shall deliver the Tax Records to J & J.  After the Closing, Cyprus shall provide J&J with access to the assets and operations of Windsor and Western and to persons knowledgeable therewith, and shall give J&J access to those Records retained by Cyprus, and permit J&J to make copies thereof at all reasonable times and upon reasonable prior notice to Cyprus, in order to permit J&J to prepare its tax returns and financial statements, to investigate or defend any indemnity claim under Section 11 hereof and for any other reasonable purpose.

7.    **Closing**.  The closing of the transaction contemplated in this Agreement (the "Closing") shall take place at 9:00 a.m. on January 6, 1989 (the "Closing Date"), at the offices of Cyprus in Englewood, Colorado; provided, however, that the parties may, by mutual prior written agreement, accelerate or extend the Closing Date beyond January 6, 1989, in order to obtain such governmental approvals or third party consents as may be reasonably required to consummate the transaction contemplated herein, or for such other good cause as the parties may mutually determine (such date shall also be a "Closing Date").

8.    **Mutual Conditions Precedent to Closing**.  The obligations of Cyprus and of J&J pursuant to this Agreement are subject to the satisfaction, at or before the Closing, of all the conditions set forth in this Section 8; provided, however, that

-52-

Cyprus or J&J may waive any or all of such conditions, in whole or in part, at such party's sole discretion.

8.1   No Injunctions.   On the Closing Date, no action or proceeding shall have been instituted or threatened to set aside the transactions provided for herein, and there shall be no effective injunction, writ or temporary restraining order or any order of any nature issued by a court or governmental agency of competent jurisdiction, directing the transaction provided for herein not be consummated as herein provided.

8.2   Approvals; Consents.   Any and all approvals and authorizations of, filings and registrations with, and notifications to any governmental or regulatory authority, and any and all approvals or consents by any third party, required for the execution, delivery and performance of this Agreement by both parties, and the consummation of the transactions contemplated herein, shall have been duly obtained or made and shall be in full force and effect.

8.3   Board Approval.   This Agreement and the transaction contemplated herein shall have been approved by the Board of Directors of Cyprus Mines Corporation and by the Executive Committee of J&J, which Board and which Committee may decline such approval at the sole and exclusive discretion of such Board or Committee, as the case may be, for any reason whatsoever.

-53-

AG8805807

8.4    Due Diligence.   Cyprus shall have completed its due diligence investigation prior to the Closing Date, and shall have verified to its satisfaction:  (i) the quantity, quality and recoverability of the talc reserves owned and operated by Windsor and Western; (ii) the satisfactory physical and operating condition of the Personal Property; (iii) the satisfactory state of title to Personal Property and Real Property; (iv) the risk associated with any actual or threatened litigation to which J&J or any of its affiliates may be a party concerning exposure to talc is, in Cyprus' sole opinion, an acceptable risk; and (v) the talc inventories of Windsor and Western are, in Cyprus' sole opinion, saleable and recoverable and shall be stated on the Closing Balance Sheet at the lower of cost or market.

8.5    Talc Supply Agreement.   Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless, on or before Closing, Cyprus and J&J, or affiliates of Cyprus and J&J, shall have executed a mutually satisfactory Talc Supply Agreement, wherein Cyprus agrees or affiliates of Cyprus agree to supply, and J&J or affiliates of J&J agree to purchase, cosmetic grade talc pursuant to the terms and conditions set forth therein (the "Talc Supply Agreement").   The Talc Supply Agreement shall be in substantially the form attached as Exhibit "V" hereto and by this reference incorporated herein.

AG8805B07

11.   <u>Survival and Indemnification</u>

11.1 <u>Survival</u>.   To the extent that the representations and warranties set forth in Section 3.24 hereof relate to ERISA, such representations and warranties shall survive the Closing for a period of two (2) years following the Closing Date.   The representations and warranties set forth in Section 3.24(h) shall survive the Closing for a period of two (2) years following the Closing Date. The representations and warranties set forth in Section 3.9 hereof relating to the "Shear Disc" shall survive until the termination or expiration of the Talc Supply Agreement.   All other representations and warranties contained in Sections 3 and 4 hereof shall survive the Closing for a period of one year following the Closing Date.   With respect to the obligations, covenants and agreements contained in Sections 2.2, 3.24(j), 5.2, 5.3, 5.4, 5.6, 5.7, 5.8, and 5.11, such obligations, covenants or agreements shall survive until the same shall have been duly performed.   With respect to the obligations, covenants and agreements contained in Sections 5.15 and 5.16, such obligations, covenants and agreements, as between Windsor and J&J, shall survive the Closing for the periods set forth therein.   With respect to the obligations, covenants and agreements contained in Sections 5.1, 5.9, 11.2(v) and 11.2(vi) hereof, such obligations, covenants and agreements, as between Cyprus and J&J, shall survive the Closing forever.   Any representation, warranty, covenant or obligation contained in this Agreement relating to taxes shall survive the Closing for

-60-

the period of the applicable Statute of Limitations, including all extensions thereof.

11.2 **Indemnification by J&J.** Consistent with the provisions of Section 11.1 hereof, J&J hereby agrees to indemnify and hold harmless Cyprus from and against any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and any and all related litigation costs and expenses arising after Closing from or as a consequence of any such proceeding described in this Section 11.2, including such attorneys' fees and costs incurred in connection with pursuing claims under this Section 11.2) (collectively referred to in this Section 11.2 as "Costs") imposed upon or incurred by Cyprus or its affiliates as a result of or in connection with or arising out of: (i) any and all inaccurate representations or material breaches of covenants, warranties, stipulations, agreements and certifications made by or on behalf of J&J, Windsor or Western in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by J&J of any covenant, agreement or obligation contained in this Agreement; (iii) any tax liability or obligation determined in accordance with Sections 3.17 and 5.8 hereof to be due and owing on behalf of Windsor and/or Western for periods prior to the Closing Date; (iv) any liabilities related to the J & J Salaried Plan; (v) any debt, liability or other financial obligation not consistent with

-61-

the business of Windsor or Western which:    (A) is the legal obligation of Windsor or Western; (B) was undertaken on behalf of or at the request or direction of J&J; and (C) creates or gives rise to any liability which Cyprus would not assume but for the consummation of the transaction contemplated herein; and (vi) any product liability-based claim, suit, demand or cause of action directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing. J&J's obligation of indemnification pursuant to Sections 11.2(v) and 11.2(vi) shall survive the Closing forever.

11.3   **Indemnification by Cyprus.**   Cyprus hereby agrees to indemnify and hold J&J harmless from and against any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and all related litigation costs and expenses arising after Closing from or as a consequence of any such proceeding described in this Section 11.3, including such attorneys' fees and costs incurred in connection with pursuing claims under this Section 11.3) (collectively referred to in this Section 11.3 as "Costs") imposed upon or incurred by J&J or its affiliates as a result of or in connection with or arising from:    (i) any and all inaccurate representations or material breaches of covenants, warranties, stipulations, agreements and certifications made by

-62-

or on behalf of Cyprus in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by Cyprus of any covenant, agreement or obligation contained in this Agreement; and (iii) any tax refund obligation determined in accordance with Section 5.8 hereof to be due and owing J&J for periods prior to the Closing Date.

11.4 <u>Indemnification Procedure; Defense.</u>  In the event that any indemnified party determines that it is entitled to indemnification under this Agreement, it shall promptly thereafter so notify the indemnifying party in writing, which writing shall set forth in detail the amount of and the basis for such claim. Promptly after receipt by the indemnified party of notice of the commencement of any action involving the subject matter of the foregoing indemnity provisions, such indemnified party shall, if any claim in respect thereof is to be made against the indemnifying party under Section 11.2 or 11.3, notify the indemnifying party in writing of the commencement thereof. In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall have the right to participate therein, and to the extent that it may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; provided, however, that if the

-63-

defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and other indemnified parties which are different or are in addition to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert, at the cost and expense of the indemnified party or parties, such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties, subject to reimbursement of such costs and expenses to the indemnified party or parties upon a final determination that such defense is within the indemnification obligations set forth in this Section 11. In the event that the indemnifying party shall assume the defense of a lawsuit as provided herein, the indemnifying party, after consultation with the indemnified party, shall have reasonable control over the decision to try, settle, compromise or otherwise terminate such lawsuit.

11.5 **Exclusive Remedy**. J&J and Cyprus acknowledge and agree that the indemnity provisions of this Section 11 shall be the exclusive remedy for either party for any matter for which either party may be indemnified.

12. **Operation of Business**. Between the date hereof and the Closing Date, J&J shall cause Windsor and Western to operate their businesses in the ordinary course. Neither Windsor nor

-64-

AG8805807

Western shall enter into or amend any material contract, or otherwise adversely affect in any material respect the financial conditions, ownership or operations of Windsor and Western without the prior written consent of Cyprus, which consent shall not be unreasonably withheld.   With respect to capital investments and expenditures, and the ongoing operation of Windsor and Western facilities, J&J shall cause Windsor and Western to operate the business and facilities in the ordinary course, and shall make such capital investments and expenditures as may be required therefor; provided, however, that no capital investment or expenditure in excess of One Hundred Thousand Dollars ($100,000) shall be made or approved without the prior written consent of Cyprus, which consent or approval shall not be unreasonably withheld.  After the Closing, Windsor shall have the right to manage its business and all aspects of it, and J & J shall have no right, except as set forth in the Talc Supply Agreement, to manage Windsor's business or any aspect of it.

13.   **Miscellaneous.**

13.1   **Parties in Interest; Assignment.**   This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns.   This Agreement is not made for the benefit of any person, firm, corporation or other entity not a party hereto, and nothing in this Agreement shall be construed to give any person,

-65-

affect the interpretation of any of the provisions of this Agreement.

14
13.13 **Mutual Negotiation**.   This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties.   Accordingly, no provision hereof shall be construed against one party or in favor of another party merely by reason of draftsmanship.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

CYPRUS MINES CORPORATION,       JOHNSON & JOHNSON,
a Delaware corporation          a New Jersey corporation
By: _____       By: _____
Title: Vice President _____   Title: _____