# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Civ. Action No. 19-mc-00103 (MN) |
| | Bankr. Case No. 19-10289 (LSS) |
| **Debtors.** | Jointly Administered |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF JOHNSON & JOHNSON'S AND JOHNSON & JOHNSON CONSUMER INC.'S MOTION TO FIX VENUE FOR CLAIMS RELATED TO IMERYS'S BANKRUPTCY UNDER 28 U.S.C. §§ 157(b)(5) AND 1334(b)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FURTHER STATEMENT OF FACTS .........................................................................5

    I.    J&J's Exclusive Supply Relationship with Debtors Began in 1966. ......................5

    II.    J&J's Continued Litigation of the Talc Claims Will Impact the Available
    Proceeds from Several Hundred Insurance Policies Issued to J&J. .......................7

    III.    Debtors Owe J&J a Duty to Defend From and Against Liabilities Arising
    Out of Any Violation of Law From 1989 Through 2006.......................................8

ARGUMENT..............................................................................................................9

    I.    The Court Has "Related To" Jurisdiction over the Talc Claims. ...........................9

        A.    Shared Insurance Supports "Related To" Jurisdiction for Talc
        Claims Alleging Product Use From 1966 Until 1986. ..............................9

        B.    Debtors' Contractual Duty to Defend J&J Provides this Court with
        "Related to" Jurisdiction for Talc Claims Alleging Product Use
        From 1989 Through 2006. ....................................................................10

        C.    Debtors Share an Identity of Interest with J&J for Virtually All
        Talc Claims Alleging Product Use from 1967 to Present.........................23

        D.    Plaintiffs Misread the Law....................................................................26

    II.    Section 157(b)(5) Permits Transfer of Claims by Non-Debtors, Regardless
    of Whether Debtors Are Codefendants. ............................................................29

    III.    This Court Should Exercise Jurisdiction and Decline to Abstain,
    Consistent with the Legislative Purpose of Section 157(b). ...............................31

        A.    It Is This Court's Province to Determine Jurisdiction.............................31

        B.    Mandatory Abstention Does Not Apply Here..........................................34

        C.    Even If Mandatory Abstention Applied, the Requisite Factors Are
        Not Met.................................................................................................35

        D.    This Court Should Decline to Permissively Abstain.................................37

CONCLUSION..........................................................................................................45

WEIL:\97035373\22\54966.0222

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ...................................................................................*passim*

*Abbatiello v. Monsanto Co.*,
No. 06 Civ. 266 (KMW), 2007 WL 747804 (S.D.N.Y. Mar. 8, 2007)....................................2

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
No. 11 Civ. 2232 (NRB), 2011 WL 4965150 (S.D.N.Y. Oct. 19, 2011)..............................17

*In re Am. Home Mort. Holdings, Inc.*,
390 B.R. 120 (Bankr. D. Del. 2008) ...........................................................................13, 15

*Anstine & Musgrove, Inc. v. Calcasieu Ref. Co.*,
436 B.R. 136 (D. Kan. 2010) .............................................................................................39

*Ariz. v. Cal.*,
460 U.S. 605 (1983) ...........................................................................................................31

*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001) .......................................................................................24, 27

*In re Asbestos Litig.*,
No: 01-1790-PA, 2002 U.S. Dist. LEXIS 3083 (D. Or. Feb. 1, 2002) .................................14

*Beck v. Victor Equip. Co.*,
277 B.R. 179 (S.D.N.Y. 2002).....................................................................................35, 37

*Belcufine v. Aloe*,
112 F.3d 633 (3d Cir. 1997) ........................................................................................15, 16

*Berry v. Pharmacia Corp.*,
316 B.R. 883 (S.D. Miss. 2004)..........................................................................................2

*In re Brentano's, Inc.*,
27 B.R. 90 (Bankr. S.D.N.Y. 1983) ....................................................................................13

*Broyles v. U.S. Gypsum Co.*,
266 B.R. 778 (E.D. Tex. 2001)...........................................................................................35

*In re Castle Cheese, Inc.*,
541 B.R. 586 (W.D. Pa. 2015)............................................................................................42

WEIL:\97035373\22\54966.0222

*Co-operative Ins. Cos. v. Woodward*,
  45 A.3d 89 (Vt. 2012) ..........................................................................................................19

*Colorado River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976) ..............................................................................................................1

*In re Combustion Engineering*,
  391 F.3d 190 (3d Cir. 2005), *as amended* (Feb 25, 2005) .............................................*passim*

*Coop. Refinery Ass'n v. Consumers Pub. Power Dist.*,
  190 F.2d 852 (8th Cir. 1951) .................................................................................................9

*Cottle v. Walgreens*,
  No. A-1430-11T3, 2013 WL 4404121 (N.J. Super. Ct. App. Div. Aug. 19, 2013) ...............19

*Desimone Hospitality Servs., LLC v. W. Va.-Am. Water Co.*,
  No. 2:14-14845, 2015 U.S. Dist. LEXIS 168714 (S.D. W.Va. Dec. 17, 2015) ....................35

*In re Doctors Hosp. of Hyde Park, Inc.*,
  308 B.R. 311 (Bankr. N.D. Ill. 2004) ..................................................................................14

*In re Dow Corning Corp.*,
  86 F.3d 482 (6th Cir. 1996) ............................................................................................*passim*

*In re Dow Corning Corp.* (*Dow II*),
  113 F.3d 565 (6th Cir. 1997) ...............................................................................................29

*Duffy v. United States*,
  835 F. Supp. 1087 (N.D. Ill. 1993) .................................................................................31, 32

*In re Estate of Gadash*,
  413 P.3d 272 (Colo. Ct. App. 2017).......................................................................................9

*In re Fed.-Mogul Glob., Inc.*,
  282 B.R. 301 (Bankr. D. Del. 2002) ................................................................................*passim*

*In re Federal-Mogul*,
  300 F.3d 368 (3d Cir. 2002) ...........................................................................................*passim*

*In re FedPak Sys., Inc.*,
  80 F.3d 207 (7th Cir. 1996) .................................................................................................14

*G-I Holdings, Inc. v. Ashland, Inc.*,
  No. 17-0077, 2017 U.S. Dist. LEXIS 68891 (D.N.J. May 5, 2017) ......................................37

*Gen. Elec. Capital Corp. v. Pro-Fac Coop., Inc.*,
  No. 01 Civ.10215 LTS JCF, 2002 WL 1300054 (S.D.N.Y. June 11, 2002).........................17

*Georgine v. Amchem Prods., Inc.*,
   83 F.3d 610 (3d Cir. 1996) ........................................................................40

*Gorse v. Long Neck, Ltd.*,
   107 B.R. 479 (D. Del. 1989) ......................................................................41

*Grippo v. Schrenell & Co.*,
   538 A.2d 404 (N.J. Super. Ct. App. Div. 1988) .......................................19

*Hall v. Chrysler Grp. LLC*,
   No. 11-05866 GAF, 2011 U.S. Dist. LEXIS 163683 (C.D. Cal. Sep. 29, 2011) ...................39

*Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co.*,
   483 A.2d 402 (N.J. 1984) ..........................................................................22

*Hopkins v. Plant Insulation Co.*,
   342 B.R. 703 (D. Del. 2006) ......................................................................30

*Hopkinton Scout Leaders Ass'n v. Town of Guilford*,
   844 A.2d 753 (Vt. 2004) ............................................................................18

*In re Janssen*,
   396 B.R. 624 (E.D. Pa. 2008) ....................................................................42

*Kaiser Group Int'l, Inc. v. Kaiser Aluminum & Chem. Corp.*
   *(In re Kaiser Aluminum Corp., Inc.)*,
   315 B.R. 655 (D. Del. 2004) ......................................................................23

*Kitces v. Wood*,
   917 F. Supp. 338 (D.N.J. 1996) .................................................................32

*Langer v. Presbyterian Med. Ctr. Of Phila.*,
   No. 87-4000, 1995 WL 395937 (E.D. Pa. July 3, 1995) ...........................31

*Lichtenfels v. Electro-Motive Diesel, Inc.*,
   No. 09-1590, 2010 WL 653859 (W.D. Pa. Feb. 22, 2010) ........................35

*In re Lower Bucks Hosp.*,
   488 B.R. 303 (E.D. Pa. 2013), *aff'd*,
   571 F. App'x 139 (3d Cir. 2014) ................................................... 11, 12, 13

*In re LTC Holdings, Inc.*,
   587 B.R. 25 (Bankr. D. Del. 2018) .................................................. 15, 16, 19

*Mantilla v. NC Mall Assocs.*,
   770 A.2d 1144 (N.J. 2001) ........................................................................22

iv

*In re Maxus Energy Corp.*,
   597 B.R. 235 (Bankr. D. Del. 2019) ................................................................41

*Mem'l Props., LLC v. Zurich Am. Ins. Co.*,
   46 A.3d 525 (N.J. 2012) ................................................................................22

*In re Millennium Lab Holdings II, LLC*,
   591 B.R. 559 (D. Del. 2018)................................................................................12

*Miller v. Maddox*,
   866 F.3d 386 (6th Cir. 2017) ................................................................................31

*In re Montreal Me. & Atl. Ry., Ltd.*,
   No. 1:13-MC-00184-NT, 2014 WL 1155419 (D. Me. Mar. 21, 2014)................. 4, 29, 37, 39

*Nase v. TECO Energy, Inc.*,
   No. 09-7659, 2010 U.S. Dist. LEXIS 36409 (E.D. La. Mar. 9, 2010)...................................35

*In re New Eng. Compounding Pharm., Inc. Prods. Liab. Litig.*,
   496 B.R. 256 (D. Mass. 2013) ................................................................... 2, 29, 37

*In re Nutraquest*,
   No. 03-5869 (GEB), 2004 U.S. Dist. LEXIS 29143 (D.N.J. Mar. 8, 2004)....................29, 37

*O'Brien v. Gladstone*,
   No. 13-cv-6578 (JAP), 2014 U.S. Dist. LEXIS 89284 (D.N.J. July 1, 2014) ........................14

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984) ............................................................... 4, 11, 13, 14

*In re Pan Am. Corp.*,
   950 F.2d 839 (2d Cir. 1991) ................................................................... 30, 37

*Pastewka v. Texaco, Inc.*,
   420 F. Supp. 641 (D. Del. 1976) ................................................................................32

*Perez v. El Bamboo Bar/Club*,
   2007 WL2081472 (N.J. Super. Ct. App. Div. July 23, 2007) ................................22

*Piccinin v. A.H. Robins Co., Inc.*,
   No. 86-211, 1986 WL 767279 (U.S. 1986) ................................................................29

*In re Pistor's Estate*,
   154 A.2d 721 (N.J. 1959) ................................................................................17

*Policemen's Benev. Ass'n v. City of Trenton*,
   16 A.3d 322 (N.J. 2011) ................................................................................17

*Seagate Tech. (US) Holdings, Inc. v. Global Kato HG, LLC (In re Solyndra, LLC)*,
   No. 11-12799 (MFW), 2015 WL 6125246 (Bankr. D. Del. Oct. 16, 2015)...........................14

*Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*,
   No. 12 Civ. 1397 (LTS)(HBP), 2012 WL 4794450 (S.D.N.Y. Oct. 9, 2012).......................17

*Skylark v. Honeywell Int'l, Inc.*,
   No.: 01-5069-CIV-GRAHAM/TURNOFF, 2002 U.S. Dist. LEXIS 10554
   (S.D. Fla. Jan. 25, 2002) ....................................................................................................14

*State Farm Mut. Auto. Ins. Co. v. Colby*,
   82 A.3d 1174 (Vt. 2013)......................................................................................................22

*State v. Prison Health Servs., Inc.*,
   88 A.3d 414 (Vt. 2013).........................................................................................................19

*Steel Workers Pension Tr. V. Citigroup*,
   295 B.R. 747 (E.D. Pa. 2003)...............................................................................................14

*Taracorp, Inc. v. NL Indus. Inc.*,
   73 F.3d 738 (7th Cir. 1996) ..................................................................................................17

*Tateosian v. State*,
   945 A.2d 833 (Vt. 2007).......................................................................................................18

*In re Twin Labs., Inc.*,
   300 B.R. 836 (S.D.N.Y. 2003)................................................................................................1

*In re Valley Media, Inc.*,
   289 B.R. 27 (Bankr. D. Del. 2003) ......................................................................................42

*W.K. v. Fifth Third Bank, Inc.*,
   No. 1:11-cv-00180-JHW, 2012 U.S. Dist. LEXIS 73176 (W.D. Ky. May 25, 2012)................36

*In re W.R. Grace & Co.*,
   315 B.R. 353 (Bankr. D. Del. 2004) ....................................................................................15

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) ..............................................................................*passim*

*In re W.R. Grace & Co.*,
   591 F.3d 164 (3d Cir. 2009) .................................................................................................28

*In re W.R. Grace & Co.*,
   900 F.3d 126 (3d Cir. 2018) .................................................................................................28

*W9/PHC Real Estate LP v. Farm Family Cas. Ins. Co*,
   970 A.2d 382 (N.J. Super. Ct. App. Div. 2009)..................................................................19

vi

*Wingate v. Insight Health Corp.*,
No. 7:13cv00142, 2013 U.S. Dist. LEXIS 67358 (W.D. Va. May 10, 2013) ........................35

*Zerand-Bernal Grp., Inc. v. Cox*,
23 F.3d 159 (7th Cir. 1994) ................................................................................14

**Statutes**

28 U.S.C. § 157(b)(2) ................................................................................34, 35

28 U.S.C. § 157(b)(4) ................................................................................34, 35

28 U.S.C. § 157(b)(5) ................................................................................*passim*

28 U.S.C. § 1334 ................................................................................10

28 U.S.C. § 1334(b) ................................................................................*passim*

28 U.S.C. § 1334(c)(1) ................................................................................36

28 U.S.C. § 1404 ................................................................................33

28 U.S.C. § 1412 ................................................................................33

28 U.S.C. § 1452 ................................................................................39

28 U.S.C. § 2283 ................................................................................33

**Other Authorities**

130 Cong. Rec. H 7492, June 29, 1984, *reprinted in*
1984 U.S. Code Cong. & Adm. News ................................................................30

Restatement (Second) of Contracts § 209 (1981) ................................................................9

Theodore Eisenberg et al., *Litig. Outcomes in State & Fed. Courts: A Statistical Portrait*,
19 SEATTLE U. L. REV. 433 (1996) ................................................................35

WEIL:\97035373\22\54966.0222

J&J submits this memorandum of law in further support of its Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b) (the "Venue Motion") and as a reply to the opposition briefs filed by counsel for various Talc Claim plaintiffs (D.I. 37, 49, 53, 57, 58) and the Official Committee of Tort Claimants (the "CTC") (D.I. 46), as joined by several other plaintiffs, their counsel, and the Future Claimants' Representative (*see* D.I. 45, 48, 55) (collectively, the "Plaintiffs").[2]

## PRELIMINARY STATEMENT

"[P]erhaps even more than elsewhere, federal courts [considering § 157(b)(5) transfer] have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *In re Twin Labs., Inc.*, 300 B.R. 836, 841 (S.D.N.Y. 2003) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). This motion to exercise the Court's jurisdiction over claims in 2,400 tort cases that will implicate Debtors' estates is no "delay tactic." D.I. 46 at 4. Instead, it effectuates the sound policies that motivated Congress's enactment of 28 U.S.C. § 157(b)(5)—ensuring efficiency and fairness and avoiding inconsistent judgments and piecemeal litigation. It also attempts to shed light on plaintiffs' improper attempt to have their cake and eat it too by maintaining a state of disarray where they can bring thousands of Talc Claims (predicated on Debtors' talc) against J&J, all over the country, while negotiating a favorable settlement with Debtors in Delaware. Because it is in Debtors' best interest and in the interest of all creditors to minimize plaintiffs' claims against them, Debtors have not opposed the requested relief.[3] Only

WEIL:\97035373\22\54966.0222

---

[2] Most plaintiffs asserting the Talc Claims have *not* responded, but, for economy, J&J uses the term "Plaintiffs" with respect to only those plaintiffs who have opposed the Venue Motion. Lowercase "plaintiffs" shall refer to *all* plaintiffs asserting the Talc Claims, including those who did not oppose the Venue Motion. Capitalized terms not otherwise defined herein shall have the same meaning as in the Venue Motion. Citations to Exhibits to the Supplemental Declaration of John J. Nolan are abbreviated as "Ex.___".

[3] Debtors have no need to affirmatively join in the Venue Motion, as any claims asserted against them are subject to an automatic stay and can be estimated or otherwise adjudicated in the Bankruptcy Action.

Plaintiffs have—and only because they prefer to try the same issues against J&J, over and over again, in courtrooms around the country,[4] depleting J&J's insurance coverage and running up indemnity obligations for Debtors. This Court has § 1334(b) "related to" jurisdiction over the Talc Claims, and its mandate to exercise that jurisdiction is clear.

Transfer of mass tort claims under § 157(b)(5) is not novel, as this Court has recognized. *See* D.I. 34 at 2. It should come as no surprise to Plaintiffs that J&J seeks to transfer the Talc Claims to this venue—where J&J's exclusive talc supplier since 1967 chose to file for bankruptcy *because of* the Talc Claims. Allegations that some plaintiffs are *in extremis* do not deprive the Court of "related to" jurisdiction or provide a basis to deny § 157(b)(5) transfer.[5] Contrary to Plaintiffs' claims of delay and burden, transfer will *streamline* the final disposition of these claims. It will allow for centralized resolution of threshold issues, uniform to all Talc Claims—namely, whether talc supplied by Debtors was contaminated with asbestos and whether it can cause mesothelioma and ovarian cancer. For the causation issues, this Court may even look to the MDL court's forthcoming *Daubert* rulings.

---

[4] As one lawyer for Plaintiffs and member of the CTC unabashedly admitted to media, it "serves [his] purposes as a litigator" in pursuit of individual settlements to have talc lawsuits "keep driving [J&J's] stock down." Matthew J. Belvedere, *Attorney behind a huge talc verdict: J&J's stock drop 'serves my purposes' in seeking a settlement* (CNBC Dec. 18, 2018), *available at* https://www.cnbc.com/2018/12/18/attorney-behind-huge-talc-verdict-jnj-stock-drop-serves-my-purposes.html.

[5] *See Abbatiello v. Monsanto Co.*, 2007 WL 747804 (S.D.N.Y. Mar. 8, 2007) (declining to equitably abstain and remand plaintiffs' claims alleging defendants produced chemicals causing "cancer, liver disease, and other serious illnesses" where debtor and non-debtor defendants were "inextricably intertwined" and remand would harm administration of debtor's estate); *see also A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) (affirming transfer and centralization under § 157(b)(5) of thousands of claims alleging that the Dalkon Shield intrauterine device led to serious medical complications and death); *In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir. 1996) (reversing district court's determination of no "related to" jurisdiction over thousands of claims alleging that implants caused autoimmune disease); *In re New Eng. Compounding Pharm., Inc. Prods. Liab. Litig.*, 496 B.R. 256 (D. Mass. 2013) (transferring claims under § 157(b)(5) where plaintiffs alleged health product in question "led to serious fungal infections and … death"); *Berry v. Pharmacia Corp.*, 316 B.R. 883 (S.D. Miss. 2004) (declining to remand cases removed pursuant to "related to" jurisdiction where plaintiffs alleged serious injuries and deaths resulting from exposure to defendant's chemicals).

2

Plaintiffs' oppositions to the Venue Motion are based on fundamental misunderstandings of the contractual obligations, the insurance policies, and the nature of the Talc Claims, as well as Plaintiffs' misreading of the case law. This Court has § 1334(b) "related to" jurisdiction over the Talc Claims on three independent, well-established grounds recognized by and within the Third Circuit. *First*, as Debtors have acknowledged, they seek to recover $2 billion in insurance coverage shared with J&J. Debtors also expressly claim to "have a significant interest in shared insurance policies with J&J and/or its subsidiaries." *In re Imerys Talc America, Inc.*, Case No. 19-10289-LSS (Bankr. D. Del.), D.I. 557, ¶ 5.[6] *Second*, Debtors' duty to defend the Talc Claims began with the filing of such claims against J&J. And neither that duty nor Debtors' indemnification obligations are predicated on findings of fact. As such, the Talc Claims adversely impact the Debtors' estates without a secondary legal action—regardless of any defenses or contractual ambiguities Debtors may raise. *Third*, Debtors have been the exclusive (with one brief exception for one product) contractual suppliers of J&J's total of *two* talcum powder products since 1967—and almost every single plaintiff alleges exposure to purportedly harmful talc supplied by Debtors and sold to J&J during this supply period.[7] In other words, virtually every Talc Claim alleges that Debtors' talc was inherently unsafe from the day it was mined. Thus, Debtors and J&J share an identity of interest such that Debtors are the true parties-in-interest in every Talc Claim and plaintiffs' claims against J&J are derivative; if the talc supplied by Debtors was safe, as J&J and Debtors contend, then the Talc Claims against J&J fail. Whether other defendants and their

---

[6] Contrary to Plaintiffs' assertions, these policies—covering exposures implicating talc sourced from Debtors between 1966 and 1986—exist and are submitted herewith for a full record. *See* Exs. 100–536.

[7] Windsor's exclusive supply of talc for Johnson's Baby Powder began in 1966 and for Shower to Shower began in 1967. *See* Ex. 19 (*Cadigan* Verified Interrogatories) at 20–23. With the exception of 1970-1973 for Shower to Shower only, this exclusive supply has continued through present day. *See id.* All but 9 of the approximately 2,400 Talc Claim plaintiffs allege exposure to J&J's talcum powder products after this exclusive relationship began. *See* Supp. Nolan Decl. ¶ 5.

3

unrelated products were named in any cases does not detract from this reality, because J&J properly seeks to transfer only claims against it.[8]

The undisputed standard for "related to" jurisdiction asks whether the outcome of the claims could have any conceivable impact on a debtor's estate. Here, just one Talc Claim verdict against J&J could be disastrous for Debtors' estates. Additionally, the mounting costs related to J&J's ongoing defense of piecemeal actions in courts across the country—all dictated by the same threshold issue—impacts Debtors' estates, regardless of outcome.[9] Despite these factors establishing this Court's jurisdiction and favoring transfer in accordance with the clear legislative purpose of § 157(b)(5), Plaintiffs would have this Court abstain. As discussed below, there is no sound basis for this Court to decline its authority under § 157(b)(5) as contemplated by Congress. Abstention would only perpetuate the inefficiencies, inconsistencies, and unfairness that J&J's Venue Motion seeks to avoid.

---

[8] Likewise, whether Debtors were or are co-defendants in these cases—although they have been named in approximately 90% of talc-related actions against J&J—is not relevant to jurisdiction. *See, e.g.*, *In re Montreal Me. & Atl. Ry., Ltd.*, 2014 WL 1155419, at *1, 12 (D. Me. Mar. 21, 2014) (granting § 157(b)(5) transfer and finding "related to" jurisdiction even though claims against debtors had been dismissed, and in actions where debtors had not been named as defendants); *W.R. Grace & Co.*, 386 B.R. 17, 23-30 & n.33 (Bankr. D. Del. 2008) (exercising "related to" jurisdiction over 100 asbestos-related personal injury suits against non-debtor railroad, most of which did not name any debtors as co-defendants); *see also Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. Thus, *the proceeding need not necessarily be against the debtor or against the debtor's property.*" (emphasis added)).

[9] Given this risk, the Court must question whether the CTC, in opposing J&J's Venue Motion (*see* D.I. 46), is properly exercising its fiduciary duties to all tort claimants. Allowing certain plaintiffs to proceed in state court will increase the size of J&J's claim against the estate, deplete insurance proceeds potentially available to satisfy Debtors' creditors, and result in certain of Debtors' creditors being advantaged over others, in violation of Congress's carefully crafted priority scheme. The CTC's primary purpose in opposing the Venue Motion, quite clearly, is to maximize J&J's liability exposure to plaintiffs—not to protect the interests of all its constituents as creditors of Debtors, which would involve seeking to limit the overall size of the claims against Debtors (including J&J's indemnity claims). The joinder of Debtors' proposed Future Claimants' Representative in the CTC opposition (*see* D.I. 48) is similarly suspect. Any action that stands to reduce the assets available to satisfy Debtors' creditors, like insurance proceeds, not only prioritizes some current unsecured creditors over others, but also prioritizes them over all future claimants.

4

**FURTHER STATEMENT OF FACTS[10]**

**I.      J&J's Exclusive Supply Relationship with Debtors Began in 1966.**

In 1965, J&J formed a wholly owned subsidiary to purchase the assets and assume the name and liabilities of Eastern Magnesia Talc Company, Inc. ("EMT"). *See* Ex. 20 (Miller Aff.) ¶ 1. EMT later changed its name to Windsor Minerals, Inc. ("Windsor").[11] *See id.* ¶¶ 4–5. Windsor is now known as Debtor Imerys Talc Vermont, Inc. *See* Ex. 1 (First Day Decl.) ¶ 12.

Beginning in 1966, the company that would soon be known as Windsor exclusively supplied J&J with talc for use in Johnson's Baby Powder. *See* Ex. 19 (*Cadigan* Verified Interrogatories) at 20–21.[12] With the exception of a six-month period around 1980 (due to a workers' strike) when another now-Debtor entity stepped in to supply,[13] Windsor remained J&J's exclusive talc supplier for that product through 1988. *See id.* at 20–21. Shower to Shower follows along similar lines, except from 1970 to 1973. *See id.* at 22–23; n.7, *supra*.

On January 6, 1989, J&J sold all outstanding Windsor shares to Cyprus Mines Corporation ("Cyprus"). *See* Ex. 7 (SPA). A condition of that sale was that Cyprus (or its affiliates) would continue to supply J&J with talc. *See id.* at § 8.5. So, on the same day, Windsor (now a wholly-owned subsidiary of Cyprus by virtue of the Stock Purchase Agreement) also entered into a supply agreement with J&J (the "1989 Agreement"). *See* Ex. 2 (1989 Agreement). Under the 1989

---

[10] Plaintiffs' briefing reflects several critical misunderstandings of the nature and timing of the supply relationship between J&J and Debtors; the insurance, duty to defend, and indemnification obligations between them; and the allegations at the core of the Talc Claims. Below, J&J sets the record straight.

[11] In 1989, Windsor changed its name from Windsor Minerals, Inc. to Cyprus Windsor Minerals Corp. *See* Ex. 1 (First Day Decl.) at 7. In 1992, Cyprus Windsor Minerals Corp. changed its name back to Windsor Minerals, Inc. *See id.* For clarity, J&J simply refers to this entity as "Windsor."

[12] Windsor supplied talc to J&J for Shower to Shower beginning in 1967. *See* Ex. 19 (*Cadigan* Verified Interrogatories) at 22–23.

[13] During the six-month strike when Windsor Vermont talc was unavailable to J&J, Cyprus—which later transferred its entire talc business (Cyprus Talc) to RTZ America, Inc. (which is now the Debtor ITA)—supplied Italian talc to J&J. *See* Ex. 19 (*Cadigan* Verified Interrogatories) at 20–23.

5

Agreement, Windsor (currently known as Debtor ITV) agreed to meet all J&J's domestic talc requirements and remained J&J's sole talc supplier. *See id.* at 3.

Debtors retained their role as J&J's exclusive talc supplier for domestic products throughout various corporate restructurings during the 1990s and thereafter.[14] First, the parties extended their exclusive supply relationship through the end of 1999 in a 1996 agreement between J&J and Windsor's then-corporate parent RTZ America, Inc. (later known as Rio Tinto America, Inc.). *See* Ex. 10 (1996 Amendment). Then, in June 2000, RTZ America, Inc. informed J&J that Luzenac America (now Debtor ITA) would continue to supply J&J under the exclusive 1989 Agreement through calendar year 2001. *See* Ex. 11 (2000 Letter). In a further agreement in 2001, Luzenac America (Debtor ITA) agreed to provide 100% of J&J's requirements for products containing cosmetic grade talc. *See* Ex. 3 ("2001 Agreement") § 1(a). Subsequent agreements continued this exclusive talc supply relationship between Debtors and J&J. *See* Ex. 4 (2010 Agreement) at 1 ("BUYER shall purchase from SELLER one hundred percent (100%) of BUYER'S and BUYER'S Affiliates' collective talc requirements"); Ex. 5 (2011 Agreement) at 1.

In 2011, "Imerys Group" purchased Debtors through a holding company, Mircal S.A. *See* Ex. 1 (First Day Decl.) ¶ 13. Mircal S.A. entered into an agreement with Rio Tinto America, Inc. (formerly RTZ America, Inc. and the parent of Luzenac America and Windsor) to purchase the

---

[14] In June 1992, Cyprus (the parent corporation) and its affiliates transferred their stock in Windsor and all of their assets in the talc business to a newly formed subsidiary, Cyprus Talc Corporation ("Cyprus Talc") via an asset transfer agreement (the "1992 ATA"). *See* Ex. 1 (First Day Decl.) ¶ 12; Ex. 21 (1992 ATA). On the same day1989, Cyprus (the parent) and Cyprus Minerals Corporation sold all shares of Cyprus Talc (i.e., the talc business) to RTZ America, Inc. *See* Ex. 1 (First Day Decl.) ¶ 12; Ex. 22 (RTZ SPA). The continuation of the 1989 Agreement with J&J was a condition precedent to that stock purchase agreement. *See* Ex. 22 (RTZ SPA) § 9.8. As part of this restructuring, Cyprus Talc, Windsor's parent and RTZ America, Inc.'s subsidiary, changed its name to Luzenac America, Inc. ("Luzenac America"). *See* Ex. 1 (First Day Decl.) ¶ 14. Luzenac America is now known as Debtor Imerys Talc America, Inc. (ITA) and is the parent of Debtor Imerys Talc Vermont, Inc. (ITV). *See* Ex. 1 (First Day Decl.) ¶ 12 & Ex. A. On June 29, 1992, Windsor assigned all of its rights and duties under the 1989 Agreement to its new corporate parent, RTZ America, Inc. *See* Ex. 9 (1992 Consent Agreement).

6

stock to Rio Tinto Group's talc operations—including the stock of Luzenac America (Debtor ITA) and Windsor (Debtor ITV). *See* Ex. 1 (First Day Decl.) ¶¶ 13–14.

In sum, despite the different monikers and changes to the corporate form, Debtors (ITA or ITV) have been J&J's exclusive talc supplier since 1966 for Johnson's Baby Powder and since 1967 (with the exception of 1970–1973) for Shower to Shower.

## II.      J&J's Continued Litigation of the Talc Claims Will Impact the Available Proceeds from Several Hundred Insurance Policies Issued to J&J.

From its inception until January 6, 1989, EMT (which was later renamed Windsor) remained a wholly owned subsidiary of J&J. *See* Denton Decl. [D.I. 3] ¶ 9. J&J maintained CGL insurance on an occurrence basis for several decades, beginning in the 1950s and continuing until 1986. *See id.* ¶ 6. These CGL policies provide coverage for the Talc Claims. *See id.* For example, under the Comprehensive Liability Policy, provided by the Aetna Casualty and Surety Company ("Aetna"), effective January 1, 1964 to January 1, 1967, the Named Insured is: "Johnson & Johnson & affiliated or subsidiary companies & operating divisions now existing or hereafter formed." Ex. 100 (Aetna 38 AL 9608SRY) at 27. For that period, CGL policy limits are at least $50 million. *See* Supp. Denton Decl. ¶¶ 10–11. Likewise, for example, under the Products Bodily Injury and Property Damage Liability Policy, Product Liability Policy, provided by Aetna, effective January 1, 1980 to January 1, 1981, the named insured is: "Johnson and Johnson and any affiliated, associated or subsidiary company in any tier as now or hereafter may be formed." Ex. 264 (Aetna 38 PK 17SCA) § II. That policy's applicable limit is $5 million. *See id.* With excess layers, total policy limits are approximately $110.05 million. *See* Supp. Denton Decl. ¶ 24.

Contemporaneously with this filing, J&J supplements the record with its primary and excess CGL insurance policies in effect from 1964 until 1986—*i.e.*, all but three years and five

7

days that Windsor was wholly owned by J&J.[15] *See* Exs. 100-536.[16] In response to a prepetition request from Debtors, J&J sent these CGL policies to Debtors. *See* Denton Decl. [D.I. 3] ¶ 14. Debtors' CFO has stated: "One or more of the Debtors have the right to seek proceeds from various insurance policies issued to J&J and its subsidiaries with total aggregate limits of approximately $2 billion." *See* Ex. 1 (First Day Decl.) ¶ 42; *see also In re Imerys Talc America, Inc.*, Case No. 19-10289-LSS (Bankr. D. Del.), D.I. 557, ¶ 5 ("The Debtors … have a significant interest in shared insurance policies with J&J and/or its subsidiaries."). Regardless of the validity of Plaintiffs' claims, both J&J and Debtors will look to these policies to recover defense and liability costs.[17]

## III.    Debtors Owe J&J a Duty to Defend From and Against Liabilities Arising Out of Any Violation of Law From 1989 Through 2006.

Under the 1989 Agreement, Windsor (now Debtor ITV) owes J&J a duty to defend. Windsor "shall indemnify, *defend* and hold harmless [J&J] . . . *from and against* all liabilities arising out of any violation by [Windsor] of *any* law, ordinance, regulation or rule or the order of any court or administrative agency . . . arising in connection with this Agreement." Ex. 2 (1989 Agreement) § 10 (emphasis added). By separately listing—and thus distinguishing—"any law" from ordinances, regulations, rules, or judicial orders, the duty to defend does not merely pertain to legal obligations that are statutory or regulatory. "Any law" includes the common law, product liability law, as well as the statutory provisions under which plaintiffs bring claims against J&J.[18]

---

[15] Although EMT was not formed until 1965, the 1964 Aetna policy was effective until 1967.

[16] Plaintiffs' arguments that J&J has denied the existence of or failed to provide these policies (D.I. 53 at 5, 11-13 & n.12) therefore fail.

[17] In addition, Debtors were supposed to obtain and maintain shared insurance for the benefit of J&J under section 12 of the 2001 Agreement. J&J has requested several times that Debtors provide such policy or policies to J&J, but so far these requests have been ignored. *Cf.* D.I. 46 at 8 n.5, 12–13.

[18] J&J, Debtors, and Rio Tinto America, Inc. have engaged in ongoing discussions and correspondence regarding indemnification since June 2015. Since at least May 30, 2018, Debtors have been on notice of J&J's contractual indemnification claims against them. *See* Ex. 24 (Ladd Letter). Those discussions ultimately resulted in two separate mediations. *See id.* In any event, J&J

WEIL:\97035373\22\54966.0222

Despite Windsor's various names and changes in corporate parentage, the 1989 Agreement governed the terms of talc supply to J&J until April 15, 2001, when the 2001 Agreement came into effect. Section 7(a)(iv) of the 2001 Agreement contains the exact same language and imposes the exact same duty to defend J&J on what is now known as Debtor ITA. *See* Ex. 3 (2001 Agreement) § 7(a)(iv). The 2001 Agreement governed the supply relationship through 2006. *See* Ex. 6 (2004 Amendment) ¶ 12. Regardless, Windsor's (Debtor ITV's) obligations under Section 10 of the 1989 Agreement and Luzenac America's (Debtor ITA's) obligations under Section 7(a)(iv) of the 2001 Agreement survive the respective agreements' termination or expiration. *See* Ex. 2 (1989 Agreement) § 10; Ex. 3 (2001 Agreement) § 7(b).[19]

## ARGUMENT

**I.     The Court Has "Related To" Jurisdiction over the Talc Claims.**

> **A.     *Shared Insurance Supports "Related To" Jurisdiction for Talc Claims Alleging Product Use From 1966 Until 1986.***

Shared insurance between J&J and Debtors is an independently sufficient basis to exercise "related to" jurisdiction over the Talc Claims, which threaten to deplete a pool of assets available

---

will submit proofs of claims against Debtors' estates prior to the bar date, which has not yet been set.

[19] Thus, Plaintiffs' contention that the 2010 and 2011 Agreements render the 1989 and 2011 Agreements "ineffective" is incorrect. *See* D.I. 57 at 9–10. *First*, even if the 2010 and 2011 Agreements disposed of the earlier agreements, the relevant sections of the agreements survive forever. *Second*, Plaintiffs' argument fundamentally misapprehends the purpose of an integration clause. The provisions Plaintiffs cite merely denote the same basic contractual device: language ensuring that subsequent disputes arising out of the contract are governed by the contract and not by parol evidence. *See* Restatement (Second) of Contracts § 209 (1981) ("An integrated agreement supersedes contrary prior statements."). These provisions did not—as is contended—terminate every prior contractual commitment. Under Colorado law, which governs interpretation of the 2010 and 2011 Agreements, "for a subsequent contract to implicitly supersede an earlier one, the two agreements must cover the same subject matter and be inconsistent with one another." *In re Estate of Gadash*, 413 P.3d 272, 278 n.6 (Colo. Ct. App. 2017); *see also Coop. Refinery Ass'n v. Consumers Pub. Power Dist.*, 190 F.2d 852, 856 (8th Cir. 1951). Because the prior agreements concerned the purchase of talc up to a certain date, and because the 2010 and 2011 Agreements concern the purchase of talc after that date, the latter agreements do not supersede the parties' respective rights and obligations under the prior agreements. In any event, J&J does not rely on either the 2010 or 2011 Agreement for its jurisdictional argument, and does not dispute that the 2010 Agreement concerns indemnification only for patent issues not implicated here.

to satisfy creditors (including Plaintiffs). Plaintiffs contend, without support, that coverage disputes defeat shared insurance as a basis for "related to" jurisdiction.[20] If this Court's jurisdiction depended on agreement between creditors and debtors, 28 U.S.C. § 1334 would cease to have meaning. Regardless, Debtors themselves have represented as follows in their bankruptcy:

- "The Debtors … have a significant interest in shared insurance policies with J&J and/or its subsidiaries." *In re: Imerys Talc America, Inc.*, Case No. 19-10289-LSS (Bankr. D. Del.), D.I. 557, ¶ 5.

- "One or more Debtors have the right to seek proceeds from various insurance policies issued to J&J and its subsidiaries with total aggregate limits of approximately $2 billion." Ex. 1 (First Day Decl.) ¶ 42.

Thus, it *is* undisputed that every dollar J&J spends defending against the Talc Claims depletes a pool of funds to which Debtors have laid claim. Debtors' concerns that non-J&J insurance coverage "for certain cosmetic talc-related litigation may be exhausted in the first half of 2019," Ex. 1 (First Day Decl.) ¶ 43, only emphasize the adverse impact on the estates, should J&J exhaust its CGL policy proceeds by continuing to defend the Talc Claims.

**B.    *Debtors' Contractual Duty to Defend J&J Provides this Court with "Related to" Jurisdiction for Talc Claims Alleging Product Use From 1989 Through 2006.***

1.    J&J's Contractual Rights Against Debtors Have Already Accrued.

Under Section 10 of the 1989 Agreement and Section 7 of the 2001 Agreement, Debtors must "indemnify, *defend*, and hold harmless" J&J. For purposes of clarity in assessing jurisdiction over the Talc Claims, the Court need only focus on Debtors' current *duty to defend* J&J within these broader indemnification provisions to see that estate resources are being depleted by

---

[20] *See, e.g.*, D.I. 46 at 13, D.I. 49 at 11-12; *cf. A.H. Robins Co.*, 788 F.2d at 1008 (referring only to claimants' "status as additional insureds under [debtor's] insurance policy" as being "undisputed on the record," and noting also "[t]hat there are thousands of Dalkon Shield actions and claims pending is a fact established in the record and the limited fund available under Robins' insurance policy is recognized in the record"); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 232–33 (3d Cir. 190), *as amended* (Feb. 25, 2005) (citing same discussion in *A.H. Robins Co.*, and distinguishing those facts from the *Combustion* bankruptcy court's complete lack of findings and undeveloped record on shared insurance).

10

mounting unsecured claims at this moment. Plaintiffs' resistance to jurisdiction rests on a patent misapplication of the following standard:

> Only when the right to indemnification is clearly *established* and has *accrued* upon the filing of a civil action is the proceeding deemed "related to" the bankruptcy case. But, where the right to indemnification is *contingent on a factual finding* in an action not involving the bankruptcy debtor *and requires the commencement of another lawsuit to establish that right*, there is no effect on the bankruptcy estate and thus no "related to" jurisdiction.

*In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013) (emphases added), *aff'd*, 571 F. App'x 139 (3d Cir. 2014). Because both the 1989 and 2001 Agreements obligate Debtors to *defend* J&J, not only will the *outcomes* of the Talc Claims adversely affect Debtors' estates (as articulated in *Pacor*),[21] but the *very existence* of the Talc Claims has already caused the meter to start running against Debtors' estates (as articulated in *Lower Bucks*).[22] Should this Court deny J&J's Venue Motion and permit the Talc Claims to proceed to judgments, any potential judgement against J&J would trigger Debtors' additional obligations to indemnify J&J for adjudicated liabilities, resulting in further dilution of Debtors' estates.

In *Lower Bucks*, the district court affirmed the bankruptcy court's exercise of "related to" jurisdiction even absent a specified duty to defend. There, the agreement required the debtor to "indemnify and hold harmless" the non-debtor. *See Lower Bucks*, 488 B.R. at 315. Here, of course, Debtors are contractually obligated to "indemnify, *defend* and hold harmless" J&J. *See* Ex. 2 § 10; Ex. 3 § 7(a)(iv). Lacking the defense obligation present here, the court looked to other portions of

---

[21] *See Pacor*, 743 F.2d 984, 994 (3d Cir. 1984) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome* of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.").

[22] *See Lower Bucks*, 488 B.R. at 316 ("LBH's indemnification obligation, at least in part, was triggered upon the filing of the class action against BNYM; and, it is not contingent upon a finding of liability. Therefore, the Bankruptcy Court has 'related to' subject matter jurisdiction to rule on the third party release provision.").

the contract to determine if the right to demand indemnity had actually accrued, or if it was contingent on a factual finding. *See Lower Bucks*, 488 B.R. at 314–16. Because the contract gave the non-debtor the option of directing the debtor to assume the defense of the claim and pay all reasonable expenses incurred, the court held that the non-debtor's "claim for defense costs" was "triggered upon the filing" of the class action complaint and therefore "had an immediate effect on [the debtor-indemnitor's] bankruptcy estate." *Id.* at 311-12, 314–16[23]; *see also In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 583–84 (D. Del. 2018) ("[c]ontractual obligations to advance defense costs . . . before any final determination on the merits" supported jurisdiction). The same is true here. Once each plaintiff's respective complaint was filed, Debtors were obligated to defend J&J—irrespective of any prior factual findings or liability determinations. In other words, even if the Talc Claims fail, they will adversely affect (and are related to) Debtors' estates.

2.      J&J's Contractual Rights Are Clearly Established.

Moreover, as in *Lower Bucks*, J&J's right to demand indemnification and defense costs is clearly established under the 1989 and 2001 Agreements. *See Lower Bucks*, 488 B.R. at 313–315 (exercising "related to" jurisdiction despite contractual carve-outs for gross negligence and willful misconduct). Unlike a common law indemnity claim—which would require, *first*, a liability finding for the claim to accrue, and *second*, another lawsuit to establish the right to be indemnified—J&J's contractual indemnification and defense rights accrued upon the filing of each complaint and were clearly established decades earlier, upon the execution of the 1989 and 2001 Agreements. Illustrating this principle, the *Pacor* court explained the circumstances before it as

---

[23] Because the drafters of the 1989 and 2001 Agreements (collectively, the "Agreements") deliberately included the word "defend" in Section 10 and Section 7(a)(iv)'s affirmative obligations flowing to J&J, the language that the court looked to in *Lower Bucks*—allowing the non-debtor to direct the debtor to assume the defense and recoup defense costs—was not necessary. That is, those rights were already clearly established within the Agreements.

WEIL:\97035373\22\54966.0222

follows: "Even if the [third-party] dispute is resolved in favor of [the plaintiff] . . . [the debtor] would still be able to relitigate any issue, or adopt any position, in response to a subsequent claim by [the non-debtor defendant]. Thus, the bankruptcy estate could not be affected in any way until the [indemnification] action is actually brought and tried." *Pacor*, 743 F.2d at 995. The *Pacor* court contrasted this scenario to a case where "a judgment . . . would *automatically result in indemnification liability against* [the debtor]," by virtue of a contractual indemnity owed by the debtor "for any liability or judgments incurred as a result of [the] guarantee agreement." *Id.* (emphasis added) (citing *In re Brentano's, Inc.*, 27 B.R. 90 (Bankr. S.D.N.Y. 1983)).[24] Debtors' obligations to J&J under contractual indemnification and defense provisions are an independently sufficient ground for "related to" jurisdiction.[25]

_____

[24] Plaintiffs seize on the word "automatic" and fashion it to their liking (D.I. 46 at 9; D.I. 53 at 9). Notably, courts in this District have rejected the notion that "the *effect on the estate* must be 'automatic.'" *In re Am. Home Mort. Holdings, Inc.*, 390 B.R. 120, 132 (Bankr. D. Del. 2008) (emphasis added). *See also In re TK Holdings, Inc.*, Ex. 14 (TKH Hr'g Tr.), at 17:6-14 ("I do not fully accept the [] plaintiffs' articulation of the 'absolute and automatic' indemnification standard that they derive from the *W.R. Grace* decision. First, that phrasing does not appear in the *W.R. Grace* decision and is not required by the logic of the ruling. W.R. Grace stands largely for the proposition that routine theories of common law indemnity or joint liability are too thin a reed upon which to base a bankruptcy court's related to jurisdiction."). This is consistent with *Pacor*'s instruction that a civil proceeding is related to bankruptcy if the **outcome** could conceivably have any effect on the estate. *See Pacor*, 743 F.2d at 994. Here, indeed, the outcome of the Talc Claims against J&J affects Debtors' estates. Should a defense verdict result, J&J's claims against the estates for defense costs will increase. Should plaintiffs secure favorable verdicts, in addition to J&J's claims for defense costs, its claims for indemnification will crystalize against the estates.

[25] The additional cases Plaintiffs raise with respect to indemnification claims change nothing about this analysis. *See, e.g.*, *In re FedPak Sys., Inc.*, 80 F.3d 207, 214 (7th Cir. 1996) (declining to exercise "related to" jurisdiction over request for a clarification order concerning parties' respective intellectual property rights to properties no longer in the bankruptcy estate, where debtor requesting order also lacked standing). Plaintiffs quote *FedPak* for the proposition that "related to" jurisdiction only encompasses claims that "would be ordinary stand-alone lawsuits between the debtors and others," but *FedPak* takes that language from *Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir. 1994), which also recognizes that "[a] secondary purpose [of "related to" jurisdiction] is to force into bankruptcy court suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate." *See also In re Doctors Hosp. of Hyde Park, Inc.*, 308 B.R. 311, 317 (Bankr. N.D. Ill. 2004) (rejecting common law cross-claims for breach of contract and fraud as supporting "related to" jurisdiction); *In re Asbestos Litig.*, 2002 U.S. Dist. LEXIS 3083, at *11 (D. Or. Feb. 1, 2002) (rejecting *hypothetical [common law] indemnity and contribution claims* . . . with almost no factual support" as basis for "related to" jurisdiction (emphasis added)); *Skylark v. Honeywell Int'l, Inc.*, 2002 U.S. Dist. LEXIS 10554, at

Plaintiffs contend—largely on the mistaken assumption that none of Debtors' obligations have yet *accrued*—that contractual rights between J&J and Debtors must be adjudicated in a second lawsuit, and therefore J&J's rights against Debtors are not yet *established. See, e.g.*, D.I. 49 at 7-8; D.I. 53 at 5-6. Not so. *Pacor* and its progeny only preclude the sort of inchoate, common law indemnity and contribution claims that Plaintiffs *imagine* J&J to be asserting, not the indemnification and defense obligations (which arose upon the filing of the Talc Claims) set forth by the contracts at issue here.[26] Nor do disputes Debtors' potential defenses—all of which themselves are contingent upon prior factual findings—or the scope of the contractual provisions detract from the existence of J&J's established right or deprive this Court of jurisdiction. *See* D.I. 53 at 5 n.6; *see also In re LTC Holdings, Inc.*, 587 B.R. 25, 38-39 (Bankr. D. Del. 2018) ("Any possible defenses by the Debtors against [non-debtor's] claim [under triggered indemnity] are not enough to derail jurisdiction over [action against non-debtor]"); *Belcufine v. Aloe*, 112 F.3d 633, 637 (3d Cir. 1997) (rejecting arguments that defenses to indemnification claims defeat jurisdiction, noting "the question [of] whether the claims are barred is one for none other than the bankruptcy court"); *In re Am. Home Mortg. Holdings, Inc.*, 390 B.R. 120, 132 (Bankr. D. Del. 2008) (rejecting argument that debtors' defenses to claims under swap agreements defeat jurisdiction, concluding "the effect on the estate need not be automatic" to find "related to" jurisdiction); *In re W.R. Grace*

---

*9 (S.D. Fla. Jan. 25, 2002) (rejecting "*tenuous [common law] cross-claims* for contribution and indemnity" as basis for "related to" jurisdiction (emphasis added)).

[26] Plaintiffs' other cited cases rejecting the sufficiency of conditional contractual indemnities do not undermine this rule. *See* D.I. 49 at 5, D.I. 37 at 3 (citing *Steel Workers Pension Tr. v. Citigroup*, 295 B.R. 747 (E.D. Pa. 2003); *Seagate Tech. (US) Holdings, Inc. v. Global Kato HG, LLC (In re Solyndra, LLC)*, 2015 WL 6125246, at *6 (Bankr. D. Del. Oct. 16, 2015) (rejecting "related to" jurisdiction over post-confirmation contract claims where it was "only after adjudication of the [non-debtor's underlying] claims [asserting breach of contract] … that it may be determined that [non-debtor] has any indemnity claims against the [debtor's] estate"); *O'Brien v. Gladstone*, 2014 U.S. Dist. LEXIS 89284, at *12 (D.N.J. July 1, 2014) ("[B]ecause Defendants are not entitled to automatic indemnification by [debtor], a second proceeding between Defendants and [debtor] would be required to determine Defendants' coverage under the indemnification agreement.").

WEIL:\97035373\22\54966.0222

*& Co.,* 386 B.R. 17, 28-29 & n.45 (Bankr. D. Del. 2008) (finding "related to" jurisdiction over claims against non-debtor on the basis of indemnification right and shared insurance, although "[d]ebtors do not acknowledge liability to [non-debtors] under any of these circumstances"); *In re W.R. Grace & Co.*, 315 B.R. 353, 357-58 (Bankr. D. Del. 2004) (validity or ambiguity of contract setting forth indemnity is not relevant to determination of "related to" jurisdiction). Plaintiffs' appeals to arbitration clauses (D.I. 46 at 11 n.7; D.I. 49 at 8; D.I. 53 at 8 n.8) therefore carry no weight.[27]

Nor is it relevant to the outcome, as Plaintiffs suggest (D.I. 46 at 8, 10; D.I. 58 at 11), that J&J has not sued to enforce the indemnification and duty to defend rights that Debtors owe. *See Belcufine*, 112 F.3d at 637 (defense to indemnification claim based on failure to file a timely proof of claim does not defeat jurisdiction); *LTC Holdings, Inc.*, 587 B.R. at 39 (vested indemnification claim supported "related to" jurisdiction "[w]hether or not [non-debtor] has asked the Court for indemnification at this time"). Plaintiffs' arguments on this point are especially hollow given that J&J gave notice to Debtors of its claims before the Petition Date, *see* Ex. 24 (Ladd Letter), and the bar date has not been set for J&J to file proofs of claim against Debtors' estates in the bankruptcy.[28]

---

[27] Inconsistently, certain Plaintiffs also highlight that J&J has denied its own alleged indemnification obligations to Debtors (*e.g.*, D.I. 58 at 9), while others argue that Debtors' demand for indemnity from J&J has no bearing on the jurisdictional analysis (*e.g.*, D.I. 53 at 11). Whether J&J disputes its obligations has no bearing on the jurisdictional analysis. And, although J&J can only seek transfer for claims against J&J due to the automatic stay protecting Debtors, *if* J&J must indemnify Debtors pursuant to the 1989 and 2011 Agreements, then these obligations would still impact (specifically, expand) the estate and thus *do* bear on "related to" jurisdiction. *See Dow Corning Corp.*, 86 F.3d at 494 (indemnities owed by debtor to non-debtor "*or vice versa*" establish conceivable impact on bankruptcy estates).

[28] The argument that J&J does not have a vested right in defense or indemnification because it has not asserted cross-claims against Debtors (D.I. 58 at 11) ignores the fact that cross-claims are not compulsory.

It is likewise irrelevant that J&J has denied the existence of contractual indemnities or insurance agreements under wholly unrelated circumstances. D.I. 46 at 3; D.I. 49 at 2, 9; D.I. 58 at 12 & n.14. Plaintiffs' arguments on this score mix apples and oranges—whether or not, in response to discovery requests, J&J discloses or objects to disclosing indemnity or insurance agreements implicated only to the extent they bear on J&J's bias or ability to satisfy a judgment in a particular action presents an issue distinct from and irrelevant to the "related to" jurisdiction standard under

15

3. Plaintiffs Misread the 1989 and 2001 Agreements.

   a. *There are no conditions precedent to Debtors' duty to defend.*

Plaintiffs' efforts to defeat this Court's jurisdiction rely heavily on a misunderstanding of the relevant contracts. Their claim—that Debtors' contractual obligations are conditioned on factual findings concerning fault—does not withstand scrutiny. *See* D.I. 46 at 5–6; D.I. 49 at 6–7; D.I. 53 at 5, 7–9; D.I. 57 at 10–12. Specifically, Section 10 of the 1989 Agreement and Section 7(a)(iv) of the 2001 Agreement both state that "[Debtors] shall indemnify, ***defend and hold harmless*** [J&J], and its affiliates … ***from and against*** all liabilities arising out of any violation by [Debtors] of ***any*** law [or] regulation … arising in connection with this Agreement." (emphases added).[29] This duty to defend accrues before any factual finding and, certainly, before entry of any judgment.

Plaintiffs, however, point to the same exclusionary language contained in both agreements to support their contention that Debtor's duty to defend requires a prior factual finding that J&J is without fault. The language to which Plaintiffs cling does not support their argument:

> [P]rovided however, that Seller [Debtor ITV or Debtor ITA, depending on the agreement] shall not *indemnify* [J&J] for any such liabilities to the extent such liabilities arise from: (i) the acts or omissions of [J&J]; or (ii) the acts or omissions of Seller which were directed by [J&J].

---

28 U.S.C. § 1334(b). As J&J has consistently argued, its rights to Debtors' duty to defend do *not* depend on the existence of a judgment against J&J.

[29] To the extent Plaintiffs argue that Debtors' duty to defend relates only to their own "violation" of any law, and this obviates their duty to defend the Talc Claims because they are asserted only against *J&J* (D.I. 46 at 10), such argument fails because Debtors are named in almost all actions in which the Talc Claims arise—*i.e.*, approximately 90% of the State Court Talc Claim actions—and, as discussed *infra*, Debtors are the true parties-in-interest in all Talc Claims. Indeed, any allegation that J&J has violated laws and regulations by selling contaminated or otherwise unsafe talcum powder products directly implicates violations by Debtors.

WEIL:\97035373\22\54966.0222

*See* Ex. 2 (1989 Agreement) § 10; Ex. 3 (2001 Agreement) § 7(a)(iv). *First*, this language describes the circumstances under which Debtors shall have no obligation to *indemnify* J&J, not, as Plaintiffs claim, a condition precedent to Debtors' *defense* obligations. Therefore, Debtors' duty to defend is not contingent upon a finding that J&J has not engaged in or directed misconduct.[30]

Indeed, just as the duties to defend and indemnify are distinct, it is a well-established principle that when parties use different language in two parts of a contract, a court should interpret the parties as having intended different meanings.[31] Here, the difference between the provisions creating Debtors' defense obligations and the subsequent limiting provisions is apparent. The inclusionary provisions—Debtors must "indemnify, defend and hold harmless" J&J—incorporate the additional obligations to "defend and hold harmless." *See* Ex. 2 (1989 Agreement) § 10; Ex. 3 (2001 Agreement) § 7(a)(iv). In contrast, by omitting the phrase "defend and hold harmless," which was used earlier in the same sentence, from the exclusionary provision, the parties limited *only* Debtors' indemnification obligations, not their duty to "defend and hold harmless." So, under the plain language of the Agreements, any findings of fact necessary for *indemnification* have no impact on Debtors' obligation to *defend* J&J or on this Court's "related to" jurisdiction analysis.

---

[30] This fact also eviscerates Plaintiffs' attempts to distinguish the relevant case law. *Compare* Mot. at 10-12 and nn.16-19, *with* D.I. 46 at 11 *and* D.I. 53 at 10 & n.11 (also citing *Gen. Elec. Capital Corp. v. Pro-Fac Coop., Inc.*, 2002 WL 1300054, at *2 (S.D.N.Y. June 11, 2002) (rejecting unspecified "contingent contribution and indemnity claims" as basis for "related to" jurisdiction, without discussion of any contract or terms); *Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*, 2012 WL 4794450, at *3 (S.D.N.Y. Oct. 9, 2012) (rejecting as basis only "potential indemnification claims" not filed as of the time the bar date passed); *see also Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 2011 WL 4965150, at *4 & n.4 (S.D.N.Y. Oct. 19, 2011) ("An outcome's contingency does not preclude it from having a 'conceivable effect' on a bankruptcy proceeding. . . . To the extent defendants can utilize the provisions of their indemnification agreements to claim legal fees associated with defending this action, the outcome itself may in fact be irrelevant.").

[31] *See Policemen's Benev. Ass'n v. City of Trenton*, 16 A.3d 322, 328 (N.J. 2011) ("[W]here parties to [the] same contract use different language to address parallel issues, it is reasonable to infer that they intend this language to mean different things.") (citing *Taracorp, Inc. v. NL Indus. Inc.*, 73 F.3d 738, 744 (7th Cir. 1996)); *In re Pistor's Estate*, 154 A.2d 721, 723 (N.J. 1959) (similar); *cf. Hopkinton Scout Leaders Ass'n v. Town of Guilford*, 844 A.2d 753, 756 (Vt. 2004) (similar, for statutory interpretation).

WEIL:\97035373\22\54966.0222

And Debtors are obligated to "defend and hold harmless" J&J for any liability that arises due to Debtors' violation of any law arising in connection with the Agreements, even if such liabilities implicate J&J's own acts, omissions, or directions to Debtors.

WEIL:\97035373\22\54966.0222

*Second*, ignoring the omission of "defend and hold harmless" from the exclusionary provision, Plaintiffs argue that the Agreements require a court to decide whether J&J or Debtors suffer "liability" or have committed a "violation" before *any* of Debtors' obligations are triggered, meaning final judgment is a fact-specific condition that defeats "related to" jurisdiction. *See* D.I. 57 at 11; D.I. 53 at 5, 10-11. But Plaintiffs again conflate Debtors' duty to defend with Debtors' duty to indemnify. Whether liability is based on J&J's own misconduct has no bearing, under the plain contract terms, on Debtors' "defend and hold harmless" obligations. The case law, too, supports this reading. "In contractual duty-to-defend cases, an indemnitor's obligation to defend should be determined at the beginning of the case based on the pleadings." *State v. Prison Health Servs., Inc.*, 88 A.3d 414, 417 (Vt. 2013) (citation omitted). In other words, "a party does not have to await trial to ascertain if there is a duty to defend. Whether [a party] has a duty to defend is determined by comparing the allegations in the complaint with the language of the [agreement]. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit." *Cottle v. Walgreens*, 2013 WL 4404121, at *4 (N.J. Super. Ct. App. Div. Aug. 19, 2013)).[32] Thus, J&J's right to Debtors' *duty to defend* turns on no findings of fact.[33]

---

[32] *See also Co-operative Ins. Cos. v. Woodward*, 45 A.3d 89, 93 (Vt. 2012) ("In determining whether there is a duty to defend, we compare the language of the policy to the language of the complaint … [;] [the only time when] there is no duty to defend [is] when there is no possible factual or legal basis on which the insurer might be required to indemnify"); *W9/PHC Real Estate LP v. Farm Family Cas. Ins. Co*, 970 A.2d 382, 391 (N.J. Super. Ct. App. Div. 2009) (holding that when the "allegations of that complaint, upon its face, fall within the risk insured against … the duty to defend arises, irrespective of the claim's actual merit because the duty to defend is broader than the duty to indemnify").

Plaintiff Harris relies on *Grippo v. Schrenell & Co.*, 538 A.2d 404 (N.J. Super. Ct. App. Div. 1988) to argue that the Court must first finally adjudicate whether Debtors violated the law before Debtors' duty to defend obligations to J&J will accrue. D.I. 57 at 11-12. But the duty to defend obligations in the 1989 and 2001 Agreements are broader than that in *Grippo*, where it only extended to liability "arising from accidents . . . occasioned by the Subcontractor." *Id.* at 405. Plaintiff Harris does not dispute that his allegations of violations of state laws necessarily implicate the legality of Debtors' conduct as J&J's exclusive talc supplier. In addition, unlike in *Grippo* where the indemnitee made the allegations that implicated the indemnitor's conduct and that purportedly triggered the indemnification obligations, in this case, it is *Plaintiffs* whose allegations necessarily implicate the legality of Debtors' conduct and thus triggered Debtors' duty to defend

19

*Third*, Plaintiffs argue that Sections 10 and 11 of the 1989 Agreement effectively cancel each other out and leave only J&J potentially liable for product liability-based claims, by virtue of specific "product liability-based" language in Section 11. D.I. 58 at 10-11.[34] While it is true that Section 10 (Windsor's obligations to J&J) and Section 11 (J&J's obligations to Windsor) largely mirror one another,[35] the "product liability-based" language in Section 11 pertains only to limited circumstances and as such cannot be read to exclude product liability laws from the broader "[a]ny law" (which includes the common law) language in Sections 10 and 11. In other words, Section 11's specific reference to "product liability-based claims" does not, as Plaintiffs contend, demonstrate the parties' desire to exclude the Talc Claims from Section 10.

The limited circumstances to which Section 11 applies are as follows. The 1989 Agreement places "product liability-based claims" into two buckets: *first*, retrospective claims for product manufactured before January 6, 1989, *see* Ex. 2 § 11; *second*, prospective claims for which J&J is "directly or indirectly responsible." *See id.* As to either bucket, any obligation J&J may have to indemnify Windsor is negated under plaintiffs' theory of the case because J&J's obligation in Section 11 (but not Debtors' obligation in Section 10) also contains the following exclusion:

> [P]rovided, however, that [J&J] shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to [J&J] hereunder did not conform to the specifications for such Talc *then in effect*, and such variance from such specifications was a material contributing factor in the claim, suit,

J&J. Further, this single, nonbinding case from 1988 is out of step with the overwhelming majority of case law concerning the duty to defend. The duty to defend would become functionally worthless if an indemnitee needed to defend itself throughout a protracted litigation before it could hope to one day, maybe, secure reimbursement for its attorneys' fees and costs.

[33] Even as to Debtors' indemnification obligations, these exclusions can only be satisfied to "undo the *presumed* applicability of the indemnity," *In re LTC Holdings, Inc.*, 587 B.R. at 38, and thus do not run afoul of the accrued, not "contingent on a factual finding," articulation. (emphasis in original)

[34] *See also* D.I. 46 at 5–6; D.I. 49 at 8; D.I. 58 at 10–12.

[35] The 2001 Agreement contains no provision requiring J&J to defend Debtor ITA. *See generally* Ex. 3.

demand or cause of action being asserted.[36]

In other words, if Plaintiffs are correct and the talc supplied to J&J by Windsor contained asbestos[37]—which J&J and Debtors both vehemently dispute—then J&J has no obligation to indemnify Windsor[38] and the talc-related liabilities rest with Debtor ITV.[39] By using the past tense "then in effect," this provision relieves J&J of indemnification obligations for even claims implicating pre-1989 product if, as alleged by Plaintiffs here, variance from the material specifications was a contributing factor in the claim, suit, demand, or cause of action being asserted. The questions of fact raised by these provisions are immaterial to the Court's "related to" jurisdiction analysis, but they show that the net effect of the 1989 Agreement is *not*, as Plaintiffs contend, to allocate any and all Talc Claim liability *away* from Debtors.

*Finally*, Plaintiffs argue that Debtors' obligations to J&J under the 2001 Agreement depend on findings of fact because <u>Section 7(a)(i)</u> of the 2001 Agreement, which provides for Debtors' indemnification to J&J arising from the talc not meeting specifications or from a failure to sample

---

[36] *See* Ex. 2 (1989 Agreement) § 11. Thus, if Plaintiffs' theories are correct (which they are not), contrary to what Plaintiffs claim (D.I. 46 at 2), J&J will not owe Debtors indemnity for product liability claims. In fact, this language is conspicuously absent from Plaintiffs' discussion of Section 11 of the 1989 Agreement. *See, e.g.*, D.I. 46 at 5–6.

[37] *See* Ex. 2 (1989 Agreement), Ex. E ¶ 1 ("Johnson & Johnson cosmetic talc is currently and must continue to be asbestos free.").

[38] Nor does J&J have any indemnification obligations to Debtors for those periods where the parties operated without a supply agreement (2007–2009 and 2012–present).

[39] If true, Debtor ITV would likely look to the CGL policies to satisfy its creditors' claims.

21

and test the talc, is subject to certain caps.[40] *See* D.I. 53 at 10. This argument misses the point.

Section 7(a)(i) addresses *indemnification* and has no bearing on Debtors' duty to defend.[41]

        *b.*        *The law governing the contracts does not change the analysis.*

Again asking the Court to ignore the express contractual language, Plaintiffs also argue that "[u]nder governing [Vermont and New Jersey] law, Debtor's duty to defend—unlike that of an insurance company—is strictly construed and includes only those claims that give rise to an indemnity right." D.I. 53 at 9. But Plaintiffs' own cited authority belies their argument by recognizing that the scope of a party's duty to defend is a creature of contract.[42] Moreover, it is well-established in the analogous insurance context that "[t]he duty to defend and the duty to indemnify are distinct … [and the] duty to defend is neither identical nor coextensive with [the] duty to indemnify." *Mem'l Props., LLC v. Zurich Am. Ins. Co.*, 46 A.3d 525, 529 (N.J. 2012); *see also State Farm Mut. Auto. Ins. Co. v. Colby*, 82 A.3d 1174, 1177 n.2 (Vt. 2013). Simply put, there

---

[40] Luzenac America (Debtor ITA) "shall indemnify [J&J] for any *cost*, loss, damage or *expense* suffered by [J&J] which arises from: (A) the Product not meeting the specifications therefor as described in Annex A at the time title for such Product passed to [J&J] . . . or (B) Seller [Luzenac America (Debtor ITA)] failing to sample and test Products in accordance with the sampling and testing methods described in Annex A in the manner practiced by Seller on the date of this Agreement or as modified by mutual agreement pursuant to Section 1(b) above." Ex. 3 (2001 Agreement) § 7(a)(i).

[41] Even *if* Debtors' Section 7(a)(iv) defense obligations were capped based on a finding of "gross negligence or willful misconduct," as its indemnification obligations may be under Section 7(a)(i), then there may be more or fewer assets left in Debtors' estate, but this does not change the fact that Debtors' estate will nonetheless be reduced (albeit by less) through its duty to defend obligations.

[42] *See Mantilla v. NC Mall Assocs.*, 770 A.2d 1144, 1150-51 (N.J. 2001) ("[I]t is clear that [a duty to defend provision] is to be construed in accordance with the rules for construction of contracts generally, and hence that the judicial task is to ascertain the intention of the parties") (citation omitted); *Tateosian v. State*, 945 A.2d 833, 838 (Vt. 2007) ("In [duty to defend] cases, we interpret the language to give effect to the intent of the parties as that intent is expressed in their writing") (citation omitted); *cf. Perez v. El Bamboo Bar/Club*, 2007 WL2081472, at *2-3 (N.J. Super. Ct. App. Div. July 23, 2007) (analyzing a specific contractual provision in which the duty to defend and the duty to indemnify covered the same types of claims). The duty to defend "is solely a contractual undertaking" and "can be as limited or as broad" as the parties "see[] fit to provide" through the agreement. *Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 483 A.2d 402, 405 (N.J. 1984).

22

is no prohibition against parties agreeing that an indemnitor's duty to defend extends beyond the

scope or types of claims covered by its duty to indemnify,[43] just as the parties agreed here.

### C.  Debtors Share an Identity of Interest with J&J for Virtually All Talc Claims Alleging Product Use from 1967 to Present.

Debtors are effectively the true parties-in-interest in virtually all the Talc Claims.[44] The

Talc Claims revolve around a single type of product (under two different brand names) and the

injuries allegedly caused by contamination or inherent properties in those products. All such

products and allegations trace back to the talc *as supplied* by Debtors since 1967. Contrary to

Plaintiffs' suggestion that different exposure periods and codefendants among the Talc Claims

defeat J&J's Venue Motion (D.I. 53 at 4; D.I. 58 at 1, 11), all but 9 of the approximately 2,400

Talc Claims allege exposure to J&J's talcum powder products since 1967, when a now-Debtor

became J&J's exclusive supplier.[45] In arguing against identity of interest,[46] Plaintiffs overlook that

---

[43] Additionally, while it is true that New Jersey and Vermont law will "strictly construe[]" an indemnitor's duty to defend, *see* D.I. 53 at 9, the authority cited by Plaintiffs merely reflects that while in the insurance context, ambiguous duty to defend provisions will be interpreted against an insurer, in the contractual indemnification context, ambiguous duty to defend provisions will be interpreted against the indemnitee. Nevertheless, courts enforce a duty to defend, even with respect to claims involving the indemnitee's own negligence, when the parties' intentions are "expressed in unequivocal terms," *Mantilla*, 770 A.2d at 1151 (citation omitted), or "the language clearly expresses that intent." *Tateosian*, 945 A.2d at 839. That is precisely the situation here, as the 1989 and 2001 Agreements expressly provide that Debtors' duty to *defend* applies to all liabilities arising out of Debtors' violation of law arising in connection with the Agreements. As discussed above, this is so regardless of whether such liabilities implicate J&J's own alleged conduct, omissions, or instructions.

[44] *Cf.* CTC's Response In Opposition To Certain Excess Insurers' Motion For Relief From The Automatic Stay To Permit The California Coverage Action To Proceed And Order Of Abstention ("CTC Response to Excess Insurers' Motion"), *In re: Imerys Talc America, Inc.*, Case No. 19-10289-LSS, D.I. 508 at 14 ("Indeed, the protection of the automatic stay extends to any action or proceeding against an interest of the debtor and the scope of that protection 'is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation.'") (quoting *Kaiser Group Int'l, Inc. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp., Inc.)*, 315 B.R. 655, 658 (D. Del. 2004)).

[45] Arguments that transfer of claims alleging pre-1989 exposure would be improper or unworkable, therefore, fall away.

[46] Which, notably, the Lanier Law firm has argued J&J shares with Debtors' former parent company. *See* Ex. 26 (*Rimondi* brief) at 7–10 (arguing that severing J&J from Cyrus Amax

the Talc Claims against J&J fail at the outset if the talc that Debtors supplied was *safe*. This holds true for all varieties of failure to warn and breach of warranty claims,[47] conspiracy allegations, and all claims implicating defects in design or manufacture. Indeed, plaintiffs' allegations are not that J&J *added* asbestos or used unsafe additives in the talc supplied by Debtors. Rather, they allege contamination or other unsafe attributes of talc straight from Debtors' mines.

The Talc Claims present precisely the same identity of interest as in *Dow Corning*, 86 F.3d 482, 86 F.3d 482 (6th Cir. 1996), which the Third Circuit recognized as supporting jurisdiction in *In re Federal-Mogul*, 300 F.3d 368, 384 (3d Cir. 2002), and *In re Combustion Engineering*, 391 F.3d 190, 231 (3d Cir. 2005), *as amended* (Feb 25, 2005), discussed further in Section I.D, *infra*, as well as in *In re TK Holdings, Inc.*, Ex. 14 (TKH Hr'g Tr.) at 16 ("Here, every single claimant knows the vehicle they purchased and can establish the fact that it contains a Takata airbag system."). Whether Debtors sell talc to other manufacturers (D.I. 53 at 14) has no bearing on the Talc Claims, which are exclusively against J&J. And Plaintiffs fail in their attempt to equate the posture of the Talc Claims to historical asbestos mass tort cases involving dozens of products, complicated supply chains of multiple manufacturers and suppliers with varying duties, and exposures incapable of being traced to any specific product. There is no established carve-out for cases involving asbestos, nor is there any comparison between the narrow allegations of contaminated cosmetic talcum powder, supplied *exclusively* by Debtors, and traditional asbestos cases. As discussed below, Section I.D., the Talc Claims are nothing like the claims addressed in the Third Circuit's *Federal-Mogul*, *Combustion Engineering*, and *W.R. Grace* decisions.

---

Minerals Company, the mining company, prejudiced the plaintiff by risking "wholly irreconcilable and inconsistent judgments" on the same question—whether the plaintiff was exposed to asbestos from Johnson's Baby Powder).

[47] This includes the allegation that J&J failed to pass along some warning. *See* D.I. 46 at 7-8.

Contrary to Plaintiffs' arguments (D.I. 46 at 13; D.I. 53 at 14-15; D.I. 58 at 9), this "unusual situation"[48] exists independent from any corporate familial relationship, which the Third Circuit case law does *not* make a prerequisite for an identity of interest. *See, e.g.*, *W.R. Grace & Co.*, 386 B.R. at 30–31 ("[Non-debtor Railroad] and the Debtors share an identity of interest *as it is the Debtors' operations and conduct at the Libby mines that are at the core of the issues raised in the Montana Actions* filed against [the Railroad]. Indeed … trial counsel for [the Railroad] defending the Montana Actions[] stated that 'Grace's operations at Libby *were a proximate cause of the individual Plaintiffs' injuries*' and that '[the Railroad] anticipates that it may assert in excess of 1,000 indemnification claims against [the Debtor]'") (emphases added).[49]

Indeed, try as they might to distinguish the posture of *TK Holdings* from this case by emphasizing the identity of interest found between debtors and *one* corporate affiliate on the basis of a corporate familial relationship, *see, e.g.*, D.I. 53 at 15; D.I. 46 at 13-14; Ex. 14 (TKH Hr'g Tr.), at 12:20-22, Plaintiffs cannot deny Judge Shannon's identity of interest analysis with respect to non-debtor, non-affiliated car manufacturers to whom the debtor had supplied airbags:

> [T]hese debtors sold part[s] under contract to be installed in vehicles manufactured by the [non-debtor car manufacturers]. And those parts have been demonstrated to fail and to cause injury. Yes, I understand that there are other claims and other theories raised by plaintiffs . . . , ***but literally everything here begins with the delivery and installation of a defective part manufactured by the debtors***.
>
> I do not accept the objector's contention that the [non-debtor car manufacturers'] inability to be indemnified for their own negligent

---

[48] *A.H. Robins Co.*, 788 F.2d at 999.

[49] *See also Fed.-Mogul Glob., Inc.*, 300 F.3d at 384 (quoting and approving the analysis in *Arnold v. Garlock, Inc.*, 278 F.3d 426, 440 (5th Cir. 2001), where the Fifth Circuit discussed *Dow Corning*, 86 F.3d at 498, as follows: "In that case, *each of the co-defendants was closely involved in using the same material, originating with the debtor, to make the same, singular product, sold to the same market and incurring substantially similar injuries. This circumstance created a unity of identity* between the debtor and the co-defendants." (emphasis added)).

WEIL:\97035373\22\54966.0222

> or wrongful acts operates to vitiate the identity of interest that's otherwise created by the contractual indemnity obligations.
>
> This observation applies as well to the lemon law litigations where the court acknowledges that in some cases the debtors may not be a main party. Nevertheless, in each of those cases, the debtors' interest are at issue as the record reflects that the [car manufacturers'] defenses in each of these cases will certainly revolve around the acts and omissions of the debtors.

Ex. 14 (TKH Hr'g Tr.) at 14:22-15:16 (emphasis added). As in *TK Holdings*, "literally everything here begins with the delivery" of Debtors' talc and its use in Johnson's Baby Powder and Shower to Shower.

### D.    *Plaintiffs Misread the Law.*

The Third Circuit precedent on which Plaintiffs chiefly rely in contesting "related to" jurisdiction bears no similarities to this case, where J&J can point to Debtors' claims to billions of dollars in proceeds from shared insurance with J&J, J&J's already-accrued and established contractual rights against Debtors, and a complete unity of interest in two products allegedly causing all Talc Claim plaintiffs' injuries. *See generally* Ex. 27 (table comparing cases to Talc Claims). Still, under the rules stated and the distinctions drawn therein, the Third Circuit cases confirm that this Court has "related to" jurisdiction over the Talc Claims.

*First,* the case most frequently cited by the Plaintiffs, *In re Federal-Mogul Global, Inc.*, involved asbestos claims brought by tens of thousands of plaintiffs "against various manufacturers and distributors of [different] friction products . . . as well as against companies that made and sold products that incorporated friction products" in their own products. 300 F.3d at 372. Eleven auto-manufacturer movants sought to remove their cases from state court to the district court in which the debtors' bankruptcy case was pending. *In re Fed.-Mogul Glob., Inc.*, 282 B.R. 301, 303 (Bankr. D. Del. 2002). But in arguing that the district court had jurisdiction, the movants "produced no evidence whatsoever of even a bare agreement to indemnify running between the debtors and the

26

solvent co-defendants." *Fed.-Mogul Glob.,* 300 F.3d at 376 (quoting *Fed.-Mogul Glob.,* 282 B.R. at 311). Only one movant "submitted documents that could even plausibly support a claim based on a written indemnification agreement, namely boiler-plate purchase orders that refer to documents containing indemnification language"—documents that were "'too thin a thread with which to pull [the movants] into the [debtors'] bankruptcy.'" *Id.* at 376 (quoting *Fed.-Mogul Glob.,* 282 B.R. at 312). The lower court had determined that "[n]o asset of the estate [was] threatened," *id.* at 311, and the Third Circuit, "remain[ing] a step away from reaching the merits" and applying a "clear error" standard of review, declined to issue a writ of mandamus with respect to the district court's finding that it lacked "related to" jurisdiction on the basis of the tenuous, common-law indemnification and contribution rights. *Fed.-Mogul Glob.*, 300 F.3d at 379-84.

Setting aside the distinguishable facts there, the *Federal-Mogul* district court expressly recognized that absolute contractual indemnification rights "plainly establish[] a sufficient nexus between suits against [non-debtors] and the administration of the bankrupt's estate." 282 B.R. at 309 (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1007-08 (4th Cir. 1986)). Further, while no shared insurance was asserted there, in distinguishing the case before it from *A.H. Robins Co.*, the *Federal-Mogul* district court noted that common insurance "created a link *decisively favoring bankruptcy jurisdiction*." 282 B.R. at 310 (emphasis added). And on appeal, the Third Circuit cited with approval the Fifth Circuit's analysis in *Arnold v. Garlock, Inc.*, 278 F.3d 426 (5th Cir. 2001), noting that the *Garlock* court distinguished circumstances "where the co-defendants variously use[d] asbestos for brake friction products, insulation, gaskets, and other uses," from the "unity of identity between the debtor and the [non-debtors]" in *Dow Corning*, where "each of the [non-debtors] was closely involved in using the same material, originating with the debtor, to make the

27

same, singular product, sold to the same market and incurring substantially similar injuries." *Fed.-Mogul Glob.,* 300 F.3d at 384 (quoting *Garlock*, 278 F.3d at 440).

*Second*, addressing similar facts to *Federal-Mogul*, the Third Circuit in *In re Combustion Eng'g, Inc.*, 391 F.3d 190, noted a lack of "express indemnification obligations" asserted within a prepackaged Chapter 11 plan, and it rejected the *possibility* of future common law contribution or indemnity claims as supporting "related to" jurisdiction. *Id.* at 230-32. The court further rejected as independent grounds for jurisdiction: (1) a corporate affiliation between lateral, peer companies in a holding company structure, "without more," *id.* at 228; (2) the notion that parties could create subject matter jurisdiction by pre-packaged consent—*i.e.*, by structuring a plan to depend on third-party contributions, *id.* at 228-29; and (3) alleged shared insurance where there were no factual findings by the court below. On this last ground, contrary to Plaintiffs' suggestion that the *Combustion* court rejected shared insurance generally as an independent basis for "related to" jurisdiction (D.I. 46 at 12; D.I. 49 at 10-11), the court explained that it *would have* remanded for the district court to correct its "insufficient findings of fact" on shared insurance, but it refrained because an alternative, unrelated ground supported its decision. *Combustion Eng'g,* 391 F.3d at 231-33. Further, the *Combustion* court found a "unity of interest" lacking because "the asbestos-related personal injury claims [against debtors and non-debtors arose] from different products, involved different asbestos-containing materials, and were sold to different markets"—in explicit contrast to the "single product" scenario in *Dow Corning. Id.* at 231.

*Lastly*, in *In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009), the state of Montana, seeking expansion of a preliminary injunction, sought to establish "related to" jurisdiction over failure to warn claims brought by plaintiffs exposed to asbestos from the debtor's mining operations. Unlike here, Montana raised no contractual indemnification obligations or shared

28

insurance rights, so the court again rejected possible common-law claims as a jurisdictional hook. *Id.* at 172-73. It then found that no identity of interests existed between Montana and the debtor because the parties' potential liabilities arose from entirely different relative duties and circumstances. *Id.* at 173. Notably, prior and subsequent *W.R. Grace* decisions have found "related to" jurisdiction over asbestos-related claims on the type of facts presented here. *See In re W.R. Grace & Co.*, 900 F.3d 126, 139 (3d Cir. 2018) ("'[R]elated to' jurisdiction [exists] over actions [against] non-debtors involv[ing] contractual indemnity obligations between the debtor and non-debtor that automatically result in indemnification liability against the debtor.' (quoting *Combustion Eng'g*, 391 F.3d at 226)  Such is the case here, as the Trust is obligated by contract to indemnify [non-debtor defendant insurer] up to $13 million for its asbestos personal injury liability.") 900 F.3d at 139; *W.R. Grace & Co.*, 386 B.R. at 30-31 (similar).

## II.  Section 157(b)(5) Permits Transfer of Claims by Non-Debtors, Regardless of Whether Debtors Are Codefendants.

Plaintiffs argue that § 157(b)(5) does not apply to "claims by non-debtors against non-debtors." D.I. 46 at 20; *see also* D.I. 58 at 5, 7. The case law proves otherwise. *See, e.g.*, *In re Montreal Me. & Atl. Ry.*, 2014 WL 1155419, at *5, *9-10, 12 (D. Me. Mar. 21, 2014) (transferring product liability claims against non-debtors under § 157(b)(5), including in cases from which debtors had been dismissed); *In re New Eng. Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 496 B.R. 256, 264-65 (D. Mass. 2013) (transferring and aggregating cases, including against non-debtors in which debtor affiliates but not debtors themselves were named codefendants, under § 157(b)(5)); *In re Nutraquest*, 2004 U.S. Dist. LEXIS 29143, at *42-43 (D. N.J. Mar. 8, 2004) (finding "related to" jurisdiction over claims against non-debtors, and citing a legislative presumption in favor of § 157(b)(5) transfer; *see also In re Dow Corning Corp.*, 86 F.3d at 498 (reversing "the district court's determination that it lacked subject matter jurisdiction over the tort

29

claims pending against the nondebtor defendants and that it did not have the power to transfer those claims pursuant to Section 157(b)(5)"); *In re Dow Corning Corp.* (*Dow II*), 113 F.3d 565, 572 (6th Cir. 1997) (issuing writ of mandamus ordering § 157(b)(5) transfer of claims against non-debtor shareholders of debtor).

While the court in *A.H. Robins* addressed a § 157 motion brought by the debtor and framed its decision on transfer in terms of "suits against the debtor," *A.H. Robins*, 788 F.2d at 998, 1016, a tort claimant-appellant's subsequent petition for writ of certiorari to the U.S. Supreme Court shows that transfer of thousands of claims against non-debtor codefendants indeed occurred. *See Petition for Writ of Certiorari, Piccinin v. A.H. Robins Co., Inc.*, No. 86-211, 1986 WL 767279, at *3 (U.S. 1986). *See also Dow Corning Corp.*, 86 F.3d at 497 ("We agree with the Fourth Circuit [in *A.H. Robins*] that Section 157(b)(5) should be read to allow a district court to fix venue for cases *pending against nondebtor defendants* which are 'related to' a debtor's bankruptcy proceedings pursuant to Section 1334(b)." (emphasis added)). Further, in *Hopkins v. Plant Insulation Co.*, 342 B.R. 703 (D. Del. 2006), Judge Farnan exercised discretionary abstention rather than transferring under § 157(b)(5), but he did not pronounce the inapplicability of that provision to claims against non-debtors. Rather, his decision turned on unique circumstances not at issue here: "the *Debtor's opposition to the transfer*, coupled with the lack of precedent for applying Section 157(b)(5) to *frustrate the debtor/plaintiff's choice of forum*." *Id.* at 717 (emphasis added). Here, J&J seeks to transfer the Talc Claims *to* the district court in Debtors' chosen forum, and Debtors do not oppose J&J's Venue Motion, as the record reflects.

Section 157(b)(5) has been working as Congress intended for over thirty years— transferring state court claims against debtors and non-debtors alike into a single district court in case after case. *See A.H. Robins Co.*, 788 F.2d at 1011 ("The purpose of [§ 157(b)(5)] was, as

30

Congressman Kastenmeier declared, to centralize the administration of the estate and to eliminate the 'multiplicity of forums for the adjudication of parts of a bankruptcy case.'") (quoting 130 Cong. Rec. H 7492, June 29, 1984, *reprinted* in 1984 U.S. Code Cong. & Adm. News at 579); *In re Pan Am. Corp.*, 950 F.2d 839, 843, 845 & n.5 (2d Cir. 1991) (recognizing the congressional purpose described in *A.H. Robins* as "consistent with Congress' desire to eliminate the confusion, delay and inefficiencies associated with the Bankruptcy Act's limited jurisdictional scheme"). If the plaintiffs' bar did not like this result, they should have turned to Congress to change it, but they did not do so, at least not successfully. As it stands, Congress's intent has been manifested clearly in this statute's application—fairly, uniformly, and without controversy—over the years.

## III. This Court Should Exercise Jurisdiction and Decline to Abstain, Consistent with the Legislative Purpose of Section 157(b).

### A. It Is This Court's Province to Determine Jurisdiction.

This Court has exclusive authority to decide the issues raised in the Venue Motion. Indeed, it recently affirmed its power to "consider the transfer of the [talc] cases under § 157(b) regardless of the decisions reached by the state court on transfer and remand issues." D.I. 34 at 6.[50] Ignoring this clear guidance, Plaintiffs launch a salvo of misguided attacks on this Court's authority, attempting to bind it to other courts' transfer and remand decisions.[51]

*First*, Plaintiffs assert that the law of the case doctrine means other courts' remand decisions "command absolute deference," and "this Court may not second-guess those … rulings." D.I. 53 at 2-3. Plaintiffs stretch this doctrine beyond recognition. The law of the case doctrine stands for the idea that "when a court decides upon *a rule of law*, that decision should continue to

---

[50] *See also* Mot. at 20 & n.27 (citing opinions from this District and the Fourth Circuit to the same effect).

[51] Notably, some of the courts that have remanded have done so for reasons that are inapplicable here—different standards under the law of the circuit in which the court sits, no record of insurance, or intra-state consolidated proceedings. As such, these decisions are not only non-binding, as described below, but they should not be considered persuasive precedent.

31

govern the *same issues* in subsequent stages in the *same case*." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (citing *Ariz. v. Cal.*, 460 U.S. 605, 618 (1983)) (emphasis added). It is generally intended to enforce a court's adherence to a superior court's judgment. 866 F.3d at 390; *see also Duffy v. United States*, 835 F. Supp. 1087, 1090 (N.D. Ill. 1993) ("[W]here the issue has been addressed not by a superior court (such as the Court of Appeals) but by a court of coordinate jurisdiction, the non-binding nature of that court's rulings really follows a fortiori."). Further, "[l]aw-of-the-case is a prudential, rather than a jurisdictional doctrine." *Langer v. Presbyterian Med. Ctr. Of Phila.*, 1995 WL 395937, at *4 (E.D. Pa. July 3, 1995). For that reason, "subject matter jurisdiction is not constrained by the law of the case principles." *Duffy*, 835 F. Supp. at 1089; *see also id.* ("Finally, law of the case is a discretionary prudential doctrine in any event, not a limitation on judicial power."). Plaintiffs therefore go too far in claiming that the law of the case doctrine binds this Court to jurisdictional decisions by other courts, in individual cases, which dealt with different issues.[52] Nor were they decisions of a superior court. The law of the case doctrine does not deprive this Court of authority to decide the Venue Motion.

*Second*, Plaintiffs argue that "[f]or cases where the jurisdiction issue has already been decided direct estoppel [*i.e.*, issue preclusion] applies." D.I. 58 at 7 n.8. This too is a massive overstatement. As the two cases cited by Plaintiffs—neither of which deals with § 157(b)(5) or "related to" jurisdiction—make abundantly clear, issue preclusion can only apply to cases presenting identical issues. In *Pastewka v. Texaco, Inc.*, this District found that it was precluded

---

[52] Specifically, those decisions did not concern a rule of law, but rather jurisdictional issues to which the law of the case doctrine does not apply. Nor did they concern the same issues in the same case, given that J&J's Motion here concerns numerous cases and this Court is the only one that can decide the § 157(b)(5) transfer issue. Even if the transferor district courts could decide the § 157(b)(5) transfer issue (and they cannot, under the plain terms of the statute), different issues apply here in light of the different balance of equitable considerations that comes with considering the Talc Claims in their entirety.

from re-deciding forum non conveniens "where the parties, complaints and legal theories are, for all practical purposes, identical." 420 F. Supp. 641, 646 (D. Del. 1976). Indeed, neither party in *Pastweka* disputed this fact. *Id.* at 645; *see also id.* at 642 n.3. On the "peculiar facts" of that case, the court found it was bound by the prior decision on forum non conveniens, while "emphasiz[ing] that not every discretionary determination [such as this] will necessarily preclude a second court from reconsidering the issue." *Id.* at 646. In *Kitces v. Wood*, the other case cited by Plaintiffs, the court also repeatedly stressed how the issues between the two cases were identical. 917 F. Supp. 338 (D.N.J. 1996). And like in *Pastewka*, it was "undisputed" that the identical issue had already been resolved. *Id.* at 341. For this reason, and because its jurisdiction was "co-extensive with and no greater than that of a New Jersey state court," the court found preclusion. *Id.* at 342-43. Both of these cases are inapt. J&J's Motion does not present indisputably identical issues, to a court with coextensive jurisdiction, in the hope of achieving a different result. It presents the issue of whether this Court—the only one with authority to decide § 157(b)(5) transfer—should centralize thousands of claims. No other court can decide this issue, nor have they.

*Finally*, Plaintiffs argue that if this Court transfers remanded State-Court Talc Claims pursuant to its acknowledged authority under § 157(b)(5), it would violate the Anti-Injunction Act. D.I. 57 at 6-8. The statutory provision Plaintiffs cite is facially inapplicable. It provides, "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Plaintiffs fail to explain why § 157(b)(5) transfer should be deemed "an injunction to stay proceedings in a State court." Nor do they cite any case law applying the Anti-Injunction Act in the § 157(b)(5) context. Nor do they adequately explain why the requested transfer, which would necessarily be predicated on a finding of "related to"

33

jurisdiction under 28 U.S.C. 1334(b), is not therefore authorized by statute and necessary to aid this Court's jurisdiction. The Court should reject this unsupported argument.[53]

Plaintiffs' attempts to undercut this Court's authority over the issues raised in the Venue Motion are misguided. Their arguments not only fail on their own terms, but are contradicted by (i) this Court's own recent recognition of its authority (*see* D.I. 34 at 6), and (ii) relevant precedent in which claims have been transferred under § 157(b)(5) even after they were remanded to state court (*see* Mot. at 20 & n.27).

### B. *Mandatory Abstention Does Not Apply Here.*

Plaintiffs' briefs jump right into the mandatory abstention analysis, giving short shrift to the threshold question of whether it applies in the first place. It does not. As explained in the Venue Motion (p.15 & n.23), the mandatory abstention analysis is irrelevant because the claims at issue fall under the explicit statutory exemption for "personal injury tort or wrongful death claims." *See* 28 U.S.C. §§ 157(b)(4), (b)(2). While Plaintiffs claim that a phrase in the exemption, "against the estate," means it cannot apply to related claims against non-debtors such as J&J, they cite no controlling authority to that effect. Their ultimate position is telling: although relevant authority (including from this District and within this Circuit) supports J&J's position, Plaintiffs think there are some "better reasoned" cases out there. D.I. 49 at 15-16; *see also* D.I. 46 at 16; D.I. 53 at 16-17 n.15; D.I. 57 at 15-16 & n.13; D.I. 58 at 15-16. Plaintiffs are wrong.

As to their "better reasoned" cases, Plaintiffs cite a handful of distinguishable, mostly out-

---

[53] Plaintiffs similarly argue that district courts should be allowed to decide any remand motions first. D.I. 57 at 4-6; D.I. 58 at 4-7. This argument apparently misunderstands the issues before this Court—Plaintiffs separate the issues of § 1334(b) "related to" jurisdiction and § 157(b)(5) transfer, contending that the former should be decided individually (and inconsistently) by numerous district courts, while the latter should be decided by this Court. Such a bifurcation is illogical and inconsistent with how courts have adjudicated § 157(b)(5) transfer. What's more, this argument relies on cases suggesting that, where a remand motion and a 28 U.S.C. § 1404 or § 1412 transfer motion are pending concurrently *before the same court*, the remand motion may be decided first. That is not the case here.

WEIL:\97035373\22\54966.0222

of-circuit opinions that do not warrant this Court's deference. Many of these opinions address the issue only in dicta, *after* they have already disposed of the matter with a finding of no "related to" jurisdiction—meaning the court has already determined that the claims are not "against the estate." *See, e.g.*, *Fed.-Mogul*, 282 B.R. at 313 (finding that defendants' argument about the statutory exemption from mandatory abstention "must rise and fall on the same argument as their claim of related-to jurisdiction," and "the Court has already rejected the [related-to] proposition").[54] None of Plaintiffs' cases overcome the statutory exemption from mandatory abstention that applies here. This is particularly true because the exemption should be read broadly in light of Congress's recognition of the "potentially deleterious effects on a debtor's estate" that may be caused by "the unpredictable and substantial verdicts that are often produced in personal injury tort and wrongful death claims." *Beck v. Victor Equip. Co.*, 277 B.R. 179, 180–81 (S.D.N.Y. 2002).

## C. Even If Mandatory Abstention Applied, the Requisite Factors Are Not Met.

To the extent this Court determines that a mandatory abstention analysis attains notwithstanding §§ 157(b)(4) and (b)(2), the requisite factors are not all met. Two of the mandatory

---

[54] The excerpt from *Federal-Mogul* that Plaintiffs quote is misleading because it omits this context. The *Federal-Mogul* court never ruled on whether mandatory abstention generally applies to claims against non-debtors in the § 157 context. *See also Lichtenfels v. Electro-Motive Diesel, Inc.*, 2010 WL 653859, at *6 (W.D. Pa. Feb. 22, 2010) (discussing mandatory abstention in the abstract, and assuming *arguendo* it had not already resolved the "related to" issue against the defendant, while noting that such questions "cannot truly be resolved until the 'related to' jurisdiction question is answered"); *Desimone Hospitality Servs., LLC v. W. Va.-Am. Water Co.*, 2015 U.S. Dist. LEXIS 168714, at *19-23 (S.D. W.Va. Dec. 17, 2015) (discussing mandatory abstention—and acknowledging contrary authority—after concluding there was no "related to" jurisdiction); *Nase v. TECO Energy, Inc.*, 2010 U.S. Dist. LEXIS 36409, at *13 n.7 (E.D. La. Mar. 9, 2010) (only referencing mandatory abstention in a footnote without applying it—instead basing the decision on equitable remand and *permissive* abstention); *Wingate v. Insight Health Corp.*, 2013 U.S. Dist. LEXIS 67358, at *14-15 (W.D. Va. May 10, 2013) (finding mandatory abstention applied but explicitly distinguishing cases where, as here, claims were effectively against the estate because "the debtor and the third party had negotiated an indemnification agreement"); *Broyles v. U.S. Gypsum Co.*, 266 B.R. 778, 784 (E.D. Tex. 2001) (without analysis or reference to any case law, stating that the mandatory abstention exemption did not govern "[t]he instant case, which primarily seeks enforcement of a settlement agreement resulting from a tort action, [and] is not under title 11").

35

abstention factors are disputed.[55] First, as J&J explained in the Venue Motion, the state courts cannot timely adjudicate the thousands of Talc Claims filed all across the country. Mot. at 16.[56] Plaintiffs' only responses are confused and self-contradictory. They cite cases and make straw man arguments regarding the ability of a *bankruptcy* court versus a state court to adjudicate claims (D.I. 37 at 4-5; D.I. 46 at 15; D.I. 49 at 14; D.I. 53 at 17)—even though the Venue Motion seeks centralization in the District of Delaware, not the bankruptcy court. Worse, they contend there is no evidence that state courts cannot timely adjudicate the Talc Claims, even while arguing elsewhere that such claims "have been *pending for years* in state courts." D.I. 46 at 15 (emphasis added); *see also, e.g.*, D.I. 49 at 18 (Talc Claims have been pending in state courts "*for many years*" (emphasis added)); D.I. 58 at 16 ("Responding Plaintiffs' lawsuits were already pending in State court *long before* the Debtor filed…" (emphasis added)). Plaintiffs cannot have it both ways. Unless they believe it is "timely" for cases to remain pending for "many years," Plaintiffs have effectively conceded that the timely adjudication factor is not met, and mandatory abstention fails for that reason alone.

Mandatory abstention also fails because the vast majority of the removed State Court Talc Claims could have been brought in federal court pursuant to diversity jurisdiction. Mot. at 16 & n.24. Plaintiffs do not, and cannot, contest this fact.[57]

---

[55] Plaintiffs misstate that J&J challenges only one factor, timely adjudication. D.I. 46 at 14-15; D.I. 49 at 14. The Venue Motion, however, openly challenged the notion that the State Court Talc Claims could not have been brought in federal court. Mot. at 16 & n.24.

[56] *See also, e.g.*, Theodore Eisenberg et al., *Litig. Outcomes in State & Fed. Courts: A Statistical Portrait*, 19 SEATTLE U. L. REV. 433, 434 & Tables 6-7 (1996) (depicting how, for tort cases, federal courts historically move more quickly than state courts with respect to almost every type of disposition—with an even more profound difference for trials).

[57] Instead, as discussed *supra* in footnote 55, Plaintiffs mischaracterize the Venue Motion in order to avoid this argument. The only brief to address J&J's argument also does not contest that diversity jurisdiction would exist for most plaintiffs' claims—it merely argues that J&J should submit further proof of such. D.I. 58 at 15-16. It cites *W.K. v. Fifth Third Bank, Inc.*, 2012 U.S. Dist. LEXIS 73176 (W.D. Ky. May 25, 2012), for this argument. But *W.K.* involved a bona fide dispute over whether the amount in controversy exceeded $75,000 (and citizenship was

36

### D.     This Court Should Decline to Permissively Abstain.

Where a court has "related to" jurisdiction in the § 157(b)(5) context, a presumption against § 1334(c)(1) permissive abstention exists. Mot. at 16-17 & n.25. That is because abstaining in this context would "undercut the statutory purpose" and abdicate the "virtually unflagging obligation" to exercise jurisdiction. *Beck*, 277 B.R. at 181; *Nutraquest, Inc.*, 2004 U.S. Dist. LEXIS 29143, at *43. Thus, permissive abstention should be "rarely invoked" in circumstances like these. *Beck*, 277 B.R. at 181. Plaintiffs ignore the effect of this strong presumption against abstention here.[58]

Five permissive abstention factors are in dispute:[59] (i) the effect on the efficient administration of the estate; (ii) the relatedness of the claims to the estate; (iii) the right to a jury trial; (iv) the burden on the court's docket; and (v) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping.  Overall, they weigh against abstention.

### *Efficient Administration of the Estates*[60]

The parties agree this factor is particularly important but disagree on which direction it points. *See* D.I. 49 at 16. As described in the Venue Motion—and as courts have repeatedly found in this very context[61]—aggregation of the Talc Claims here would lead to manifest efficiencies

---

undisputed). The vast majority of plaintiffs here cannot legitimately dispute either ground for diversity jurisdiction.

[58] The only brief that attempts to address it simply says that some courts have denied § 157(b)(5) transfer where a non-debtor had requested it and the debtor opposed it. As discussed *supra* in Section II, however, it is not necessary that the debtor request § 157(b)(5) transfer, and Imerys has not opposed it.

[59] While one brief states (without citing any support) that the 'difficulty of state law' factor favors Plaintiffs because "[e]ach case presents complicated state law issues" (D.I. 49 at 19), elsewhere Plaintiffs recognize that this factor favors J&J "[c]onsidering the well-settled nature of state product liability law." D.I. 53 at 19. J&J agrees. The other factors also support J&J or else are neutral.

[60] Citing *G-I Holdings, Inc. v. Ashland, Inc.*, 2017 U.S. Dist. LEXIS 68891, at *34 (D.N.J. May 5, 2017), Plaintiffs suggest that J&J improperly conflates considerations of efficient adjudication and the effect of the claims on the bankruptcy estate. D.I. 58 at 20. But that case explains only that these factors raise separate considerations—precisely as J&J articulates here and in the Venue Motion. Mot. at 17-18.

[61] *See, e.g.*, *In re Nutraquest*, 2004 U.S. Dist. LEXIS 29143, at *45 (finding abstention improper because "[t]he centralization of all personal injury and wrongful death claims [including those

37

with respect to these claims that intrinsically affect the bankruptcy estates. Mot. at 17-18. J&J's goal and express intent is to streamline the Talc Claims' adjudication and prevent disparate outcomes, for example by holding a single general causation hearing and setting bellwether trials. Such benefits would redound to creditors like plaintiffs, Debtors themselves, as well as J&J. This factors weighs strongly in favor of § 157(b)(5) transfer.

None of Plaintiffs' arguments to the contrary holds water. *First*, they contend that the State Court Talc Claims involve different facts and state-law claims, which would render centralization inefficient. D.I. 37 at 6 n.6; D.I. 46 at 16-17; D.I. 53 at 18; D.I. 58 at 18. Only one of Plaintiffs' briefs even attempts to offer examples, claiming that this Court would have to "conduct[] individual trials *ad infinitum*" because of variation in "[t]he substantive law on causation," "damages," "non-parties and liability," and "differences in the exposure histories" of plaintiffs. D.I. 37 at 6 n.6. This parade of horribles is ill-conceived and disproven by the fact that thousands of state-law claims are currently centralized in the MDL court. As a threshold matter, this Court could centrally resolve the important question of whether the allegations that Debtors' talc, as supplied to J&J, causes mesothelioma are grounded in sound science; an issue that will be

---

against non-debtors] will assist in 'developing a reasonable plan of reorganization' or orderly plan of liquidation 'and at the same time assure fair and non-preferential resolution of outstanding claims'") (quoting *In re Dow Corning*, 86 F.3d at 496); *New Eng. Compounding*, 496 B.R. at 273 (finding abstention would be "counterproductive" to judicial efficiency and the fair and efficient distribution of the estate); *In re Montreal Me., Ltd.*, 2014 WL 1155419, at *12 ("[J]udicial economy and efficiency concerns … weigh in the determination to retain jurisdiction"); *Pan Am. Corp.*, 950 F.2d at 845 (describing the "manifest purpose of 157(b)(5)" as "consistent with Congress' desire to eliminate the confusion, delay and inefficiencies associated with the Bankruptcy Act's limited jurisdictional scheme"); *see also In re Dow Corning*, 86 F.3d at 497 (fixing venue for claims against nondebtor defendants under § 157(b)(5) will "further the prompt, fair, and complete resolution of all claims 'related to' bankruptcy proceedings, and harmonize Section 1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate"); *A.H. Robins Co.*, 788 F.2d at 1011-14 (centralizing thousands of state and federal personal injury cases against debtors and non-debtor co-defendants under 157(b)(5) was "obviously in the interest of the class of claimants as a whole to obviate the tremendous expense of trying these cases [all involving one brand of intrauterine device] separately," and would ensure the "fair and non-preferential resolution of the … claims," as critical to "the development of a reasonable plan of reorganization for the debtor").

WEIL:\97035373\22\54966.0222

determined by the MDL court as to the ovarian cancer allegations in its forthcoming *Daubert* ruling. These gating questions do not raise *a single one* of the supposedly difficult and variegated issues cited by Plaintiffs. Likewise, after determining the threshold issues, this Court could hold or transfer select cases to other federal courts for "bellwether" trials. This, too, would not raise any varied issues. What it would do is avoid the need to address these key, common issues in a piecemeal and duplicative fashion.

*Second*, Plaintiffs argue that centralization of claims against J&J would require them to inefficiently litigate in two fora, because some claims against other codefendants may remain in state court. D.I. 37 at 6; D.I. 46 at 18; D.I. 49 at 1, 18-19. While Plaintiffs characterize this result as "[r]emarkabl[e]," "[i]ncredibl[e]," "strategic" (D.I. 49 at 1, 18), and something "J&J has sought to [do]" (D.I. 46 at 18), it is anything but. The text of § 157(b)(5) dictates this result. The statute speaks in terms of "claims," not "cases." *See* 28 U.S.C. § 157(b)(5). *Cf. Anstine & Musgrove, Inc. v. Calcasieu Ref. Co.*, 436 B.R. 136, 141-42 (D. Kan. 2010) (the "most reasonable and logical" construction of the removal statute for claims related to a bankruptcy is that it governs claims, whereas the ordinary removal statute governs entire actions); *Hall v. Chrysler Grp. LLC*, 2011 U.S. Dist. LEXIS 163683, at *11 (C.D. Cal. Sep. 29, 2011) ("Unlike traditional removals, which are limited to an entire civil action, under the bankruptcy removal statute, 28 U.S.C. § 1452, individual claims may be removed."). Indeed, it distinguishes between the two, twice referring to personal injury and wrongful death "claims," on the one hand, and a bankruptcy "case" on the other. Thus, claims against different defendants—though in the same case and related to the same general allegations—may be split up due to the operation of § 157(b)(5).

For example, in *Montreal Me. & Atl. Ry.*, the wrongful death cases at issue all named various groups of defendants. 2014 WL 1155419, at *1. The court found "related to" jurisdiction

and § 157(b)(5) transfer applied as to claims against some defendants, but not others. *Id.* at *8-10. Nevertheless, the court declined to abstain; rather than finding that the splitting of claims in this manner weighed in favor of abstention, the court found that "[t]he judicial economy and efficiency concerns … weigh in the determination to *retain jurisdiction*." *Id.* at *12 (emphasis added); *see also Dow Corning*, 86 F.3d at 486-87 (each of the non-debtor codefendants filed separate motions seeking § 157(b)(5) transfer of claims against them, as opposed to any one codefendant seeking transfer of actions against all defendants).

J&J did not pursue any nefarious strategy by following the statute's language, and the fact that some claims against other defendants may be litigated elsewhere does not weigh in favor of abstention. Beyond that, many of Plaintiffs' claims against "other co-defendants" proceed along an entirely separate theory of liability—*e.g.*, occupational or "take home" exposure to asbestos— and do not relate to cosmetic talcum powder sold by J&J and mined by Debtors. To the extent Plaintiffs wish to expeditiously adjudicate their claims, they should favor the disposition of threshold issues in one forum, rather than risking disparate outcomes regarding the same product.

*Finally*, Plaintiffs argue that the State Court Talc Claims would progress more efficiently divided among numerous state courts than they would if centralized in this Court. D.I. 37 at 4-5; D.I. 53 at 17; D.I. 57 at 15 & n.12; D.I. 58 at 16. This argument, which defies common sense, has already been refuted in Section III.C *supra*.[62] This factor weighs against abstention.

---

[62] Plaintiffs suggest that "the Third Circuit rejected the idea of efficiency in mass grouping of asbestos cases." D.I. 37 at 6; *see also* D.I. 53 at 20, D.I. 58 at 19. However, they cite a section of *Federal-Mogul* in which the court analogized to *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996), in deciding it would not, in favor of transfer and consolidated adjudication of automotive-related asbestos claims, overlook its conclusion that the district court's denial of "related to" jurisdiction was not worthy of a writ of mandamus, nor that the court had "no jurisdiction over the decision of the District Court denying the transfer and remanding the cases to the state courts from which they came." *Fed.-Mogul Glob.*, 300 F.3d at 390. In *Georgine*, the court would not overlook a class's inability to satisfy Rule 23 class action requirements. 83 F.3d at 617. Here, "related to" jurisdiction *does* exist, and § 157(b)(5) directs this Court to aggregate the State Court Talc Claims. There is no need to overlook anything here.

40

*Relatedness of the Claims to the Estates*

As discussed in the Venue Motion (Mot. at 18) and in Section I *supra*, the claims here are integrally related to Debtors' estates. Assuming the Court reaches a permissive abstention analysis—implying a predicate finding of "related to" jurisdiction—this factor indisputably weighs against abstention.

*Right to a Jury Trial*

Section 157(b)(5) transfer does not jeopardize plaintiffs' jury trial right, because this Court can hold jury trials. Indeed, this provision specifically fixes venue for where "claims shall be *tried*." 28 U.S.C. § 157(b)(5) (emphasis added). Plaintiffs do not dispute this fact, but they nevertheless claim this factor favors abstention. D.I. 49 at 20; D.I. 53 at 19-20. Their only support does not withstand scrutiny. Both cases Plaintiffs cite analyze this factor with respect to the *Bankruptcy* Court for the District of Delaware, not the Delaware *District* Court; they also do not address the § 157(b)(5) context. *See In re Maxus Energy Corp.*, 597 B.R. 235, 250 (Bankr. D. Del. 2019) ("This Court can not conduct trials without the consent of all parties and the district court's designation. . . . Because it would be difficult to sever the claims, this weighs in favor of abstention."); *see also generally Gorse v. Long Neck, Ltd.*, 107 B.R. 479 (D. Del. 1989) (order adopting bankruptcy court's report and recommendation to remand after removal to bankruptcy court). Jury trials do not ordinarily occur in bankruptcy court, so it is no surprise that these two decisions found this factor to weigh in favor of abstention. Plaintiffs' authority has no bearing here, where the Court is not only able to conduct jury trials, but is specifically called out by § 157(b)(5) to do so. This Court also has the ability to transfer cases to other federal courts for jury trials. This factor, too, weighs against abstention.

_____

41

Plaintiffs argue that this factor favors abstention, because the Talc Claims will burden this Court's docket. D.I. 46 at 19; D.I. 49 at 19; D.I. 57 at 15 & n.12; D.I. 58 at 18.[63] Of course, transfer will always add to the transferee court's caseload, but if that were the test, then this factor would invariably weigh in favor of abstention. Instead, courts have considered this factor holistically in terms of whether the matter would impose an "undue" burden. *In re Janssen*, 396 B.R. 624, 637 (E.D. Pa. 2008); *see also In re Castle Cheese, Inc.*, 541 B.R. 586, 597 (W.D. Pa. 2015) ("Because both courts at issue here are busy but capable, this factor does not weigh significantly toward abstaining or refusing to abstain from hearing the lawsuit."). And in *In re Valley Media, Inc.*, the court noted that although it had a heavy caseload, a countervailing consideration was that the party advocating abstention had "presented no facts regarding how long it would take to reach a trial in the state court." 289 B.R. 27, 32 (Bankr. D. Del. 2003). The court ultimately declined to abstain. *Id.* The same rationale applies here, where Plaintiffs have not identified how long it will take for the State Court Talc Claims to reach trial.[64]

Moreover, if the requested relief is granted, J&J will proactively work with the Court and the parties to ensure that any burden to this Court is minimized, and that common threshold issues can be identified, streamlined, and ultimately resolved in an efficient and expeditious manner. For instance, some or all of the following means could be used to relieve any burden on the Court's docket: (i) holding a central hearing on the threshold question whether there is a basis in reliable

---

[63] Notably, their sudden emphasis on the number of State Court Talc Claims here belies their assertions elsewhere that no efficiencies will be gained from centralizing in this District—and as discussed *supra*, the parties agree that the "efficient administration" factor is of primary importance to this analysis. The strong presumption against abstaining in the context of § 157(b)(5) also means that this factor should not be accorded significant (much less decisive) weight. *See A.H. Robins Co.*, 788 F.2d at 1013 ("[I]t is obviously in the interest of the class of claimants as a whole to obviate the tremendous expense of trying these cases separately").

[64] As discussed *supra* in footnote 56, state courts often take longer than federal courts to dispose of cases—especially where jury trials are in question.

science for the claim that talc supplied by Debtors causes mesothelioma; (ii) awaiting the MDL court's *Daubert* ruling as to whether allegations that this talc causes ovarian cancer are grounded in reliable science; (iii) transferring select cases to other federal courts for bellwether trials; and (iv) transferring certain allegedly *in extremis* plaintiffs for expedited trials.[65]

### *Likelihood of Forum-Shopping*

Lastly, Plaintiffs suggest that the Venue Motion represents an attempt to forum-shop. D.I. 46 at 19-20; D.I. 49 at 17, 20; D.I. 53 at 18-19; D.I. 58 at 19-20. They identify three main points that they contend raise an inference of forum-shopping: (i) the Venue Motion does not seek to include the 80% of claims that have already been aggregated in an MDL; (ii) plaintiffs would allegedly face difficulty in litigating here, away from their home states; and (iii) there have been a handful of verdicts against J&J. Each point is misplaced.

*First*, J&J has not acted improperly by excluding the cases in the MDL from the "Talc Claims" it seeks to transfer. The MDL has already achieved the efficiencies that the Venue Motion seeks with respect to non-MDL claims. Indeed, contrary to Plaintiffs' suggestions of impropriety, the Venue Motion makes no secret of this fact. *See* Mot. at 3-4, 19-20. There is simply no reason to include the MDL claims here, given that they have already been centralized for efficient adjudication, with a *Daubert* hearing on key causation questions scheduled for July.

*Second*, Plaintiffs overplay their hand in decrying the hardships of litigating in this Court instead of their home states. They tell the Court it would be "shameful" if plaintiffs had to litigate "hundreds or thousands of miles from home." D.I. 49 at 20. What they do not tell the Court is that a great many plaintiffs were *already doing exactly that*. For instance, among the 29 plaintiffs who

---

[65] Plaintiffs also argue that this Court will be burdened because the State Court Talc Claims implicate different states' laws. D.I. 58 at 18 & n.16. But as discussed *supra* n.59, Plaintiffs admit that there are no difficult or unsettled areas of state law here, and federal courts routinely apply state law.

43

have tried their ovarian cancer claims, *only 6* did so in their home state.[66] A number of the plaintiffs who have tried mesothelioma claims have also been from out-of-state, including a California plaintiff who filed her action in Oklahoma. And out of the cases that have not been tried, over 900 (including the majority of the Talc Claims alleging mesothelioma) sit in a venue other than the plaintiffs' home states. *See* Supp. Nolan Decl. ¶ 6. The thousands of MDL cases are similarly being adjudicated out-of-state for most plaintiffs. Plaintiffs also overstate the burden of litigating in this Court given that discovery is local and much of the litigation, apart from trial, would not require plaintiffs to travel to Delaware. In any event, if plaintiffs chose to bring their claims to trial against Debtors, that trial would likely take place in this Court.

*Finally*, Plaintiffs imply that J&J is fleeing adverse verdicts. *E.g.*, D.I. 53 at 18-19. In reality, plaintiffs have failed to convince juries of the merits of their claims in ten of the thirteen cases tried over the last year. There have been five defense verdicts and findings of no asbestos in J&J's products, five hung juries or mistrials, and only three plaintiff verdicts. Rather than raising an inference of forum shopping, this track record shows that J&J has nothing to flee from. Plaintiffs fail to show forum-shopping.[67]

---

[66] Several of those out-of-state plaintiffs live on the West Coast but prosecuted their case in faraway Missouri. This led to major disruptions in those proceedings arising out of jurisdictional and improper venue concerns. *See* Ex. 25 (Forrest Writ) (preliminary writ of prohibition from the Supreme Court of Missouri ordering the Honorable Rex M. Burlison, Judge, Circuit Court of St. Louis City to show cause why a writ a prohibition should not issue prohibiting Judge Burlison "from doing anything other than vacating the part of [the court's] order of October 15, 2018, denying Relator's motion to dismiss for lack of personal jurisdiction and entering an order sustaining the same").

[67] Certain Plaintiffs also argue that J&J has taken inconsistent positions in opposing consolidation of certain State Court Talc Claims for trial. *See* D.I. 58 at 19-20. These Plaintiffs fail to recognize that the threshold issues this Court has the ability to resolve—and which motivate J&J's Venue Motion—are uniform and amenable to central adjudication; on the other hand, the disparate specific causation issues that arise in any given Talc Claim action are *not* suitable for consolidated trial because they can create confusion and prejudice. J&J has not taken inconsistent positions; the questions at issue are simply different when comparing centralization before *this* Court for the adjudication of threshold issues to consolidation before a state court for ultimate trial. Thus, Plaintiffs' references to J&J's prior oppositions to consolidation are not evidence of forum-shopping.

WEIL:\97035373\22\54966.0222

_Balance of Factors_

When deciding whether to permissively abstain, this Court should balance the relevant factors in light of the strong presumption against abstention in the § 157(b)(5) context. The efficient administration of the estates factor—which the parties agree is of paramount importance—weighs against abstention due to the manifest efficiencies from centralizing thousands of claims and dispensing with key threshold issues.[68] The relatedness of the claims to the estates factor weighs against abstention for the reasons discussed in Section I _supra_. Plaintiffs cannot seriously dispute that the right to a jury trial factor weighs against abstention, when § 157(b)(5) specifically sets the transferee court as the one where the claims shall be tried. As to the burden on this Court's docket, J&J will do everything it can to minimize any such burden. Finally, Plaintiffs' aspersions of forum shopping are contrary to the facts—such that this factor also weighs against them.[69] J&J respectfully submits that the balance tilts away from abstention and requests that this Court exercise its jurisdiction.

## CONCLUSION

For the foregoing reasons and those set forth in J&J's memorandum of law in support of its Venue Motion, this Court should assert § 1334(b) jurisdiction over all Talc Claims and transfer them to this Court for centralized adjudication, pursuant to the express intent of § 157(b)(5).

---

[68] _Cf._ CTC Response to Excess Insurers' Motion, _In re: Imerys Talc America, Inc._, Case No. 19-10289-LSS, D.I. 508 at 22 ("The Adversary Proceeding is _likely to streamline both the issues and the number of parties_ in the California Coverage Action and _reduce the resources ultimately necessary to litigate the case by finally determining the threshold issue_ of who is entitled to the rights (whatever they may be) under the Cyprus Historical Policies.") (emphases added).

[69] As a miscellaneous equitable consideration, Plaintiffs assert that the minority of plaintiffs who do not name Imerys as a defendant would lack standing to pursue any eventual bankruptcy plan. D.I. 57 at 18. This argument misunderstands the bankruptcy proceeding, as a claimant need not have an outstanding lawsuit in order to file a claim and become a potential creditor of the estate.

Dated: May 23, 2019
Wilmington, Delaware

Respectfully submitted,

**DRINKER BIDDLE & REATH LLP**

*/s/ Steven K. Kortanek*

Steven K. Kortanek (Del. Bar No. 3106)
Patrick A. Jackson (Del Bar No. 4976)
Joseph N. Argentina, Jr. (Del. Bar No. 5453)
222 Delaware Ave., Suite 1410
Wilmington, DE 19801-1621
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Steven.Kortanek@dbr.com
Patrick.Jackson@dbr.com
Joseph.Argentina@dbr.com

-and-

WEIL, GOTSHAL & MANGES LLP
Diane P. Sullivan
Marcia L. Goldstein
Ronit J. Berkovich
Rachel A. Farnsworth
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Johnson & Johnson and*
*Johnson & Johnson Consumer Inc.*

WEIL:\97035373\22\54966.0222