IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| IMERYS TALC AMERICA, INC., *et al.*, | ) | No. 19-mc-103 (MN) |
| | ) | |
| Debtors. | ) | |

**MEMORANDUM OPINION**

Steven K. Kortanek, Patrick A. Jackson, Joseph N. Argentina, Jr., DRINKER BIDDLE & REATH LLP, Wilmington, DE; Diane P. Sullivan, Marcia L. Goldstein, Ronit J. Berkovich, WEIL, GOTSHAL & MANGES LLP, New York, NY – Attorneys for Johnson & Johnson and Johnson & Johnson Consumer Inc.

David W. deBruin, GAWTHROP GREENWOOD, PC, Wilmington, DE – Attorneys for Motley Rice, L.L.C., Gori Julian & Assoc. P.C., Simon Greenstone Panatier, P.C., Kazan, McClain, Satterley & Greenwood, and The Ruckdeschel Law Firm LLC

Natalie D. Ramsey, Mark A. Fink, Davis Lee Wright, Laurie A. Krepto, ROBINSON & COLE LLP, Wilmington, DE; Michael R. Enright, ROBINSON & COLE LLP, Hartford, CT; Rachel C. Strickland, Jeffrey B. Korn, Tariq Mundiya, WILLKIE FARR & GALLAGHER LLP, New York, NY – Attorneys to the Official Committee of Tort Claimants

Robert S. Brady, Edwin J. Harron, Sharon M. Zieg, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE – Proposed Attorneys for James L. Patton, Jr., the proposed legal representative for future talc personal injury claimants

Marc R. Abrams, Daniel A. Griffith, WHITEFORD, TAYLOR & PRESTON, LLC, Wilmington, DE; Kevin G. Hroblak, WHITEFORD, TAYLOR & PRESTON, L.L.P., Baltimore, MD – Attorneys for Talc Victim Plaintiffs

Mark L. Desgrosseilliers, CHIPMAN, BROWN, CICERO & COLE, LLP, Wilmington, DE; W. Mark Lanier, Kevin P. Parker, Benjamin T. Major, LANIER LAW FIRM, P.C., Houston, TX – Attorneys for Lanier Law Firm Talc-Asbestos Plaintiffs

Rick S. Miller, FERRY JOSEPH, P.A., Wilmington, DE – Attorneys for Donna and Jerry Farra

Mark L. Desgrosseilliers, CHIPMAN, BROWN, CICERO & COLE, LLP, Wilmington, DE, Robert A. Clifford, Shannon M. McNulty, CLIFFORD LAW OFFICES, Chicago, IL, John F. Kennedy, TAFT STETTINIUS & HOLLISTER LLP, Chicago, IL – Attorneys for Plaintiff Harris on behalf of the Plaintiffs in the Consolidated Cases in the Circuit Court of Cook County, Illinois

July 19, 2019
Wilmington, Delaware

Maryellen Noreika

NOREIKA, U.S. DISTRICT JUDGE:

Before the Court is Johnson & Johnson and Johnson & Johnson Consumer Inc.'s (collectively "Johnson & Johnson" or "Petitioners") motion to fix venue (D.I. 1) in this Court and to transfer approximately 2,400 state court tort cases ("State Court Talc Claims" or "Talc Claims") here pursuant to 28 U.S.C. §§ 157(b)(5) and 1334(b). Numerous parties filed briefs in opposition to the motion. (D.I. 37, 45, 46, 48, 49, 50, 53, 55, 56, 57, 58). For the forgoing reasons, the Court DENIES the motion to fix venue in this district.

## I. BACKGROUND

Roughly 2,400 personal injury and wrongful death actions have been filed against Johnson & Johnson in various state courts across the United States alleging that the Petitioners: (1) are directly liable for placing asbestos-containing talc products into the stream of commerce, (2) failed to warn customers against known risks, (3) breached express and implied warranties, and (4) acted intentionally and/or negligently leading to the development of ovarian and non-ovarian cancers. (D.I. 46 at 7). The talc in Johnson & Johnson products has historically been provided by Imerys Talc America, Inc. ("ITA") (collectively with Imerys Talc Vermont, Inc. and Imerys Talc Canada Inc., the "Debtors"), or their successors in interest.[1] Debtors supplied Petitioners with talc for their products under various agreements. (D.I. 81 at 6). Of significance to this motion, Johnson & Johnson and Debtors' predecessors entered into talc requirements contracts on January 6, 1989

[1] In its reply brief, Johnson & Johnson provides a lengthy history of its talc supply relationships. For the purposes of this motion, the Court need not recount Debtors' various changes in name and corporate forms since 1965, but instead accepts that the Debtors, as the successors in interest of those entities that have provided talc to Johnson & Johnson, have been Johnson & Johnson's nearly-exclusive talc supplier for Baby Powder since 1966 and Shower to Shower since 1967. (D.I. 81 at 5-7). The Court also notes that the entity supplying talc to Johnson & Johnson between 1966 and 1989 was a wholly owned subsidiary of Debtors. (*Id.*)

(“the 1989 Agreement”) and April 15, 2001 (“the 2001 Agreement). (D.I. 2 at 3-4). Each of these agreements included indemnity clauses. Specifically, the 1989 Agreement provides:

> “Seller shall indemnify, defend and hold harmless [Johnson & Johnson] . . . from and against all liabilities arising out of any violation by Seller of any law, ordinance, [or] regulation . . . ***provided however*** that Seller shall not indemnify [Johnson & Johnson] for any such liabilities to the extent that such liabilities arise from (i) the acts or omissions of [Johnson & Johnson]; or (ii) the acts or omissions of Seller which were directed by [Johnson & Johnson].

(D.I. 4, Ex. 2) (emphasis added). The 2001 Agreement similarly provides:

> “Seller shall indemnify, defend and hold harmless [Johnson & Johnson] . . . from and against all liabilities arising out of any violation by Seller of any law, ordinance, [or] regulation . . . ***provided however*** that Seller shall not indemnify [Johnson & Johnson] for any such liabilities to the extent that such liabilities arise from: (i) the acts or omission of [Johnson & Johnson]; or (ii) the acts or omissions of Seller which were directed by [Johnson & Johnson].”

(*Id.*, Ex. 3) (emphasis added).

On February 13, 2019, facing personal injury and wrongful death claims around the country relating to their talc, Debtors commenced voluntary chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware. All talc-related claims against Debtors have been stayed because of the bankruptcy filing. *See* 11 U.S.C. § 362. On April 18, 2019, Johnson & Johnson filed this motion to fix venue arguing that this Court has jurisdiction over the claims pursuant to 28 U.S.C. § 1334(b). (D.I. 1). Contemporaneously with that filing, Johnson & Johnson began filing notices of removal for all State Court Talc Claims, arguing that each should be heard in federal court pursuant to 28 U.S.C. § 1334(b). (D.I. 46 at 8). In the months since removal, the Court is aware that at least 346 of these actions have been remanded back to state courts. (D.I. 92). The Court is not aware of any case in which a federal district judge has

found subject matter jurisdiction over a removed State Court Talc Claim against Johnson & Johnson.

Johnson & Johnson argues that the Court should fix venue for roughly 2,400 tort cases here in the District of Delaware because: (1) 28 U.S.C. § 1334(b) provides the Court with "related to" jurisdiction over the many state law claims because they affect Debtors' estates, (D.I. 2 at 2); and (2) abstention over the State Court Talc Claims is not warranted because "these claims are overwhelming nationwide state courts." (*Id.*). As discussed below, the Court disagrees. Johnson & Johnson has not met its burden to establish that "related-to" subject matter jurisdiction exists over State Court Talc Claims, and, even if it had, this Could would abstain from hearing the roughly 2,400 cases in this district.

## II. DISCUSSION

### A. The Court Does Not Have "Related-To" Subject Matter Jurisdiction Over Talc Claims

"[F]ederal courts are courts of limited jurisdiction and have authority to act only where a statute confers it." *Kaufman v. Liberty Mut. Ins. Co.*, 245 F.2d 918, 919 (3d Cir. 1957); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, before fixing venue, the Court must determine whether subject matter jurisdiction exists over the matters that Petitioners seek to bring before it. *See Stern v. Marshall*, 564 U.S. 462, 479-80 (2011). "[T]he party asserting federal jurisdiction in a removal case bears the burden of showing . . . that the case is properly before the federal court." *Frederico v. Home Depot*, 507 F.3d 188, 193 (3d Cir. 2007) (citing *Samuel–Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004). Here, Johnson & Johnson asserts that subject matter jurisdiction exists over the Talc Claims under the "related to" prong of 28 U.S.C. § 1334(b). Section 1334 provides, in pertinent part, that ". . . the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title

11, or arising in *or related to* cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). With respect to "related-to" jurisdiction, the Third Circuit has adopted an "any conceivable effect" test, stating:

> "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the *outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* . . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984)). Though the language first outlined in *Pacor, Inc. v. Higgins* suggests a permissive and broad test for finding "related-to" jurisdiction, the Third Circuit has repeatedly reiterated that "any conceivable effect" does not encompass scenarios where such an effect would only arise as a result of another lawsuit. *See e.g.*, *id.*; *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004), *as amended* (3d Cir. 2005) ("any indemnification claims against Combustion Engineering resulting from a shared production facility would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for 'related to' jurisdiction."); *In re Fed.-Mogul Glob., Inc.*, 300 F.3d 368, 382 (3d Cir. 2002) ("The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.").

Johnson & Johnson argues that this Court has related to subject matter jurisdiction over the Talc Claims because: (i) the agreements between Johnson & Johnson and Debtors create indemnification obligations that will "immediately impact" the bankruptcy estates; (ii) Johnson & Johnson and Debtors have shared insurance, which will impact the bankruptcy estates; and (iii)

Johnson & Johnson and Debtors share an identity of interest "because a claim against J&J is, in essence, a claim against Imerys." (D.I. 2 at 10-14). The Court disagrees.

### 1. Potential Indemnification Is Not Sufficient to Establish "Related-to" Subject Matter Jurisdiction

Johnson & Johnson fails to demonstrate that the Plaintiffs'[2] lawsuits automatically trigger Debtors' duty to indemnify and defend Johnson & Johnson. To show indemnification sufficient for "related-to" jurisdiction, a party must establish that the "right to indemnification is ***clearly established*** and ***has accrued upon a filing of a civil action***." *See In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) (emphasis added). A right is not clearly established or accrued, however, in a situation where "the 'primary action' . . . would not, itself, result in the indemnification against the debtor." *In re Combustion Eng'g, Inc.*, 391 F.3d at 231. In other words, "where the right to indemnification is contingent on a factual finding in an action not involving the bankruptcy debtor and requires the commencement of another lawsuit to establish that right, there is no effect on the bankruptcy estate and thus no 'related to' jurisdiction." *In re Lower Bucks Hosp.*, 488 B.R. at 314. Indemnification cannot be contingent on the factual findings of subsequent litigation. Thus, if the underlying Talc Claims do not "alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively)," there is no relation to the Debtors' bankruptcy proceedings. *See Pacor, Inc*, 743 F.2d at 994.

Here, Johnson & Johnson fails to make a cogent argument supporting a clearly established and accrued right to indemnification or defense from the Debtors, rather than potential third party claims for such. In the brief accompanying Petitioners' motion to fix venue, Johnson & Johnson

---

[2] As used herein, "Plaintiffs" refers collectively to the roughly 2,400 plaintiffs who filed state court cases against Johnson & Johnson. *See* D.I. 1, Exhibit 1.

makes no argument that it has such a right to indemnification, but instead contends that contractual language automatically vested Debtors with a duty to defend Johnson & Johnson. (D.I. 2 at 11). In Johnson & Johnson's reply brief, it claims that the "right to demand indemnification and defense costs is clearly established." (D.I. 81 at 12). That brief, however, is devoid of any argument that the right to indemnification was vested upon the filing of Plaintiffs' claims.

The indemnification provisions in the 1989 Agreement and 2001 Agreement each state "[Debtors] shall indemnify, defend and hold harmless [Johnson & Johnson] . . . from and against all liabilities arising out of any violation by Seller of any law, ordinance, [or] regulation . . . provided however that Seller shall not indemnify [Johnson & Johnson] for any such liabilities to the extent that such liabilities arise from (i) the acts or omissions of [Johnson & Johnson]; or (ii) the acts or omissions of Seller which were directed by [Johnson & Johnson]." (D.I. 4, Ex. 2-3). Each of these provisions is set forth in its own "indemnification" paragraph and includes clear qualifications that must be met before each applies. First, Johnson & Johnson's right to indemnity from Debtors arises only when it is facing liability based on a violation of law, ordinance, or regulation by Imerys. *Id.* Second, Johnson & Johnson has no right to indemnification from Debtors if the liabilities relate to the acts or omissions of Johnson & Johnson or those directed by Johnson & Johnson. *Id.* Petitioners' brief notes these contingencies by stating, "[s]hould plaintiffs secure favorable verdicts, in addition to J&J's claims for defense costs, its claims for indemnification will crystalize against the estates." (D.I. 81 at 13 n.24). That Johnson & Johnson offers it *may* have "claims for" – as opposed to a "right to" – indemnification, signals that the indemnity is neither accrued nor vested. The Court agrees with Judge Kearney from the Eastern District of Pennsylvania that "[t]his qualified language does not evince the parties' intent to extend automatic indemnity where Johnson & Johnson's own acts or omissions are the subject of

litigation." *See Kleiner v. Rite Aid Corp.*, No. 19-1700, 2019 WL 2462967, at *6 (E.D. Pa. June 11, 2019). Should any of the Plaintiffs succeed against Johnson & Johnson in Talc Claims cases, an indemnification from Debtors would still be contingent upon findings that Johnson & Johnson's liabilities arose from a violation of law by Debtors and did not arise from the acts or omissions of Petitioners. Because such contingencies exist, a right to indemnification is not clearly established or vested at the onset of the Talc Claims, but is instead dependent upon fact finding in an ancillary proceeding. For this reason, the Court cannot find that indemnification serves as a basis for related to jurisdiction.

Alternatively, Johnson & Johnson argues that the indemnification provisions impose upon Debtors a separate and unqualified duty to defend Johnson & Johnson against State Court Talc Claims. (D.I. 81 at 18). Johnson & Johnson states "[t]his duty to defend accrues before any factual finding and, certainly before entry of any judgment," and "does not merely pertain to legal obligations that are statutory or regulatory," but "includes the common law, product liability law, as well as the statutory provisions under which plaintiffs bring claims against J&J." (*Id.* at 8, 16). Moreover, Johnson & Johnson contends that the duty is not contingent upon a finding that it has not engaged in or directed misconduct because the exclusionary clause is only directed to indemnification. (*Id.* at 16-17). Specifically, Petitioners claim that because the exclusionary clause states only that Debtor "shall not indemnify [Johnson & Johnson] for any such liabilities" the duty to defend is not so limited.

In support of its position, Petitioners analogize this case to *In re Lower Bucks Hosp.*, in which a district court affirmed the exercise of "related to" jurisdiction over a duty to defend outlined in a contractual provision that stated the debtor would "indemnify and hold harmless" the non-debtor against "any and all claims" arising out of the transaction, except for "malfeasance or

nonfeasance in office, bad faith, gross negligence, willful [sic] misconduct, fraud or deceit.". 488 B.R. at 314-16. In that case, however, the provision at issue also contained language explicitly stating "the [non-debtor] may direct [the debtor] to assume the defense of a claim and any action brought thereon and pay all reasonable expenses incurred therein." *Id.* The court found that "related-to" jurisdiction existed "because the filing of the class action against [non-debtor] had an immediate effect on [debtor's] bankruptcy estate when it triggered [non-debtor's] claim for defense costs against [debtor]." *Id.* at 312. Here, however, the provisions include no language authorizing Johnson & Johnson to direct Debtors to assume the defense of, or pay the costs of defending, a claim once filed.

Instead, Petitioners ask the Court to infer that such an automatic obligation exists because the indemnification provisions include the word defend. Petitioners argue that the exclusionary language "describes the circumstances under which Debtors have no obligation to *indemnify* J&J, not . . . a condition precedent to Debtors; *defense* obligations" and thus "Debtors' duty to defend is not contingent upon a finding that J&J has not engaged in or directed misconduct." (D.I. 81 at 17). The Court disagrees. Johnson & Johnson cannot pick and choose which parts of the indemnity clause it seeks to enforce. While it is true that basic contract interpretation provides that when parties use different language in different parts of a contract the Court should interpret the parties as intending different meanings, it also remains true that the Court should not divorce contract language from its plain context and the intent of the parties.[3] *See Four Oaks Conservation Tr. v. Bianco*, 892 A.2d 258, 259 (Vt. 2006) ("[T]he cardinal rule in construing contracts is the intent of the parties. [W]hen the language of the contract is clear on its face, we will assume that

3 The Court cites to contract law of both Vermont and New Jersey in light of the choice of law provisions located in the 1989 and 2001 Agreements.

the intent of the parties is embedded in its terms." (internal citations and quotations omitted)); *Serico v. Rothberg*, 189 A.3d 343, 350 (N.J. 2018) ("It is well-settled that '[c]ourts enforce contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.").

Here, the supposed "duty to defend" is located in the "indemnity" section of the 1989 Agreement and the 2001 Agreement. If the parties had intended an automatic duty to defend, the Court expects that they would have included language similar to that in *In re Lower Bucks*. Instead, the parties agreed that Debtors would "indemnify, defend and hold harmless" Johnson & Johnson for liabilities relating to violations of law by Debtors. This strongly suggests that there is no stand-alone duty to defend, but instead potential indemnity for defense costs if liability arises from a violation of law by the Debtors. This interpretation is validated by the Petitioners' own briefing on this issue. In the cases removed to this Court by Johnson & Johnson, the Petitioners responded to motions to remand arguing that the related-to jurisdiction arose from "indemnifiable defense costs." *See e.g.*, Defendant Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion to Remand, *McGonigle v. Johnson & Johnson*, No. 19-724 (MN) (D.I. 9). Indemnifiable defense costs, like indemnification generally, are contingent upon the limitations of the exclusionary clauses of the provisions and can only be determined by yet another lawsuit. Moreover, even if the Court were to accept that the exclusionary provisions that follow the "provided however" language did not apply to the alleged "duty to defend," such a duty would ***still*** be contingent upon a finding that liabilities determined in State Court Talc Claims arose from the illegal activity of the Debtors. Because the roughly 2,400 Talc Claims seek to redress the alleged acts and omissions of Johnson & Johnson, rather than those of the Debtors, they do not on their face relate to the wrongdoing of Imerys. Any

determination that the liabilities arising from those cases arises from a violation of law, regulation, or ordinance, as opposed to the same by Petitioner, would necessitate factual findings and adjudication by yet another court. Applying the standard set by the Third Circuit in *Pacor*, the Court cannot find that a primary case between any of the Plaintiffs and Johnson & Johnson will have effect on the Debtors' bankruptcy estate because they are mere precursors to potential third-party claims for indemnification.

**2. Johnson & Johnson Has Failed to Establish that Shared Insurance Further Impacts the Debtors' Estates.**

Johnson & Johnson argues that its shared insurance policies with Debtors – from when the entity was a wholly owned subsidiary of Johnson & Johnson – are sufficient to establish "related to" jurisdiction over the 2,400 cases because "shared policies are considered property of the debtor's estate and prosecution of a claim against a co-insured non-debtor could deplete proceeds available to the debtor reducing assets available to the bankruptcy estate." (D.I. 2 at 12).

In *In re Combustion Engineering, Inc.*, the Third Circuit considered a claim of "related-to" jurisdiction premised upon shared insurance. The Court found there was insufficient evidence in the record to resolve the issue of shared insurance and declined to exercise jurisdiction. In its ruling, the Court noted that "[c]ourts finding 'related to' jurisdiction over claims against non-debtors based in part on shared insurance policies have relied not only on extensive record findings regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor." *In re Combustion Eng'g, Inc.*, 391 F.3d at 226; *see also W.R. Grace*, 591 F.3d at 172. Here, Johnson & Johnson also fails to offer a sufficient record that the terms and operation of the policies establish subject matter jurisdiction. In its opening brief, Johnson & Johnson argues that certain of its commercial general liability and excess liability policies extend to cover affiliated or subsidiary companies, including Debtors. (D.I. 2 at 5-6). It

also argues that under the 2001 Agreement, Debtor was required to "procure and maintain . . . valid and collectible insurance policies," naming Johnson & Johnson as an additional insured. (*Id.* at 6).

Certain Plaintiffs respond that: (1) shared insurance alone is insufficient to support related-to jurisdiction; (2) Johnson & Johnson has failed "to provide the allegedly-shared policies' effective dates, the coverage provided under the policies for the state-court claims, the limits of liability, and the amounts of coverage remaining;" and (3) even so, "the possibility that J&J may deplete insurance to which Debtors might otherwise be entitled is far too thin a reed on which to rest subject matter jurisdiction for over 2,400 state law cases." (D.I. 46 at 12-13; D.I. 53 at 12-13).

In reply, and seemingly to counter the allegation by other courts that "they did not include their allegedly shared insurance policies"[4], Johnson & Johnson submitted four-hundred and thirty-six (436) policies spanning the period of 1966-1986, which it states "cover[] exposures implicating talc sourced from Debtors." (D.I. 81 at 3 n.6). According to the Declaration of John H. Denton, the Director, Corporate Risk Management, at Johnson & Johnson, the total policy limits in the appended documents are at least $1.967 billion. (D.I. 64 ¶¶ 10-30). Beyond basic identification in a declaration, however, Petitioners have provided the Court with scant detail specifying how the policies might apply to claims by each of the many Plaintiffs, whether the policies have been exhausted, or whether Debtors are actually entitled to them. The Court agrees that the blanket submission of old policies is "far too thin a reed" on which to rest subject matter jurisdiction. That Petitioners have included years of insurance policies, as well as declarations from their corporate-representatives, does little to reduce the concerns of the Court about how these policies might

[4] *See Kleiner*, 2019 WL 2462967, at *6.

relate to each of the 2,400 state law claims, if at all. As it stands, Johnson & Johnson asks the Court to accept 436 "true and correct" copies of primary and excess insurance policies for the proposition that this insurance will deplete available funds that could otherwise go towards the Debtors' estate. Though Petitioners supplied the total policy limits from the inception of those agreements, Johnson & Johnson has offered no explanation as to what, if any, portion of those policies remain operative. Should the 436 policies that purportedly cover Johnson & Johnson and many of its subsidiaries and affiliates during a 20-year time frame ending more than 30 years ago already be exhausted – as has been alleged[5] – their former existence would likely have no impact on the Debtors' estate.

Moreover, as it remains unclear whether Debtors would have a duty to indemnify Johnson & Johnson with respect to the State Court Talc Claims, or vice-versa, it is equally uncertain whether these insurance policies would have any effect on the Debtors' bankruptcy estate. In *In re Combustion Eng'g*, the court required evidence of "automatic liability" before a finding could be made that the insurance helped establish "related-to" jurisdiction. No such evidence has been provided here. The Court will not rest subject matter jurisdiction over 2,400 independent state law claims against Johnson & Johnson on insurance policies that Petitioners submitted with a reply brief and for which little information is known. Though insufficient findings for determination of subject matter jurisdiction may generally merit some discovery to further clarify the issue, the Court does not find such discovery excursion necessary given its finding *infra* that abstention is appropriate for these cases.

[5] *See* D.I. 53 at 12 ("J&J ignores the declarant's later statement that Imerys has 'determined that currently available coverage for talc-related litigation may be exhausted in the first half of 2019.'")

### 3. Johnson & Johnson Has Failed to Establish That the Parties Share an Identity of Interest

Petitioners and Debtors do not share an identity of interest sufficient to establish "related-to" jurisdiction. Johnson & Johnson argues that "a claim against J&J is, ***in essence***, a claim against Imerys." (D.I. 2 at 13) (emphasis added). In *A.H. Robins Co., Inc. v. Piccinin,* the Fourth Circuit found that an identity of interest only arises in the "unusual circumstances" where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant." 788 F.2d 994, 999 (4th Cir. 1986). The situation here does not provide such an identity.

Petitioners contend that "[e]ach Talc Claim plaintiff can draw a direct line between the bottles of J&J's talcum powder products allegedly used and the Debtors' talc" and thus "each claim against J&J by its terms directly implicates the Debtors." (*Id.* at 14). Johnson & Johnson's theory of unity of interest rests solely on Debtors' status as a supplier of talc for certain Johnson & Johnson products beginning in 1966. To support this theory, Petitioners cite *In re Dow Corning Corp*., 86 F.3d 482 (6th Cir. 1996) for the proposition that Debtors' role as a supplier creates a unity of interest between the parties. Johnson & Johnson argues that the *Dow* court concluded "related-to" jurisdiction existed over claims against a non-debtor manufacturer of silicone breast implants where the debtor had supplied the silicone materials to the non-debtors. *Id.* at 492, 493-94. The court, however, largely based its conclusions on findings of the corporate relatedness of the debtors and non-debtors[6], that the debtors and non-debtors already had claims pending against

---

[6] The Court highlighted as a competing interest among others "Dow Chemical and Corning Incorporated's interests as shareholders of Dow Corning," as well as the fact that the Debtor filed motions on behalf of it and the shareholders. *See Dow*, 86 F.3d at 486.

one another in the underlying litigation[7], and that the specific claims raised by the tort Plaintiffs' showed an inherent relatedness between the debtors and non-debtors.[8] *Dow* is distinguishable from the situation here, however, given that: (1) there is no corporate relationship between Imerys and Johnson & Johnson; (2) Imerys itself has not indicated that it sees these cases as related to its bankruptcy; (3) Johnson & Johnson, to date, has not filed claims for indemnification against Debtors; (4) and the Plaintiffs' claims relate to the acts and omissions of Johnson & Johnson, not the supply of talc by Debtors thereto.[9] Even to the extent that the Sixth Circuit found that supplier actions could establish "related-to" jurisdiction, the persuasiveness of its finding is limited by the Third Circuit's holding in *In re Combustion Eng'g*, in which the Court noted that it has already

---

7 "According to Dow Corning, Dow Chemical, and Corning Incorporated, the shareholders have asserted 'thousands of cross-claims for indemnity and contribution against Dow Corning in breast implant suits.'" 86 F.3d at 490 n.10.

8 The *Dow* court outlined four categories of claims asserted in the underlying cases that helped to demonstrate a relatedness between the parties:

> "(i) 'Multiple Implant Actions,' which are actions where plaintiffs received implants manufactured by both Dow Corning and one or more of the nondebtors; (ii) 'Supplier Actions,' which involve claims against the nondebtors as manufacturers and claims against Dow Corning as the supplier of silicone materials to the nondebtors; (iii) 'Conspiracy Actions,' which allege that Dow Corning and the nondebtors conspired to defraud the plaintiffs by fraudulently withholding material information regarding the hazards of breast implants; and (iv) 'Form Complaint Actions,' which simply name Dow Corning and the nondebtors as defendants without making any specific allegations of individual wrongdoing."

9 Similarly, Petitioners reliance on *In re TK Holdings, Inc.*, No. 17-11375 (Bankr. D. Del. Aug. 16, 2017) is misplaced because it was the debtors themselves that requested the court temporarily stay tort proceedings against their ultimate corporate parent and others to not "delay, distract from, or disrupt the debtors' intended reorganization strategy" and risk "collateral estoppel and record taint." (D.I. 66, Nolan Decl., Ex 14 at 9, 12 ("TKJP share[d] an identity of interest with the[] debtors by virtue of its relationship within the corporate family."). Here, the Debtors have not referred to these claims as "related to" their bankruptcy and there is no corporate relationship between Debtors and Petitioners.

"rejected 'related to' jurisdiction over third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim did not directly result in liability for the debtor." 391 F.3d at 231. Additionally, the Third Circuit held that "*Pacor*, and not *Dow Corning I*, provides the controlling standard for assessing 'related to' bankruptcy jurisdiction." *In re Combustion Eng'g, Inc*., 391 F.3d at 227.

Here, Johnson & Johnson has failed to establish the hallmarks upon which courts have based an identity of interest. There is no corporate relatedness, no automatic indemnity, no automatic shared or mutual defense obligations, and no automatic liability upon debtor for claims against a non-debtor. Put simply, Debtor cannot be said to be the real party defendant in the State Court Talc Claims against Johnson & Johnson nor are these claims against Johnson & Johnson *in essence* claims against Imerys. For this reason, Johnson & Johnson has failed to establish a unity or identity of identity of interests necessary to invoke federal subject matter jurisdiction.

### B. Even If Subject Matter Jurisdiction Over Talc Claims Existed, the Court Would Abstain from Transferring Those Claims To the District of Delaware

Certain Plaintiffs argue that, even if "related-to" subject matter jurisdiction exists, the Court should exercise its discretion to abstain from fixing venue over these 2,400 State Court Talc Claims. (*See e.g.* D.I. 46 at 14; D.I. 53 at 15; D.I. 87 at 2). The Court agrees that such abstention is appropriate. Section 1334(c)(1) states that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising or related to a case under title 11." 28 U.S.C. § 1334(c)(1). In deciding whether abstention is proper, courts have utilized a twelve-factor test:

> (1) the effect on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues;

> (3) the difficulty or unsettled nature of applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than section 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted 'core' proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence of non-debtor parties.

*In re Mobile Tool Int'l*, 320 B.R. 552, 556–57 (Bankr. D. Del. 2005) (citing *LaRoche Indus. v. Orica Nitrogen LLC*, 312 B.R. 249, 253-54 (Bankr. D. Del. 2004)). The Court need not consider all factors and no one factor is determinative, but instead "should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case." *In re D'Angelo*, 491 B.R. 395, 406 (E.D. Pa. 2013) (citing *Shalom Torah Centers v. Philadelphia Indem. Ins. Companies*, No. 10-6766, 2011 WL 1322295, at *4 (D.N.J. Mar. 31, 2011); *Monmouth Investor, LLC v. Saker*, No. 12-4845, 2010 WL 143687, at *4 (D.N.J. Jan. 12, 2010)).

A review of the factors, and the necessary weighing thereof, counsels the Court that discretionary abstention is proper. Johnson & Johnson seeks to fix venue here for roughly 2,400 state law actions that have been pending for months, if not years, in state trial courts around the country. These cases stand in various procedural postures.[10] The claims before the state courts sound purely in state tort laws relating to personal injury and wrongful death. In many states, the claims are being coordinated and managed by specific judges. In all cases, the state judges have

[10] According to Johnson & Johnson, at least thirteen cases have proceeded through trial to mixed results. (D.I. 81 at 44). Petitioners state "[t]here have been five defense verdicts and findings of no asbestos in J&J's products, five hung juries or mistrials, and [] three plaintiff verdicts." (*Id.*).

intimate knowledge of the parties, the facts at issue, and the state law under which they are to be adjudicated. The actions do not sound in federal law and do not raise diversity jurisdiction. Instead, the only jurisdictional basis for these cases to be heard in any federal court stems from Johnson & Johnson's theory that the matters are "related-to" Imerys's bankruptcy proceedings in the Bankruptcy Court for the District of Delaware. These factors weigh in favor of abstention.

Johnson & Johnson contends that "[n]one of the [state] law is 'difficult, unsettled, or unfamiliar to a federal court.'" (D.I. 2 at 19). While any one state's tort and product liability law may not be unsettled or difficult in nature, the expectation that an undertaking of roughly 2,400 cases under, ostensibly, each of the fifty states' personal injury and wrongful death laws would not be difficult rings hollow. The judges in the states who are already handling these cases are better suited to hear the claims before them than is this Court, which would have to hear thousands of cases and apply different state laws to each. This factor weighs in favor of abstention.

Moreover, the Court is not convinced how, if at all, the fixture of these cases here would benefit the bankruptcy proceeding and provide for a more efficient handling of Debtors' estate. If anything, the transfer of these cases would grind the wheels of justice to a halt, as cases at all stages of development are fixed here and added to an already-busy docket. According to the most recent data provided by the United States Courts, 2,279 civil cases were filed in this district between April 1, 2018 and March 30, 2019. See Administrative Office Of The United States Courts, Table C-3-U.S. District Courts–Civil Cases Commenced, By Nature Of Suit And District, During The 12-Month Period Ending March 31, 2019, https://www.uscourts.gov/statistics/table/c-3/federal-judicial-caseload-statistics/2019/03/31. Dividing that number among the four district judges leaves the undersigned with roughly 550 cases new cases in the last calendar year. To suggest that adding nearly five times that number of cases to the docket, would ***increase*** the efficiency of

handling these issues defies common sense and logic. As noted above, the cases have been pending for months if not years in state courts around the country. To move them here would halt their orderly adjudication while this Court familiarized itself with the unique facts of Plaintiffs' claims and the tort laws of the many states. Should these proceedings eventually have an effect on the bankruptcy estate, the delay would push that effect further down the road, thereby impeding the efficient administration of the estate. These factors weigh in favor of abstention.

Johnson & Johnson further argues that the effort to fix venue in federal court in Delaware is not forum shopping simply because Imerys chose to file for bankruptcy in Delaware. Even assuming *arguendo* that the 2,400 claims "relate-to" the bankruptcy proceeding, the fact remains that Johnson & Johnson seeks to move these pending state court cases to federal court for its own benefit. Without commenting on the wisdom of this strategy, the effort is patently forum shopping. *See In re Fed.-Mogul Glob., Inc.*, 282 B.R. 301, 316 (Bankr. D. Del. 2002) ("the possibility that the movants are forum shopping is too obvious to be belabored. Some jurisdictions have been notoriously unfavorable to asbestos defendants. Movants understandably believe that they would gain an advantage if the claims against them were centralized in a federal court . . . ."). The *In re Fed.-Mogul* court noted that even where certain benefits to the bankruptcy estate may exist, they "do not . . . justify the affront to the state and federal comity inherent in the removal of solvent defendants from ongoing state lawsuits into a federal bankruptcy." *Id.* This factor weighs in favor of abstention.

Lastly, the degree of relatedness between the Plaintiffs' claims and the Imerys bankruptcy is not strong. The connection relies solely on Johnson & Johnson's arguments above relating to duties to indemnify and defend, joint insurance, and identity of interest. In various courts, however, Petitioners have represented that indemnity and insurance were unlikely to be implicated

in the underlying actions. *See Removed State Court Talc Actions v. Johnson & Johnson*, No. CV 19-3080, 2019 WL 2191808, at *3 (C.D. Cal. May 21, 2019) ("Johnson & Johnson represented in its discovery disclosures that its indemnification and insurance agreements were 'unlikely to be implicated' by or were 'not relevant' to the plaintiffs' claims against it."). Because the claims against the Petitioners are about their own conduct – not to violations of law, regulation, or ordinance by Imerys – any resolution of the underlying state court cases would not determine the liability of the Debtor. Further third-party litigation would be required. For this reason, the Court cannot find any significant relatedness between the State Court Talc Claims and Imerys. This factor weighs in favor of abstention.

Reviewing these factors together, the Court finds that even if subject matter jurisdiction existed, it would be both in the interest of justice and the interest of comity with the state courts that this Court exercise its discretion to abstain from merging nearly 2,400 pending state law cases for adjudication here in the District of Delaware.

## III. CONCLUSION

For the foregoing reasons, Petitioners motion to fix venue (D.I. 1) is DENIED. An appropriate order will follow